**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**WAYCROSS DIVISION**

| | |
|---|---|
| CRISTHIAN ZUNIGA HERNANDEZ, LUIS ALFONSO PALMILLAS LOPEZ and RAMON RODRIGUEZ MENDEZ | |
| Plaintiffs, | |
| v. | Civil No. CV 5:23-cv-00023 |
| MARIA LETICIA PATRICIO, ENRIQUE DUQUE TOVAR, JOSE CARMEN DUQUE TOVAR, and MBR FARMS, INC., a Georgia corporation | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT MBR FARMS, INC.'S MOTION TO DISMISS, AND IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiffs submit this Opposition in response to Defendant MBR Farms, Inc.'s ("MBR") Motion to Dismiss, and in the Alternative, Motion for Summary Judgment (the "Motion"). As a preliminary matter, MBR's Motion to Dismiss is untimely. Nonetheless, MBR fails to show that Plaintiffs have not adequate pled their causes of action against MBR, nor has it met its to show that there is no dispute of material fact as to Plaintiffs' causes of action.

Plaintiffs have met their burden to show that their pleadings are adequately pled and that there are sufficient disputes of material facts such that a reasonable factfinder could find for Plaintiffs. Specifically, Plaintiffs have shown that MBR and Defendant Enrique Duque Tovar ("Enrique") executed an agreement to bring 84 H-2A workers to the U.S. to work from April to October 2021 at $11.71 an hour or a piece rate of $0.50 per pound. Plaintiffs have also shown that MBR executed this agreement knowing that it did not need that many workers, did not need

workers for that length of time, and that Enrique was taking a cut of the rates promised to Plaintiffs. Plaintiffs have also shown by admissible evidence that MBR witnessed Enrique yelling and berating Plaintiffs while working, and MBR did not intervene. As a result, Plaintiffs have shown that MBR was a participant in the trafficking scheme.

Plaintiffs have also shown that MBR determined the terms and conditions of Plaintiffs' employment such that it is a joint employer.  MBR provided all the tools, determined the hours Plaintiffs and other H-2A workers would work, and provided instruction to the workers through Enrique.  As a result, MBR's Motion should be denied.

## II.    **RELEVANT FACTS**

*Defendants' False Representations the Government*

In 2021, Defendant Enrique Duque Tovar ("Enrique") obtained approval of his H-2A petition.  (SUF ¶ 1).  He represented to the U.S. Department of Labor ("USDOL") and the Georgia Department of Labor  ("GADOL") that he sought to recruit eighty-four workers to perform farm labor related to blueberries.  (SUF ¶ 2.)  He also represented that he would offer the workers an hourly wage of $11.71 an hour and a piece rate of $0.50 per pound.  (SUF ¶ 3.)  The job order required workers to have two months' experience cultivating blueberries.  (SUF ¶ 4.) Enrique also represented that the workers would receive free housing that met local, state, and federal requirements, free weekly trips to a food store and laundry facility, and three meals a day would be provided.  (SUF ¶ 5.)  Enrique also represented that he and his agents would not seek payment from any workers for application fees and recruitment costs.  (SUF ¶ 6.)

Enrique listed Defendant MBR, Inc. ("MBR") as the place of employment for the eighty-four workers.  (SUF ¶ 7.)  Enrique had approached MBR about providing H-2A workers to cultivate  the blueberries on MBR's fields. (SUF ¶ 8.) MBR advised Enrique that it had wanted about 100 workers with two months' experience in picking blueberries. (SUF ¶ 9.)  MBR executed a contract and worker order work stating that it would need an estimated 84 employees and that

employees would receive $11.71 an hour and a piece rate of $0.50 per pound, which Enrique submitted in support of his H-2A petition.  (SUF ¶ 10.) The work order also stated that the employees' duties included all farm labor related to blueberries.  (SUF ¶ 11.)   MBR determined which work was paid an hourly rate and which work was paid piece rate.  (SUF ¶ 12.)   MBR knew when it signed the work order that Enrique would pay himself by taking a percentage of the employee pay rate and piece rate from the migrant workers, that it did not need workers for the whole length of time from April to October, and that did not need 84 workers.  (SUF ¶ 13.)

Defendant Maria Leticia Patricio acted as Defendant Enrique's agent for the purposes of filing and obtaining approval of the H-2A application.  (SUF ¶ 14.)

### Plaintiffs' Recruitment as H-2A workers

Plaintiffs Christhian Zuniga Hernandez, Luis Alfonso Palmillas Lopez, and Ramon Rodriguez Mendez (collectively "Plaintiffs") and are Mexican nationals who entered the U.S. in 2021 under the H-2A program.  (SUF ¶ 15.)  Defendants Enrique and Jose Carmen Duque Tovar ("Jose") told Plaintiffs they would go to the U.S. to perform farm labor related to the cultivation of blueberries.  (SUF ¶ 16.)  Enrique and Jose promised Plaintiffs they would earn at least $11.71 an hour and $0.50 per pound for performing farm labor related to cultivating blueberries.  (SUF ¶ 17.)  In exchange for the Plaintiffs coming to the U.S. to work as farm laborers, Defendants Enrique and Jose required Plaintiffs to pay fees for transportation, obtaining the Visa, and recruitment fees. (SUF ¶ 18.)

### Plaintiffs' Working Conditions in the U.S.

Contrary to the work order and Defendants' representations, when Plaintiffs entered the U.S., they first started working packing pine straw.  (SUF ¶ 19.)  Enrique then transported plaintiffs to work on blueberry fields for MBR on MBR's blueberry farm.  (SUF ¶ 20.)  Plaintiffs' duties while working in the blueberry fields included cultivating blueberries by hands or using a machine harvester, removing debris and trash from the blueberry fields, loading and unloading crates filled

with blueberries, and pulling weeds. (SUF ¶ 21.) All the equipment Plaintiffs used to cultivate the blueberries, including the mechanical harvester, were provided by MBR and not owned by Enrique. (SUF ¶ 22.) MBR also provided Plaintiffs water and portable toilet facilities. (SUF ¶ 23.) MBR also arranged for the blueberry packing shed, which was owned by the uncle of MBR's CEO, to provide the crates the workers' filled with MBR's blueberries and the pallets the crates rested on. (SUF ¶ 24.)

While working in the blueberry fields, Plaintiffs saw MBR manager Bobby Garrity and MBR CEO Bart McKinnon on the premises speaking with Enrique. (SUF ¶ 25.) Enrique informed the Plaintiffs that Bobby Garrity and Bart McKinnon were MBR' owners. (SUF ¶ 26.) After speaking with McKinnon or Garrity, Enrique informed the Plaintiffs that the owners wanted the Plaintiffs to perform specific tasks including cutting the ripe blueberries a specific way, picking specific sections of the blueberry field, pulling weeds from certain section of the fields, or asking workers to work the machine harvester or make repairs to it. (SUF ¶ 27.) MBR instructed Enrique to tell workers to stop working if there was rain or not enough crates. (SUF ¶ 28.) When Plaintiffs wanted to leave work for the day, Enrique told the workers that the owners wanted all their produce harvested before the workers could leave. (SUF ¶ 29.)

Enrique would often yell and berate the workers working in the blueberry field, threatening to deport them or report them to immigration if they complained about their working conditions. (SUF ¶ 30.) The blueberry farm owners were present and saw Enrique yelling at the workers. (SUF ¶ 31.) Enrique's son was also present on the fields and carried a firearm to ensure workers did not run away. (SUF ¶ 32.)

*Plaintiffs' Pay and Deductions*

Despite Defendants' promise to pay $11.71 an hour or $0.50 per pound, Plaintiffs' received wages that were much lower. (SUF ¶ 33.) Additionally, Plaintiffs did not receive any wages at all for some weeks despite working. (SUF ¶ 34.) Defendants did not provide pay stubs and paid

Plaintiffs in cash. (SUF 35.)  Defendants deducted fees from Plaintiffs' wages for transportation and rent.   (SUF ¶ 36.)   Enrique also announced to all the workers that he would be charging all the workers a $1,000 fee for transporting them to the U.S. (SUF ¶ 37.)

### Plaintiffs Housing Conditions

Defendants housed Plaintiffs and other H-2A workers in trailers with no heating or air conditioning, leaking roofs, no beds, and nonworking stoves and refrigerators.  (SUF ¶ 38.) Defendants did not provide Plaintiffs with the promised three meals a day week and charged Plaintiffs for transportation to the laundry facility, grocery store, and to the worksites. (SUF ¶ 39.)

### Enrique's Abuse of the H-2A workers

When Plaintiffs complained about working conditions, Enrique told Plaintiffs that they had no rights in the United States, that he would report workers to immigration authorities to get them deported, or that he would report workers to the consulate and they would never be able to come back to the United States. (SUF ¶ 40.) Enrique and Jose also took Plaintiffs' passport and visa documents.  (SUF ¶ 41.)

In response to Enrique taking Plaintiffs' documents, Plaintiff Lopez called 911 to report that Enrique had taken their passport and visa documents. (SUF ¶ 42.)  Enrique spoke to the police, and they left.  (SUF ¶ 43.)   After the police encounter, Enrique told Plaintiffs that they have no rights in America and that he had influence over the police.  (SUF ¶ 44.)

Following the encounter with the police, Enrique then took Plaintiff Mendez to the woods because Mendez told Enrique in front of other workers that Enrique was required to give Plaintiffs and other workers their passports and visas.  (SUF ¶ 45.)   He then held Plaintiff Mendez by the collar and pushed him to the ground.  (SUF ¶ 46.)   Enrique was drunk and asked Mendez "where do you get these things you're saying?" (SUF ¶ 47.)

Plaintiffs eventually reached a breaking point and escaped after a few months of working for Defendants due to the poor working and housing conditions.  (SUF ¶ 48.)

*Defendants Enrique, Jose, and Patricio Are indicted.*

On October 5, 2021, Defendants Enrique, Jose, and Maria Leticia Patricio were indicted by the U.S. government for money laundering, human trafficking, wire fraud, among other charges. *See United States v. Maria Leticia Patricio*, No. 5:21-cr-00009-LGW-BWC (S.D. Ga. Oct. 15, 2021), ECF No. 3 (the "Indictment"). The criminal case against Enrique and Jose is still ongoing.

*Plaintiffs' Complaint*

On April 4, 2023, Plaintiffs filed their complaint against Defendants for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and Georgia statutory and common law.

## III.  <u>SUMMARY JUDGMENT STANDARD</u>

"Summary judgment may be granted only if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law. A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (alteration in original) (quotations omitted). "When considering a motion for summary judgment, . . . courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party[,] and when conflicts arise between the facts evidenced by the parties, [courts must] credit the nonmoving party's version." *Valentin v. 1245, LLC*, 2023 WL 3318390, at *1 (11th Cir. May 9, 2023) (quotations omitted). "Summary judgment is only appropriate if a case is so one-sided that one party must prevail as a matter of law." *Quagga*, 814 F.3d at 1235.

VP/#67586537.1

IV.    **ARGUMENT**

A.    **MBR's Motion to Dismiss is Untimely and Should Not Be Considered.**

As a preliminary matter, MBR's Rule 12(b)(6) motion to dismiss is untimely, as it was filed long after MBR filed its answer. *Newton v. Huffman*, 2015 WL 5042253, at *8 (S.D. Ga. Aug. 25, 2015). Because it is untimely, the Court should consider only the motion for summary judgment and apply the summary judgment standard of review. *Nowak v. Lexington Ins. Co.*, 464 F. Supp. 2d 1248, 1249 (S.D. Fla. 2006).

B.    **Plaintiffs State a Claim Against MBR for Violations of the Trafficking Victims Protection Act, and the Evidence Supports Plaintiffs' Claim.**

In its Motion, Defendant MBR misconstrues Plaintiffs' Complaint and misinterprets the TVPA. At a minimum, Plaintiffs adequately plead their TVPA claims against MBR, and there are material disputed facts going to MBR's liability for the TVPA violations.

As a threshold matter, MBR appears to take issue with Plaintiffs' pleading of separate counts under the TVPA through the civil remedy set forth in 18 U.S.C. § 1595(a). However, § 1595(a) provides a private right of action for all violations of Article 18, Chapter 77 of the U.S. Code. *Id.* (allowing a civil action to "an individual who is a victim of a violation of this chapter" (emphasis added)). Therefore, it was appropriate—and consistent with how plaintiffs plead TVPA violations in other civil litigation—to plead multiple TVPA counts. *See, e.g.*, *Bates v. Sequel Youth & Fam. Servs., LLC*, 2024 WL 3316989, at *5, 11 (N.D. Ala. July 5, 2024) (Plaintiffs plausibly stated claims for violations of 18 U.S.C. §§ 1589, 1590, and 1594(a) through the civil remedies provision of 18 U.S.C. § 1595(a).)

MBR claims Plaintiffs did not sufficiently plead TVPA violations against it and thus does not share liability for the Plaintiffs' TVPA-related injuries. MBR is incorrect. First, weighing the evidence in Plaintiffs' favor, MBR conspired with the other Defendants to violate the TVPA under section 18 U.S.C. § 1594(a), even if it was not a direct perpetrator of the underlying crimes.

Second, MBR knowingly benefited from its participation in a venture with the other Defendants—or at a minimum with Defendant Enrique Duque—MBR knew or should have known was engaged in the enumerated TVPA crimes in violation of 18 U.S.C. § 1595(a). Plaintiffs sufficiently made these allegations against MBR in their Complaint, and Plaintiffs' deposition of MBR's corporate witness, MBR's contract with Enrique Duque, and Plaintiffs' declarations, provided significant evidentiary support for these allegations.

### 1.    Forced Labor

MBR first attacks Plaintiffs' Complaint, alleging Plaintiffs "merely recite 18 U.S.C. § 1589(a) instead of alleging how the purported violations took place." (SJ Br. at 10.) MBR then quotes only three paragraphs in the Complaint (¶¶ 195–197)—all in Plaintiffs' recitation of Count I (forced labor)—ignoring the preceding fact allegations entirely. (*See* Compl. ¶¶ 54-183 (detailing the labor trafficking scheme)). MBR then falsely claims that the "formulaic recitation" is the extent of Plaintiffs' TVPA pleading.  (SJ Br. at 10–11.)  As set forth below, this is misleading.

In the first sentence of the Complaint, Plaintiffs identify Defendants Maria Leticia Patricio, Enrique Duque Tovar, Jose Carmen Duque Tovar, and MBR Farms, Inc. as the "Traffickers." The Complaint then details the facts supporting the TVPA claims against the Traffickers:

- Recruitment and Deception:
  - The Traffickers, through fraudulent recruitment practices, misled the Plaintiffs and other H-2A workers about the terms and conditions of their employment in the United States. The workers were promised good wages and decent working conditions, but upon arrival, they found the reality to be vastly different (¶ 54-96).

  - Specifically with respect to the 2021 season, when MBR directly contracted with Enrique Duque to obtain H-2A workers,

    - The 2021 Job Order submitted by the defendants, including MBR Farms, was used to obtain H-2A workers. This job order falsely represented the nature of the work, the pay, and the working conditions the workers would receive. The Defendants claimed that the workers would be engaged in harvesting blueberries and other related tasks, but the conditions described in the job order were not reflective of the reality the workers faced upon arrival, and the workers were forced to do work completely outside the Job Order. (Compl. ¶¶ 82-96.)

- ▪ The Job Order promised workers would be paid $11.71 per hour. However, in practice, the workers were often paid far less than this amount. The Defendants, including MBR, did not ensure that the workers received the hours or wages promised in the job order, resulting in significant financial hardship for the workers. (Compl. ¶¶ 86-94.)

- ▪ The Job Order also required that the workers be provided with transportation, housing, and meals, or cooking facilities. The Defendants failed to meet these requirements. Workers were often transported in unsafe vehicles, housed in overcrowded and unsanitary conditions, and not provided with adequate food or cooking facilities, all in violation of the job order's terms. (*Id.*)

- ▪ The defendants failed to comply with the legal obligations outlined in the Job Order and the H-2A program. These failures include underpaying workers, requiring the workers to perform work outside the allowed scope of the Job Order, and failing to offer the benefits and conditions stipulated in the job order. This non-compliance contributed to the overall exploitation and mistreatment of the workers. (*Id.*)

- ○ The Plaintiffs were recruited under false pretenses and were made to pay exorbitant recruitment fees, travel costs, and other expenses, which were not reimbursed as required by law. This created a situation of debt bondage, as the workers felt compelled to continue working under exploitative conditions to repay these debts. (Compl. ¶¶ 98–131.)

- Substandard Living and Working Conditions:

  - ○ Once in the United States, the workers were housed in overcrowded, unsanitary, and unsafe living conditions. The complaint describes how the defendants provided inadequate housing, which further contributed to the workers' vulnerability and dependency on their employers. (Compl. ¶¶ 132–141.)

  - ○ The workers were forced to work long hours in extreme conditions for little or no pay. Their wages were significantly lower than what was promised, and illegal deductions were made from their paychecks, leaving them with minimal earnings. (Compl. ¶¶ 140–154.)

- Use of Coercion and Threats:

  - ○ The Complaint alleges that the defendants used various forms of coercion to control the workers and prevent them from leaving. This included verbal abuse, threats of physical harm, deportation, and financial ruin if the workers attempted to escape or assert their rights. (Compl. ¶¶ 155–183.)

     ○     The workers were also subjected to assaults and other forms of intimidation, which created an environment of fear and coercion, effectively trapping them in forced labor. (*Id.*)

Therefore, applying the law to these factual allegations, Plaintiffs have more than sufficiently presented facts to support their TVPA claims.

Starting with the fraud in the recruitment process, this may be a component of a forced labor and trafficking for forced labor claim insofar as a trafficker "obtained" the workers through an abuse of legal process. *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1155 (9th Cir. 2022). In *Giles*, the Ninth Circuit reversed a district court's order granting summary judgment to an employer on the plaintiffs' forced labor claims. The Ninth Circuit found the employer's misrepresentations to the workers and the government about the work the plaintiffs would perform was an abuse of the Trade NAFTA ("TN") visa program that placed Plaintiffs in a bait-and-switch situation in which Plaintiffs journeyed from Mexico to Idaho with one set of work expectations, only to be required upon arrival to perform a substantial volume of menial work. As a practical matter, the resulting situation would be expected to, and did, exert substantial pressure on Plaintiffs to go along with providing labor that was very different from what they had agreed and expected to perform. *Id.* at 1154.

In the case at bar, the "bait" was the promise of the work exclusively in blueberries at MBR Farms, wages at the adverse effect wage rate ("AEWR") of $11.71 per hour, and compliance with federal, state, and local laws regarding the terms and conditions of Plaintiffs' employment and housing. Put plainly, the "switch" was not fulfilling any of these promises.

Similarly, recruitment-related fraud that induces a worker go into debt to pay illegal recruitment fees, which "compelled [the worker] to continue working to repay those debts," is a threat of serious harm—specifically financial harm—as defined by 18 U.S.C. § 1589(c)(2). *David v Signal Intern., LLC*, 37 F. Supp. 3d 822, 832 (E.D. La. 2014); *see also Francis v. APEX USA, Inc.*, 406 F. Supp. 3d 1206, 1211 (W.D. Okla. 2019) (finding serious harm under § 1589 where,

inter alia, defendants misled the plaintiffs during the recruitment process and the plaintiffs "could not repay the debts they incurred to secure the employment, or afford travel home.").

Substandard working and living conditions and the verbal and physical abuse and threats also are common threads in TVPA claims. For example, in *Zevallos v. Stamatakis*, 2017 WL 6060623, at \*2 (D. Utah Dec. 6, 2017), the court denied the defendant's motion to dismiss the plaintiffs' TVPA claims based on facts that analogous to Plaintiffs' factual allegations here. *Zevallos* also involved H-2A workers who alleged the defendant violated the terms of the Job Order by providing inadequate housing, paying wages that were lower than the contracted wages, providing insufficient food and drink, verbally abusing the workers, requiring the workers to spend a substantial amount of time doing work that was not included in the Job Order, and confiscating the H-2A workers' passports and visas. *Id.* at \*2. The court determined these facts were sufficient to show the defendant obtained the plaintiffs' labor in violation of § 1589, as well as venture liability under § 1595(a). *Id.* at \*6–7.

Similarly, in *Arreguin v. Sanchez*, 398 F. Supp. 3d 1314 (S.D. Ga. 2019) (Wood, J.), this Court granted H-2A workers' motion for default judgment where, like Plaintiffs here, the workers were required to pay pre-employment recruitment fees and visa costs which were not reimbursed, were not paid the agreed wage or even the minimum wage, were housed deplorable conditions, and were threatened with deportation and told they would not be allowed to return to the United States. *Id.* at 1320, 1324–25. The Court found these allegations established a forced labor claim under 18 U.S.C. § 1589(a)(3) (compelled labor through abuse or threatened abuse of legal process) or § 1589(a)(4) (compelled labor through a scheme intended to make the workers believe they would suffer serious harm or physical restraint). *Arreguin*, 398 F. Supp. 3d at 1324–25; .

Together, Plaintiffs have more than sufficiently pleaded facts supporting, under the totality of the circumstances, their forced labor claim.

2. **Trafficking for Forced Labor**

If a defendant violates the forced labor prohibition in 18 U.S.C. § 1589, it necessarily also violates § 1590 if it "recruits, harbors, transports, provides, or obtains by any means" the worker. *See Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019); *Nunag–Tanedo v. E. Baton Rouge Parish Sch. B.*, 790 F. Supp. 2d 1134, 1146–47 (C.D. Cal. 2011). In their Complaint, and in addition to providing and obtaining Plaintiffs' labor in violation of § 1589, Plaintiffs alleged Defendants transported and recruited them. (*e.g.*, Compl. ¶¶ 27, 120, 155–159, 161.) Further, "by any means" is a catchall that encompasses any manner by which a defendant obtains a worker's forced labor. *See Bazxla v. Chaundhri*, 225 F. Supp. 3d 588, 593–94 (E.D. Va. 2016). Because the Plaintiffs' forced labor claim holds water, they also have sufficiently pleaded their claim that Defendants trafficked them for forced labor in violation of 18 U.S.C. § 1590.

3. **Document Servitude**

If a plaintiff sufficiently alleges a claim for forced labor under § 1589, the plaintiff necessarily states a claim under the document servitude provision of 18 U.S.C. § 1592 if the plaintiff alleges that the defendant, in the course of the § 1589 violation "destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document." *Id.*; *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 29 (D.D.C. 2016) (citing *Nunag-Tanedo*, 790 F. Supp. 2d at 1146–47). Plaintiffs have alleged the Defendants confiscated the Plaintiffs' immigration documents, including passports and visas, under the pretense of needing them for social security. (Compl. ¶ 139.) The actual purpose was to prevent the Plaintiffs from leaving. (*Id.* ¶¶ 162 & 218-219.)

4. **Conspiracy  and Venture Liability**

Plaintiffs will provide more detail about the 18 U.S.C. § 1594(b) conspiracy claim and the 18 U.S.C. § 1595(a) venture liability claim against Defendant MBR in the discussion of MBR's liability, Section B.5.b, *infra*. As a matter of pleading, however, Plaintiffs have sufficiently stated

a claim for both.  To state a claim for conspiracy under § 1594(b), a plaintiff must plead "an agreement to violate" one of the enumerated statutory provisions. *Bates v. Sequel Youth & Fam. Servs., LLC*, 2024 WL 3316989, at *11 (N.D. Ala. July 5, 2024).

Further, it is not necessary to allege that each Defendant knew of every essential detail or participated in every stage of the conspiracy; instead, Plaintiffs must only plead that Defendants "knew of the conspiratorial goal and that [they] voluntarily participated in helping to accomplish that goal. . . . It is the rare case that contains direct evidence of a conspiracy. Instead, "[w]hile mere presence or association with other persons involved in a criminal enterprise is not sufficient to prove participation in a conspiracy . . .  the essential elements of a conspiracy can be proven by inference from the actions of the actors or by circumstantial evidence." *Bates*, 2024 WL 3316989, *11 (citations omitted) (citing, inter alia, *United States v. Brown*, 872 F.2d 385, 390 (11th Cir. 1989) and *United States v. Gianni*, 678 F.2d 956, 959 (11th Cir. 1982)). Here, Plaintiffs have alleged "sufficient facts from which the Court can plausibly infer that an agreement existed between the Defendants." *Baxla v. Chaudhri*, 225 F. Supp. 3d 588, 594 (E.D. Va. 2016).

Plaintiffs specifically allege MBR conspired with the other Defendants in the scheme, (Compl. ¶ 65), and Defendants Maria Patricio and MBR "conspired with the other Defendants by knowingly providing support to the sworn declarations to USDOL in the . . . 2021 Labor Cert[ification] Applications and representations to the GADOL and to the Plaintiffs and other class members in the . . . 2021 Job Order." (Compl. ¶ 153.) The Complaint also alleges conspiracy with respect to each element in the trafficking scheme. (Compl. ¶¶ 158–159, 162, 175.) Further, Plaintiffs allege an intentional agreement between the Defendants to commit the violations of §§ 1589 and 1590  (Compl. ¶ 211); and specifically enumerate Patricio's and MBR's overt acts in furtherance of Enrique Duque's and Jose Duque's violations of §§ 1589 and 1590. (Compl. ¶ 212.)

With respect to venture liability under 18 U.S.C. § 1595(a), Plaintiffs must separately satisfy four separate elements: the defendant "(1) knowingly benefited (2) from participating in a

VP/#67586537.1

venture; (3) that venture violated the TVPRA as to the [plaintiffs]; and (4) the [defendant] knew or should have known that the venture violated the TVPRA as to the [plaintiffs]." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). Unlike a conspiracy claim, a claim for venture liability does not require an overt act. *See Doe v. Patel*, 2020 WL 6121939, at *4 (S.D. Fla. Sept. 29, 2020).

The Eleventh Circuit has adopted the "ordinary meaning" of venture: "an undertaking or enterprise involving risk and potential profit." *Red Roof Inns*, 21 F.4th at 723 ; *see also Patel*, 2020 WL 6121939, at *5 (A venture is a "continuous business relationship."). The same allegations set forth above showing an "agreement" related to Plaintiffs' conspiracy claim, *supra*, including an agreement to be named as a grower in fraudulent submissions to the government, Compl. ¶ 212(b), apply to the Defendants' participation in a venture. Further, Plaintiffs allege MBR and the other Defendants jointly employed the Plaintiffs and other class members, Compl. ¶ 21, and engaged in the racketeering acts through the RICO Enterprises for the purpose of "profit." (Compl. ¶¶ 246, 284.) As for the knowing financial benefit, Plaintiffs have alleged the purpose of the trafficking scheme was "to profit from the fraud Traffickers committed in the contracting, hiring, and employment of Plaintiffs and other class members." (Compl. ¶¶ 246, 284.)

Finally, the Eleventh Circuit has held that the "knew or should have known" prong of venture liability requires actual or constructive knowledge that the venture violated the TVPA. *Red Roof Inns*, 21 F.4th at 725; *Bates*, 2024 WL 3316989, at *8; see also *Patel*, 2020 WL 6121939, at *5 (actual knowledge of the trafficking is not necessary for venture liability). The Eleventh Circuit holds that "knowledge requires '[a]n awareness or understanding of the fact or circumstance,'" *id.*, and "constructive knowledge is that knowledge which 'one using reasonable care or diligence should have.'" *Id.* .  As with the conspiracy claim, Plaintiffs have pleaded both knowledge and constructive knowledge of the TVPA violations. (Compl. ¶¶ 65, 153, 158-159, 162, 175, 211–212.)

**5.**     <u>**MBR's Liability for the Trafficking Scheme**</u>

As set forth above, Plaintiffs' pleading of the forced labor, trafficking for forced labor, and document servitude claims against all Defendants, including MBR, is sufficient. However, if the Court were to determine MBR's summary judgment motion is not premature, the undisputed facts show MBR at a minimum conspired with Enrique Duque, and his co-conspirators Jose Carmen Duque and Maria Patricio, to engage in forced labor and trafficking for forced labor, in violation of 18 U.S.C. § 1594(b). Further MBR "knowingly benefitted . . .  financially or by receiving anything of value from participation in a venture [with Enrique Duque] which . . . [MBR] knew or should have known has engaged in" forced labor and trafficking for forced labor. 18 U.S.C. § 1595(a).

**a.**     <u>**Conspiracy.**</u>

Based on the evidence, when weighed in Plaintiffs' favor, MBR Farms conspired with, at a minimum, Enrique Duque to commit forced labor and trafficking for forced labor. As for the law, Plaintiffs incorporate by reference Section B.4, *supra*, regarding the requirements to show a conspiracy under 18 U.S.C. § 1594(b).

It is undisputed that MBR had an agreement with Enrique Duque to provide obtain labor at MBR's blueberry farm. (SUF ¶ 10.) The question is whether there was an agreement to violate the TVPA. On this, a jury may plausibly infer that MBR Farms "voluntarily participated in helping to accomplish that [conspiratorial] goal." *Bates*, 2024 WL 3316989, at *11. The contract with Enrique Duque and the R. 30(b)(6) deposition testimony shows MBR CEO Barton McKinnon (1) knew he was requesting for more H-2A workers than he needed and for a longer period of time (SUF ¶ 13); (2) paid Enrique Duque an amount for the H-2A workers' labor that necessarily meant the H-2A workers would earn less than the required wage (SUF ¶ 13); and (3) continued to do business with Enrique Duque after he was indicted, but using Enrique Duque's wife as a straw-contractor. (SUF ¶ 49.) Further, the Plaintiffs' declarations show Mr. McKinnon and Bobby

Garrity both witnessed Enrique Duque berating and threatening the H-2A workers but did nothing to intervene or prevent the abuse. (SUF ¶¶ 30–31.)

This scheme and acquiescence "when viewed in a light most favorable to Plaintiffs" is sufficient for a jury to reasonably infer a conspiracy to violate the TVPA.

### b.    Venture Liability

For the same reason the evidence, when viewed in Plaintiffs' favor, supports an inference of conspiracy, it also shows MBR knowingly benefited from participating in a venture it knew or should have known violated the TVPA. 18 U.S.C. § 1595(a). Plaintiffs incorporate their briefing on this subject by reference. *See* Section B.4, *supra*. Again, there is no requirement that MBR committed an overt act to be subject to venture liability. See *Patel*, 2020 WL 6121939, at *4.

There can be no dispute that MBR participated in a venture with Enrique Duque. They had a "continuous business relationship," *id.* at *5, that started no later than January 2021, when they signed the contract to obtain H-2A workers, SUF ¶ 10, and continued through the 2022 season, when MBR engaged the then-indicted Enrique Duque, who MBR knew was using his wife, Sherry Duque, as a front. SUF ¶ 49.

With a venture clearly established, the evidence, when weighed in Plaintiffs' favor, shows MBR at least had constructive knowledge—he would have the knowledge if he used reasonable care, *Red Roof Inns*, 21 F.4th at 725—of the trafficking. As discussed in the conspiracy section, *supra*, MBR contracted with Enrique Duque for far too many workers for far too long. (SUF ¶¶ 10, 13.) Further, the contract indicated MBR had "the right at any time during the working hours to inspect [Enrique Duque's] book [*sic*] and records." (SUF ¶ 11.) However, MBR never did so. (SUF ¶¶ 11.) Having contracted Enrique Duque for 84 workers for seven-month period, though he only had about forty H-2A workers at the blueberry farm during the peak harvest season from April through June, and paying a rate which necessarily meant the H-2A workers would earn below the legally required AEWR, a jury plausibly could find MBR did not exercise reasonable care

-16-

when it opted not to review Enrique Duque's records to attempt to ascertain the whereabouts of the remaining H-2A workers or determine whether they were earning the promised (and legally mandated) wage rate. This duty of care is even greater in light of MBR's knowledge of and acquiescence to Enrique Duque's verbal abuse and threats. (SUF 30; *see Bates*, 2024 WL 3316989, at *9 (finding venture liability where, inter alia, defendant's corporate leaders were aware of red flags, including abusive practices). These factors, combined, create a "plausible inference" MBR should have been aware of the TVPA violations, even if MBR did not have direct knowledge. *Bates*, 2024 WL 3316989, at *8–9.

For these reasons, the evidence, when weighed in Plaintiffs' favor, shows MBR at a minimum conspired to commit forced labor and trafficking for forced labor and knowingly benefitted from participation in a venture it knew or should have known committed forced labor and trafficking for forced labor.

### C. <u>MBR Was a Joint Employer under the FLSA.</u>

MBR controlled multiple aspects of the Plaintiffs' and other H-2A workers' employment. Therefore, the Plaintiffs and other H-2A workers, "as a matter of economic reality," were economically dependent on MBR, *Antenor v. D & S Farms*, 88 F.3d 925, 929, 932 (11th Cir. 1996), and therefore MBR was their joint employer. Defendant MBR Farms identifies the correct test to determine joint employment under the Fair Labor Standards Act ("FLSA") but misapplies it to the facts of the case.

As MBR notes, the Eleventh Circuit has adopted an eight-factor test to determine joint employment: (1) the nature and degree of the grower's control of the farmworkers; (2) the degree of the grower's supervision, direct or indirect, of the farmworkers' work; (3) the grower's right, directly or indirectly, to hire, fire, or modify the farmworkers' employment conditions; (4) the grower's power to determine the workers' pay rates or methods of payment; (5) the grower's preparation of payroll and payment of the workers' wages; (6) the grower's ownership of the

facilities where the work occurred; (7) the farmworkers' performance of a line-job integral to the harvesting and production of salable vegetables; and (8) the grower's and labor contractor's relative investment in equipment and facilities. *Antenor*, 88 F.3d at 932. Courts should not focus on one particular factor, but rather should examine "the economic reality of *all the circumstances*." *Id.* (emphasis added) (citing 29 C.F.R. § 500.20(h)(4)(i)). It is a qualitative, rather than a quantitative analysis. *Id.* at 934. The economic reality test, which arose out of the "suffer or permit to work" standard set forth in the FLSA definition of "employ" under 29 U.S.C. § 203(g), was developed to "assign responsibility to businesses that did not directly supervise putative employees," *Antenor*, 88 F.3d at 933, keeping in mind the broad, remedial purpose of the FLSA. *Id.*

Plaintiffs will address the economic reality factors, *seriatim*:

### 1.    Nature and Degree of Control of Workers

A grower exercises control when, for example, it determines "the number of workers hired for a job, when work should begin on a particular day, which workers should be assigned to specific tasks, and whether a worker should be disciplined or retained." *Id.* Here, MBR contracted with Enrique Duque to hire 84 workers to work at its blueberry farm. (SUF ¶ 10.) MBR CEO Barton McKinnon instructed Mr. Duque not to let the H-2A workers start harvesting blueberries while there was still dew and to stop work when it rained. (SUF ¶ 28.) MBR determined which specific varieties of blueberry—and therefore which plants—the H-2A workers should harvest on a given day. (SUF ¶ 27.) MBR decided whether the H-2A workers should work on the mechanical harvester, hand-pick the blueberries, clear weeds from the field, or pick up trash. (SUF ¶ 27.) Mr. McKinnon instructed Enrique Duque to correct H-2A workers' work if, for example, they were spilling too many blueberries and would require the workers to pick up trash they left in the field. (SUF ¶ 27.)  MBR had the power to send workers home if there were insufficient bins and crates, which MBR contracted with a packer to provide, available for the berries. (SUF ¶ 28.) That

MBR provided these instructions to Enrique Duque who then passed them along to the workers does not impact the analysis of this factor. *Antenor*, 88 F.3d at 934.

Based on these facts, this factor weighs in favor of finding MBR to be a joint employer.

**2.      The degree of the grower's supervision, direct or indirect, of the farmworkers' work.**

The same facts set forth above (with the exception of the instruction to hire 84 workers) apply equally to this factor. Again, "[i]t is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor." *Id.* at 935. Therefore, this factor weighs in favor of joint employment.

**3.      The grower's right, directly or indirectly, to hire, fire, or modify the farmworkers' employment conditions.**

While MBR did not determine which specific H-2A workers to hire, it set a two-month experience requirement for the H-2A workers. (SUF ¶ 9.) This requirement was included in the Job Order.  (SUF ¶ 4.) Further, included in this factor is MBR's power, as described above, to tell workers not to start working or to stop working if the blueberries were wet from dew or rain, to tell them which blueberries to pick on a given day, and whether the blueberries should be machine or hand harvested.

**4.      The grower's power to determine the workers' pay rates or methods of payment.**

MBR entered into a contract with Enrique Duque to pay the H-2A workers $11.71 per hour and 50 cents per bin of harvested blueberries. (SUF ¶ 10.) MBR determined the workers would be paid a piece rate of 50 cents per pound for hand picking, and the hourly rate for machine harvesting, weeding, and other similar work.  (SUF ¶ 12.)

**5.      The grower's preparation of payroll and payment of the workers' wages.**

Plaintiffs understand that Enrique Duque prepared the payment of the workers' wages, when they were paid. However, as noted above, MBR determined whether the workers would be paid on an hourly or piece rate basis. (SUF ¶ 12.)

     6.     **<u>The grower's ownership of the facilities where the work occurred.</u>**

There is no question that MBR leased the land where the H-2A workers worked. (SUF ¶ 8.) That MBR did not directly own the land is immaterial to this factor, as it controlled the land through the lease, and Enrique Duque had no ownership interest in the property. *See Torres-Lopez v. May*, 111 F.3d 633, 643-44 (9th Cir. 1997); *Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1336 (N.D. Ga. 2011).

     7.     **<u>Performance of a line-job integral to business.</u>**

It is axiomatic that harvesting blueberries is a "a normal and integral phase of the grower's production." *Antenor*, 88 F.3d at 937. Without the harvest, MBR would have no blueberries to sell. Therefore, the Plaintiffs and other H-2A workers were dependent on MBR's growing and production business. *Id.*

     8.     **<u>The grower's and labor contractor's relative investment in equipment and facilities.</u>**

Investment in equipment and facilities is a central to a joint employment analysis "because of the workers' economic dependence on the person who supplies the equipment or facilities." *Id.*

MBR owned nearly all the equipment and facilities the H-2A workers used at the blueberry farm. It owned the blueberries and the blueberry bushes themselves, SUF ¶ 22; the buckets the workers filled when they picked blueberries, SUF ¶ 22; the portable toilets and drinking water containers in the field, SUF ¶ 22; the mechanical harvester MBR assigned the workers to work on to pick blueberries that could not be hand harvested, SUF ¶ 22; and the tractor forklift used to lift the crates the H-2A workers filled (using MBR's buckets) into trucks, SUF ¶ 22. Further, MBR arranged for the blueberry packing shed, which was owned by MBR CEO Barton McKinnon's uncle, to provide the crates the workers filled with MBR's blueberries and the pallets the crates rested on, SUF ¶ 24.

This significant investment in the equipment and facilities where the H-2A workers worked weighs heavily in favor of joint employment. For the reasons set forth above, MBR jointly employed Plaintiffs within the meaning of the FLSA.

**D.**     **Plaintiffs Have Sufficiently Alleged MBR Violated the Federal and Georgia RICO.**

MBR does not take issue with Plaintiffs' pleading of the underlying federal and Georgia RICO violations: "the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiffs." *Aquino v. Mobis Alabama, LLC*, No. 3:22-CV-145-TCB, 2024 WL 2764047, at *9 (N.D. Ga. May 28, 2024) (quoting Cisneros v. Petland, Inc., 972 F.3d 1204, 1211 (11th Cir. 2020).  Rather, MBR only claims Plaintiffs did not sufficiently allege MBR conspired to violate the federal and Georgia RICO.

As with other positions in their Motion, in arguing that Plaintiffs' RICO conspiracy claims should be dismissed, Defendant MBR misleads the Court by extracting one paragraph of Plaintiffs' complaint, which it claims is deficient, while ignoring the significant number of additional substantive allegations supporting the RICO claims. MBR asks the Court to pretend the allegations against the "Traffickers" in the Complaint, which Plaintiffs define in the first paragraph as including MBR, do not exist.

For the same reason Plaintiffs have stated a claim against Defendant MBR for conspiring to commit forced labor and trafficking in forced labor in violation of 18 U.S.C. § 1594(b), MBR has conspired to violate the federal and Georgia RICO. In fact, a RICO conspiracy encompasses conduct that would not constitute an ordinary conspiracy. See *U.S. v. Starett*, 55 F.3d 1525, 1543-44 (11th Cir. 1995). It does not require an overt act, but rather only "an agreement on an overall objective." *Id*. This may be accomplished "by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise

through a pattern of racketeering activity." *Id.* at 1544 (quoting *U.S. v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991)).

As alleged in the Complaint, the purposes of the RICO enterprises were to "recruit, contract, transport, and employ foreign workers to work as farm laborers' at the [Defendants'] business operations in Georgia[,]" Compl. ¶ 242, and "to profit from the fraud [the Defendants] committed in the contracting, hiring, and employment of Plaintiffs and other class members." Compl. ¶ 246. As set forth in the TVPA conspiracy argument, *supra*, MBR conspired with Defendant Enrique Duque (and the other Defendants) to submit false information in the Job Order (mail and wire fraud; fraud in foreign labor contracting), e.g. Compl. ¶ 153; to engage in the human trafficking scheme, Compl. ¶¶ 158-159, 162, 175; and to agree to commit forced labor and trafficking for forced labor, Compl. ¶ 211. Further, though overt acts are not required to show a RICO conspiracy, Plaintiffs allege multiple overt acts MBR committed in furtherance of Enrique Duque's forced labor and trafficking for forced labor, Compl. ¶ 212.

For these reasons, Plaintiffs have sufficiently alleged MBR conspired to violate the federal and Georgia RICO.

E.    **Plaintiffs' Intentional Infliction of Emotional Distress Claims Should Not Be Dismissed, and Summary Judgment Should Not Be Granted.**

To prove a claim of intentional infliction of emotional distress, a plaintiff must show the following: (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a casual connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe.  *Lockhart v. Marine Mfg. Corp.*, 281 Ga. App. 145, 146  (2006).  "[T]he conduct also must be of such serious import as to *naturally* give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress."  *Moses v. Prudential Ins. Co. of Am.*, 187 Ga. App. 222, 225 (1988).  Whether conduct is sufficient to support a claim for intentional infliction of emotional distress is a question of law, and summary judgment must be denied, "[i]f the

evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress." *Yarbray v. Southern Bell Tel. & Tel. Co.*, 261 Ga. 703, 706 (1991).

As discussed in detail above, Defendants MBR Farms and Enrique were Plaintiffs' joint employers, and Enrique was an agent of MBR Farms during Plaintiffs' employment. (*See* Section C.)  Enrique and his agents subjected Plaintiffs to the following abusive conduct during their captivity:

- Defendants housed Plaintiffs and other H-2A workers in trailers with no heating or air conditioning, leaking roofs, no beds, and nonworking stoves and refrigerators.  (SUF ¶ 38.)

- Defendants did not provide charged Plaintiffs for transportation to the laundry facility, grocery store, and to the worksites.  (SUF ¶ 39.)

- Enrique and Jose also took Plaintiffs' passport and visa documents.  (SUF ¶ 41.)

- Enrique would often yell and berate the workers working in the blueberry field, threatening to deport them or report them to immigration if they complained about their working conditions.  (SUF ¶ 30.)

- Enrique's son was also present on the fields and carried a fire arm to ensure workers did not run away. (SUF ¶ 32.)

- If Plaintiffs complained about working conditions, Enrique told Plaintiffs that they had no rights in America, that he would report workers to immigration authorities to get them deported, or that he would report workers to the consulate and they would never be able to come back to America.  (SUF ¶ 40.)

- After Plaintiffs reported Enrique to the police, Enrique took Plaintiff Mendez to the woods (SUF ¶ 45.)   He then held Plaintiff Mendez by the collar and pushed him to the ground.  (SUF ¶ 45.)

Defendants intended to inflict emotional distress on Plaintiffs and succeeded in doing so. It is undeniable that a reasonable person would find that Enrique and his agents terrorized Plaintiffs beyond the requisite level of outrageousness and egregiousness.  Plaintiffs were lured to another country with false promises and subjected to deplorable working and living conditions.  In addition to physical threats and abusive conduct, Enrique and his agents seized Plaintiffs' passports and

-23-

visas and threatened Plaintiffs against reporting their unlawful conduct or seeking help. Moreover, MBR Farms cannot claim it was unaware of Enrique's and his agents' abusive and outrageous conduct. Enrique and his agents openly threatened and berated Plaintiffs while they worked at the blueberry fields at MBR Farms and patrolled the blueberry fields with a firearm. These actions were clearly meant to instill fear, subjugate and prevent Plaintiffs from escaping.

As a result of Defendants' willful and malicious misconduct, Plaintiffs were in a constant state of fear and severe emotional distress. Plaintiffs continue to suffer from severe emotional distress.

For the reasons discussed above, Plaintiffs have sustained their burden of showing a genuine issue of material fact regarding Plaintiffs' intentional infliction of emotional distress claim.

**F.**    **Plaintiffs' Unjust Enrichment Claim Should Not Be Dismissed, and Summary Judgment Should Not Be Granted.**

Under Georgia law, "'[t]he theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated.'" *Smith Serv. Oil Co. v. Parker,* 250 Ga. App. 270, 271 (2001) (citation omitted). An unjust enrichment claims requires a showing of the following: (1) plaintiff conferred a benefit on the defendant; and (2) that equity requires the defendant to compensate the plaintiff for this benefit. *Chem-Nuclear Sys., Inc. v. Arivec Chemicals, Inc.*, 978 F. Supp. 1105, 1110 (N.D. Ga. 1997).

MBR Farms' sole argument against Plaintiffs' claim for unjust enrichment is that it did not recruit Plaintiffs. This is plainly false, as MBR Farms contracted with Enrique to recruit the Plaintiffs. Additionally, MBR Farms fails to address the direct benefits conferred to it by Plaintiffs through Defendants' unlawful conduct at all.

As set forth in detail above, Defendant MBR Farms and Enrique were joint employers. Enrique was acting as MBR Farms' agent during Plaintiffs' employment.  Plaintiffs did not have an express contract with Defendant MBR Farms.  Instead, Enrique contracted with MBR Farms for Plaintiffs' employment and services.  (SUF ¶ 10.)  In support of the H-2A petition, Enrique submitted a signed work order from MBR Farms stating the following: (1) MBR Farms would need an estimated eighty-four employees; and (2) employees would receive $11.71 an hour and a piece rate of $0.50 per pound. (SUF ¶ 10.)  MBR Farms was listed as the place of employment for the eighty-four workers.  (SUF ¶ 7.)  Accordingly, MBR Farms was actively involved in recruiting Plaintiffs and the other workers.

Even if MBR is not considered an active recruiter, MBR Farms admits that it signed the contract with Enrique.  (SUF ¶ 10.)  MBR Farms admits it agreed with everything in the document, including the rate of wages for the workers.  (*Id.*)  MBR Farms knew when it signed the work order that Enrique was compensated by taking a percentage of the employee pay rate and piece rate from the migrant workers. (SUF ¶ 13.)  Instead of amending the wage rate in the work order to account for Enrique's compensation or compensating Enrique separately, MBR Farms did nothing.  As a result, Plaintiffs were not compensated at the legal rate for their labor.  In reality, Plaintiffs' wages were much lower than the legal rate or, at times, they received no wages at all.

MBR Farms undeniably benefitted directly from its arrangement with Enrique and Plaintiffs' labor regardless of whether they recruited Plaintiffs.  Plaintiffs were not adequately compensated for the benefits they conferred to MBR Farms.  Therefore, MBR Farms was unjustly enriched to the detriment of Plaintiffs, and Plaintiffs should be properly compensated.  As such, Plaintiffs' unjust enrichment claim should not be dismissed.

VP/#67586537.1

Respectfully submitted this day: August 19, 2024.

By: /s/ Daniel Werner
    Daniel Werner (GA Bar No. 422070)
    Radford Scott, LLP
    125 Clairemont Ave., Suite 380
    Decatur, Georgia 30030
    Tel: (678) 271-0304
    Email: dwerner@radfordscott.com

    /s/ Charlie Y. Wang
    (California Bar No. 320236)
    (Pro Hac Vice)
    **VEDDER PRICE (CA), LLP**
    1925 Century Park East, Suite 1900
    Los Angeles, California 90067
    Tel: (424) 204-7700
    Email: cwang@vedderprice.com