**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

CRISTHIAN ZUNIGA HERNANDEZ,

LUIS ALFONSO PALMILLAS LOPEZ, and

RAMON RODRIGUEZ MENDEZ,

      Plaintiffs,

v.

MARIA LETICIA PATRICIO,

ENRIQUE DUQUE TOVAR,

JOSE CARMEN DUQUE TOVAR, and

MBR FARMS, INC., a Georgia corporation,

      Defendants.

Civil No. 523-CV-00023

## DECLARATION OF CHARLIE Y. WANG

I Charlie Y. Wang, state the following based on personal knowledge:

1.      I am an Associate at Vedder Price, and I am co-counsel for Plaintiffs in the above-referenced putative class and collective action.

2.      I submit this declaration in support of Plaintiffs' Opposition to Defendant MBR Farms, Inc.'s Motion to Dismiss, and in the Alternative, Motion for Summary Judgment.

3.      Attached are true and correct copies of the following documents:

| EXHIBIT NO. | DOCUMENT DESCRIPTION |
|:---:|:---|
| **Ex. A** | 2021 Work Order |
| **Ex. B** | Contract Between Enrique Duque Tovar and MBR Farms, Inc. |
| **Ex. C** | MBR Farms, Inc. R. 30(b)(6) Deposition Testimony |

4.    Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


DATED: August 19, 2024

_____
                                          Charlie Y. Wang

# EXHIBIT A

OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**

| EXHIBIT A |
|---|



## A. Job Offer Information

**1.** Job Title * FARM WORKERS AND LABORERS

| 2. Workers Needed * | a. Total | b. H-2A | Period of Intended Employment | |
|---|---|---|---|---|
| | 84 | 84 | 3. Begin Date * 3/8/2021 | 4. End Date * 10/1/2021 |

| 5. Will this job generally require the worker to be on-call 24 hours a day and 7 days a week? * If "Yes", proceed to question 8. If "No", complete questions 6 and 7 below. | ☐ Yes ☑ No |
|---|---|

**6.** Anticipated days and hours of work per week *

| 35 | **a. Total Hours** | 6 | c. Monday | 6 | e. Wednesday | 6 | g. Friday | 6 |
|---|---|---|---|---|---|---|---|---|
| 0 | b. Sunday | 6 | d. Tuesday | 6 | f. Thursday | 5 | h. Saturday | |

**7.** Hourly work schedule *

a. 8 : 00 ☑ AM ☐ PM
b. 4 : 00 ☐ AM ☑ PM

### Temporary Agricultural Services and Wage Offer Information

**8a.** Job Duties - Description of the specific services or labor to be performed. *
*(Please begin response on this form and use Addendum C if additional space is needed.)*

Harvest, count, prune, load, unload, and all farm labor related to BLUEBERRIES. All jobs will be done under extreme weather conditions, repetitive movements like bending, stooping, and heavy lifting. Workers will also be pulling weeds, raking, cleaning around shed areas, laying irrigation pipes, digging ditches, and cleaning fields.

| 8b. Wage Offer * $ 11 . 71 | 8c. Per * ☑ HOUR ☐ MONTH | 8d. Piece Rate Offer § $ 00 . 50 | 8e. Piece Rate Units/Special Pay Information § per pound |
|---|---|---|---|

| 9. Is a completed **Addendum A** providing additional information on the crops or agricultural activities and wage offers attached to this job offer? * | ☐ Yes ☑ No |
|---|---|

**10.** Frequency of Pay. * ☑ Weekly  ☐ Biweekly  ☐ Monthly  ☐ Other (specify): N/A

**11.** State all deduction(s) from pay and, if known, the amount(s). *
*(Please begin response on this form and use Addendum C if additional space is needed.)*

State Taxes
Federal Taxes
Social Security



OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**

### B. Minimum Job Qualifications/Requirements

1. Education: minimum U.S. diploma/degree required. *
☑ None ☐ High School/GED ☐ Associate's ☐ Bachelor's ☐ Master's or Higher ☐ Other degree (JD, MD, etc.)

| 2. Work Experience: number of <u>months</u> required. * | 2 | 3. Training: number of <u>months</u> required. * | 0 |
|---|---|---|---|

4. Basic Job Requirements (check all that apply) *

☐ a. Certification/license requirements     ☑ g. Exposure to extreme temperatures
☐ b. Driver requirements     ☑ h. Extensive pushing or pulling
☐ c. Criminal background check     ☑ i. Extensive sitting or walking
☐ d. Drug screen     ☑ j. Frequent stooping or bending over
☑ e. Lifting requirement 52 lbs.     ☑ k. Repetitive movements

| 5a. Supervision: does this position supervise the work of other employees? * | ☐ Yes ☑ No | 5b. If "Yes" to question 5a, enter the number of employees worker will supervise. § | |
|---|---|---|---|

6. Additional Information Regarding Job Qualifications/Requirements.
*(Please begin response on this form and use Addendum C if additional space is needed. If no additional skills or requirements, enter "__NONE__" below)* *
None

### C. Place of Employment Information

1. Address/Location *
91 The Oak Circle

| 2. City * | 3. State * | 4. Postal Code * | 5. County * |
|---|---|---|---|
| Pearson | Georgia | 31642 | Atkinson |

6. Additional Place of Employment Information *(If no additional information, enter "__NONE__" below)* *
Growers : MBR FARMS
Field Location: 448 Virgil Mckinnon Rd

| 7. Is a completed **Addendum B** providing additional information on the places of employment and/or agricultural businesses who will employ workers, or to whom the employer will be providing workers, attached to this job order? * | ☐ Yes ☑ No |
|---|---|

### D. Housing Information

1. Housing Address/Location *
1713 1st Avenue S.E.

| 2. City * | 3. State * | 4. Postal Code * | 5. County * |
|---|---|---|---|
| Moultrie | Georgia | 31768 | Colquitt |

| 6. Type of Housing * | 7. Total Units * | 8. Total Occupancy * |
|---|---|---|
| Hotel | 30 | 90 |

| 9. Housing complies or will comply with the following applicable standards: * | ☑ Local ☑ State ☑ Federal |
|---|---|

10. Additional Housing Information. *(If no additional information, enter "__NONE__" below)* *
None

| 11. Is a completed **Addendum B** providing additional information on housing that will be provided to workers attached to this job order? * | ☑ Yes ☐ No |
|---|---|

OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**



---

**E. Provision of Meals**

| | |
|---|---|
| 1. Describe **how** the employer will provide each worker with 3 meals a day or furnish free and convenient cooking and kitchen facilities. * *(Please begin response on this form and use Addendum C if additional space is needed.)*<br>Employer will provide free housing.<br>Through a catering service, employer will provide 3 meals a day 7 days a week for the H2-A workers. Each worker will be charged each $12.68 per day for 3 meals provided.<br>Employer will also provide free transportation for the workers to and from laundry facility and food store once per week. Housing will meet, local, state, and federal requirements. Family housing is not available, and the provision of family housing is not a prevailing practice in the area of intended employment. | |

| 2. If meals are provided, the employer: * | ☐ **WILL NOT** charge workers for such meals. |
|---|---|
| | ☑ **WILL** charge workers for such meals at $ __12__ . __68__ per day per worker. |

**F. Transportation and Daily Subsistence**

1. Describe the terms and arrangement for daily transportation the employer will provide to workers. *
   *(Please begin response on this form and use Addendum C if additional space is needed.)*
   See Addendum

2. Describe the terms and arrangements for providing workers with transportation (a) to the place of employment (i.e., inbound) and (b) from the place of employment (i.e., outbound). *
   *(Please begin response on this form and use Addendum C if additional space is needed.)*
   See Addendum

| 3. During the travel described in Item 2, the employer will pay for or reimburse daily meals by providing each worker * | a. no less than | $ __12__ . __68__ | per day * |
|---|---|---|---|
| | b. no more than | $ __55__ . __00__ | per day with receipts |

OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**



**G. Referral and Hiring Instructions**

1. Explain <u>how</u> prospective applicants may be considered for employment under this job order, including verifiable contact information for the employer, or the employer's authorized hiring representative, methods of contact, and the days and hours applicants will be considered for the job opportunity. *
*(Please begin response on this form and use Addendum C if additional space is needed.)*

All referrals are to be directed to Enrique Duque (912) 592-9592. Collect calls will NOT be accepted. Walk-in applications will be accepted for interview, office hours are Monday - Friday from 10:00am 12:00pm and 1:00pm - 2:30pm. Because of prior problems with invalid social security numbers: all applicants should be advised that, after being hired, all workers social security will be verified by the social security administration. All local and intrastate applicants may apply direct to employer. All interstate applicants are encouraged but not required to first contact the Job Order holding office prior to contacting the employer for any updated information regarding the job prior referral. For referrals from beyond normal commuting distance, an application may be sent to employer or a telephone interview may be requested.

The employer will contact applicants who have applied by phone to conduct an interview. Prior to referral, each worker should either read or have read to them a copy of the Job Offer and that they understand all terms and conditions of employment as noted in the order. All workers should also be advised that they will be expected to work for the total period of employment as noted in the Job offer and should be available to work in any one of the listed activities at the discretion of the employer and workers must have transportation to the job site.

Referred and walk-in applicants should bring with them original documentation of identity and employment eligibility documents (original documents only)., sufficient to complete the I-9 Form. All workers from within normal commuting distance recruited against this job order will not be provided housing and transportation

| 2. Telephone Number to Apply * | 3. Email Address to Apply * |
|---|---|
| +1 (912) 592-9592 | enriqueduquetovar20@gmail.com |

| 4. Website address (URL) to Apply * |
|---|
| N/A |

**H. Additional Material Terms and Conditions of the Job Offer**

| 1. Is a completed **Addendum C** providing additional information about the material terms, conditions, and benefits (monetary and non-monetary) that will be provided by the employer attached to this job order? * | ☑ Yes  ☐ No |
|---|---|

Form ETA-790A                    FOR DEPARTMENT OF LABOR USE ONLY                    Page 4 of 8

H-2A Case Number: H-300-21006-998169    Case Status: Full Certification    Determination Date: 02/19/2021    Validity Period: 3/8/2021 to 10/1/2021



OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**

## I. Conditions of Employment and Assurances for H-2A Agricultural Clearance Orders

By virtue of my signature below, I **HEREBY CERTIFY** my knowledge of and compliance with applicable Federal, State, and local employment-related laws and regulations, including employment-related health and safety laws, and certify the following conditions of employment:

1. **JOB OPPORTUNITY**:  Employer assures that the job opportunity identified in this clearance order (hereinafter also referred to as the "job order") is a full-time temporary position being placed with the SWA in connection with an H-2A *Application for Temporary Employment Certification* for H-2A workers and this clearance order satisfies the requirements for agricultural clearance orders in 20 CFR 653, subpart F and the requirements set forth in 20 CFR 655.122.  This job opportunity offers U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers and complies with the requirements at 20 CFR 655, Subpart B.  The job opportunity is open to any qualified U.S. worker regardless of race, color, national origin, age, sex, religion, handicap, or citizenship.

2. **NO STRIKE, LOCKOUT, OR WORK STOPPAGE**:  Employer assures that this job opportunity, including all worksites for which the employer is requesting H-2A labor certification does not currently have workers on strike or being locked out in the course of a labor dispute. 20 CFR 655.135(b).

3. **HOUSING FOR WORKERS**:  Employer agrees to provide for or secure housing for H-2A workers and those workers in corresponding employment who are not reasonably able to return to their residence at the end of the work day.  That housing complies with the applicable local, State, or Federal standards and is sufficient to house the specified number of workers requested through the clearance system.  The employer will provide the housing without charge to the worker.  Any charges for rental housing will be paid directly by the employer to the owner or operator of the housing.  If public accommodations are provided to workers, the employer agrees to pay all housing-related charges directly to the housing's management.  The employer agrees that charges in the form of deposits for bedding or other similar incidentals related to housing (e.g., utilities) must not be levied upon workers.  However, the employer may require workers to reimburse them for damage caused to housing by the individual worker(s) found to have been responsible for damage which is not the result of normal wear and tear related to habitation.  When it is the prevailing practice in the area of intended employment and the occupation to provide family housing, the employer agrees to provide family housing at no cost to workers with families who request it. 20 CFR 655.122(d), 653.501(c)(3)(vi).

   *Request for Conditional Access to Intrastate or Interstate Clearance System*:  Employer assures that the housing disclosed on this clearance order will be in full compliance with all applicable local, State, or Federal standards at least 20 calendar days before the housing is to be occupied. 20 CFR 653.502(a)(3).  The Certifying Officer will not certify the application until the housing has been inspected and approved.

4. **WORKERS' COMPENSATION COVERAGE**:  Employer agrees to provide workers' compensation insurance coverage in compliance with State law covering injury and disease arising out of and in the course of the worker's employment.  If the type of employment for which the certification is sought is not covered by or is exempt from the State's workers' compensation law, the employer agrees to provide, at no cost to the worker, insurance covering injury and disease arising out of and in the course of the worker's employment that will provide benefits at least equal to those provided under the State workers' compensation law for other comparable employment. 20 CFR 655.122(e).

5. **EMPLOYER-PROVIDED TOOLS AND EQUIPMENT**:  Employer agrees to provide to the worker, without charge or deposit charge, all tools, supplies, and equipment required to perform the duties assigned. 20 CFR 655.122(f).

6. **MEALS**:  Employer agrees to provide each worker with three meals a day or furnish free and convenient cooking and kitchen facilities to the workers that will enable the workers to prepare their own meals.  Where the employer provides the meals, the job offer will state the charge, if any, to the worker for such meals.  The amount of meal charges is governed by 20 CFR 655.173. 20 CFR 655.122(g).

   For workers engaged in the herding or production of livestock on the range, the employer agrees to provide each worker, without charge or deposit charge, (1) either three sufficient meals a day, or free and convenient cooking facilities and adequate provision of food to enable the worker to prepare his own meals.  To be sufficient or adequate, the meals or food provided must include a daily source of protein, vitamins, and minerals; and (2) adequate potable water, or water that can be easily rendered potable and the means to do so. 20 CFR 655.210(e).

7. **TRANSPORTATION AND DAILY SUBSISTENCE**:  Employer agrees to provide the following transportation and daily subsistence benefits to eligible workers.

   A. *Transportation to Place of Employment (Inbound)*

   If the worker completes 50 percent of the work contract period, and the employer did not directly provide such transportation or subsistence or otherwise has not yet paid the worker for such transportation or subsistence costs, the employer agrees to reimburse the worker for reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer, whether in the U.S. or abroad to the place of employment.  The amount of the transportation payment must be no less (and is not required to be more) than the most economical and reasonable common carrier transportation charges for the distances involved.  The amount the employer will pay for daily subsistence expenses are those amounts disclosed in this clearance order, which are at least as much as the employer would charge the worker for providing the worker with three meals a day during employment (if applicable), but in no event will less than the amount permitted under 20 CFR 655.173(a).  The employer understands that the Fair Labor Standards Act applies independently of the H-2A requirements and imposes obligations on employers regarding payment of wages. 20 CFR 655.122(h)(1).

   B. *Transportation from Place of Employment (Outbound)*

   If the worker completes the work contract period, or is terminated without cause, and the worker has no immediate subsequent H-2A employment, the employer agrees to provide or pay for the worker's transportation and daily subsistence from the place of employment to the place from which the worker, disregarding intervening employment, departed to work for the employer.  Return transportation will not be provided to workers who voluntarily abandon employment before the end of the work contract period, or who are terminated for cause, if the employer follows the notification requirements in 20 CFR 655.122(n).

**Form ETA-790A**                                      **FOR DEPARTMENT OF LABOR USE ONLY**                                      Page 5 of 8

H-2A Case Number: H-300-21006-998169     Case Status: Full Certification     Determination Date: 02/19/2021     Validity Period: 3/8/2021 to 10/1/2021

OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**



If the worker has contracted with a subsequent employer who has not agreed in such work contract to provide or pay for the worker's transportation and daily subsistence expenses from the employer's worksite to such subsequent employer's worksite, the employer must provide for such expenses. If the worker has contracted with a subsequent employer who has agreed in such work contract to provide or pay for the worker's transportation and daily subsistence expenses from the employer's worksite to such subsequent employer's worksite, the subsequent employer must provide or pay for such expenses.

The employer is not relieved of its obligation to provide or pay for return transportation and subsistence if an H-2A worker is displaced as a result of the employer's compliance with the 50 percent rule as described in sec. 655.135(d) of this subpart with respect to the referrals made after the employer's date of need. 20 CFR 655.122(h)(2).

C.  *Daily Transportation*

Employer agrees to provide transportation between housing provided or secured by the employer and the employer's worksite(s) at no cost to the worker. 20 CFR 655.122(h)(3).

D.  *Compliance with Transportation Standards*

Employer assures that all employer-provided transportation will comply with all applicable Federal, State, or local laws and regulations. Employer agrees to provide, at a minimum, the same transportation safety standards, driver licensure, and vehicle insurance as required under 29 U.S.C. 1841 and 29 CFR 500.105 and 29 CFR 500.120 to 500.128. If workers' compensation is used to cover transportation, in lieu of vehicle insurance, the employer will ensure that such workers' compensation covers all travel or that vehicle insurance exists to provide coverage for travel not covered by workers' compensation. Employer agrees to have property damage insurance. 20 CFR 655.122(h)(4).

8.   **THREE-FOURTHS GUARANTEE**: Employer agrees to offer the worker employment for a total number of work hours equal to at least three-fourths of the workdays of the total period beginning with the first workday after the arrival of the worker at the place of employment or the advertised contractual first date of need, whichever is later, and ending on the expiration date specified in the work contract or in its extensions, if any. 20 CFR 655.122(i).

The employer may offer the worker more than the specified hours of work on a single workday. For purposes of meeting the three-fourths guarantee, the worker will not be required to work for more than the number of hours specified in the job order for a workday, or on the worker's Sabbath or Federal holidays. If, during the total work contract period, the employer affords the U.S. or H-2A worker less employment than that required under this guarantee, the employer will pay such worker the amount the worker would have earned had the worker, in fact, worked for the guaranteed number of days. An employer will not be considered to have met the work guarantee if the employer has merely offered work on three-fourths of the workdays if each workday did not consist of a full number of hours of work time as specified in the job order. All hours of work actually performed may be counted by the employer in calculating whether the period of guaranteed employment has been met. Any hours the worker fails to work, up to a maximum of the number of hours specified in the job order for a workday, when the worker has been offered an opportunity to work, and all hours of work actually performed (including voluntary work over 8 hours in a workday or on the worker's Sabbath or Federal holidays), may be counted by the employer in calculating whether the period of guaranteed employment has been met. 20 CFR 655.122(i).

If the worker is paid on a piece rate basis, the employer agrees to use the worker's average hourly piece rate earnings or the required hourly wage rate, whichever is higher, to calculate the amount due under the three-fourths guarantee. 20 CFR 655.122(i).

If the worker voluntarily abandons employment before the end of the period of employment set forth in the job order, or is terminated for cause, and the employer follows the notification requirements in 20 CFR 655.122(n), the worker is not entitled to the three-fourths guarantee. The employer is not liable for payment of the three-fourths guarantee to an H-2A worker whom the Department of Labor certifies is displaced due to the employer's requirement to hire qualified and available U.S. workers during the recruitment period set out in 20 CPR 655.135(d), which lasts until 50 percent of the period of the work contract has elapsed (50 percent rule). 20 CFR 655.122(i).

*Important Note:* In circumstances where the work contract is terminated due to contract impossibility under 20 CFR 655.122(o), the three-fourths guarantee period ends on the date of termination.

9.   **EARNINGS RECORDS**: Employer agrees to keep accurate and adequate records with respect to the workers' earnings at the place or places of employment, or at one or more established central recordkeeping offices where such records are customarily maintained. All records must be available for inspection and transcription by the Department of Labor or a duly authorized and designated representative, and by the worker and representatives designated by the worker as evidenced by appropriate documentation. Where the records are maintained at a central recordkeeping office, other than in the place or places of employment, such records must be made available for inspection and copying within 72 hours following notice from the Department of Labor, or a duly authorized and designated representative, and by the worker and designated representatives. The content of earnings records must meet all regulatory requirements and be retained by the employer for a period of not less than 3 years after the date of certification by the Department of Labor. 20 CFR 655.122(j).

10.  **HOURS AND EARNINGS STATEMENTS**: Employer agrees to furnish to the worker on or before each payday in one or more written statements the following information: (1) the worker's total earnings for the pay period; (2) the worker's hourly rate and/or piece rate of pay; (3) the hours of employment offered to the worker (showing offers in accordance with the three-fourths guarantee as determined in 20 CFR 655.122(i), separate from any hours offered over and above the guarantee); (4) the hours actually worked by the worker; (5) an itemization of all deductions made from the worker's wages; (6) if piece rates are used, the units produced daily; (7) beginning and ending dates of the pay period; and (8) the employer's name, address and FEIN. 20 CFR 655.122(k).

For workers engaged in the herding or production of livestock on the range, the employer is exempt from recording and furnishing the hours actually worked each day, the time the worker begins and ends each workday, as well as the nature and amount of work performed, but otherwise must comply with the earnings records and hours and earnings statement requirements set out in 20 CFR 655.122(j) and (k). The employer agrees to keep daily records indicating whether the site of the employee's work was on the range or off the range. If the employer prorates a worker's wage because of the worker's voluntary absence for personal reasons, it must also keep a record of the reason for the worker's absence. 20 CFR 655.210(f).

**Form ETA-790A**                                          **FOR DEPARTMENT OF LABOR USE ONLY**                                          Page 6 of 8

H-2A Case Number:  H-300-21006-998169      Case Status:  Full Certification      Determination Date:  02/19/2021      Validity Period:  3/8/2021  to  10/1/2021

OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**

11. **RATES OF PAY:** The employer agrees that it will offer, advertise in its recruitment, and pay at least the Adverse Effect Wage Rate (AEWR), the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest. If the worker is paid by the hour, the employer must pay this rate for every hour or portion thereof worked during a pay period. If the offered wage(s) disclosed in this clearance order is/are based on commission, bonuses, or other incentives, the employer guarantees the wage paid on a weekly, semi-monthly, or monthly basis will equal or exceed the AEWR, prevailing hourly wage or piece rate, the legal Federal or State minimum wage, or any agreed-upon collective bargaining rate, whichever is highest.

If the worker is paid on a piece rate basis and at the end of the pay period the piece rate does not result in average hourly piece rate earnings during the pay period at least equal to the amount the worker would have earned had the worker been paid at the appropriate hourly rate of pay, the employer agrees to supplement the worker's pay at that time so that the worker's earnings are at least as much as the worker would have earned during the pay period if the worker had instead been paid at the appropriate hourly wage rate for each hour worked. 20 CFR 655.120, 655.122(l).

For workers engaged in the herding or production of livestock on the range, the employer agrees to pay the worker at least the monthly AEWR, the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof. If the offered wage disclosed in this clearance order is based on commissions, bonuses, or other incentives, the employer assures that the wage paid will equal or exceed the monthly AEWR, the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, whichever is highest, and will be paid to each worker free and clear without any unauthorized deductions. The employer may prorate the wage for the initial and final pay periods of the job order period if its pay period does not match the beginning or ending dates of the job order. The employer also may prorate the wage if an employee is voluntarily unavailable to work for personal reasons. 20 CFR 655.210(g).

12. **FREQUENCY OF PAY:** Employer agrees to pay workers when due based on the frequency disclosed in this clearance order. 20 CFR 655.122(m).

13. **ABANDONMENT OF EMPLOYMENT OR TERMINATION FOR CAUSE:** If a worker voluntarily abandons employment before the end of the contract period, or is terminated for cause, employer is not responsible for providing or paying for the subsequent transportation and subsistence expenses of that worker, and that worker is not entitled to the three-fourths guarantee, if the employer notifies the Department of Labor and, if applicable, the Department of Homeland Security, in writing or by any other method specified by the Department of Labor or the Department of Homeland Security in the Federal Register, not later than 2 working days after the abandonment or termination occurs. A worker will be deemed to have abandoned the work contract if the worker fails to show up for work at the regularly scheduled time and place for 5 consecutive work days without the consent of the employer. 20 CFR 655.122(n).

14. **CONTRACT IMPOSSIBILITY:** The work contract may be terminated before the end date of work specified in the work contract if the services of the workers are no longer required for reasons beyond the control of the employer due to fire, weather, or other Act of God that makes fulfillment of the contract impossible, as determined by the U.S. Department of Labor. In the event that the work contract is terminated, the employer agrees to fulfill the three-fourths guarantee for the time that has elapsed from the start date of work specified in the work contract to the date of termination. The employer also agrees that it will make efforts to transfer the worker to other comparable employment acceptable to the worker and consistent with existing immigration laws. In situations where a transfer is not affected, the employer agrees to return the worker at the employer's expense to the place from which the worker, disregarding intervening employment, came to work for the employer, or transport the worker to his/her next certified H-2A employer, whichever the worker prefers. The employer will also reimburse the worker the full amount of any deductions made by the employer from the worker's pay for transportation and subsistence expenses to the place of employment. The employer will also pay the worker for any transportation and subsistence expenses incurred by the worker to that employer's place of employment. The amounts the employer will pay for subsistence expenses per day are those amounts disclosed in this clearance order. The amount of the transportation payment must not be less (and is not required to be more) than the most economical and reasonable common carrier transportation charges for the distances involved. 20 CFR 655.122(o).

The employer is not required to pay for transportation and daily subsistence from the place of employment to a subsequent employer's worksite if the worker has contracted with a subsequent employer who has agreed to provide or pay for the worker's transportation and subsistence expenses from the present employer's worksite to the subsequent employer's worksite. 20 CFR 655.122(h)(2).

15. **DEDUCTIONS FROM WORKER'S PAY:** Employer agrees to make all deductions from the worker's paycheck required by law. This job offer discloses all deductions not required by law which the employer will make from the worker's paycheck and all such deductions are reasonable, in accordance with 20 CFR 655.122(p) and 29 CFR part 531. The wage requirements of 20 CFR 655.120 will not be met where undisclosed or unauthorized deductions, rebates, or refunds reduce the wage payment made to the employee below the minimum amounts required under 20 CFR part 655, subpart B, or where the employee fails to receive such amounts free and clear because the employee kicks back directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. 20 CFR 655.122(p).

16. **DISCLOSURE OF WORK CONTRACT:** Employer agrees to provide a copy of the work contract to an H-2A worker no later than the time at which the worker applies for the visa, or to a worker in corresponding employment no later than on the day work commences. For an H-2A worker coming to the employer from another H-2A employer, the employer agrees to provide a copy of the work contract no later than the time an offer of employment is made to the H-2A worker. A copy of the work contract will be provided to each worker in a language understood by the worker, as necessary or reasonable. In the absence of a separate, written work contract entered into between the employer and the worker, the required terms of this clearance order, including all Addendums, and the certified *H-2A Application for Temporary Employment Certification* will be the work contract. 20 CFR 655.122(q).

**Form ETA-790A**                    **FOR DEPARTMENT OF LABOR USE ONLY**                    Page 7 of 8

H-2A Case Number: H-300-21006-998169    Case Status: Full Certification    Determination Date: 02/19/2021    Validity Period: 3/8/2021 to 10/1/2021



OMB Approval: 1205-0466
Expiration Date: 8/31/2022

H-2A Agricultural Clearance Order
Form ETA-790A
**U.S. Department of Labor**

17. **ADDITIONAL ASSURANCES FOR CLEARANCE ORDERS**:

A. Employer agrees to provide to workers referred through the clearance system the number of hours of work disclosed in this clearance order for the week beginning with the anticipated date of need, unless the employer has amended the date of need at least 10 business days before the original date of need by so notifying the Order-Holding Office (OHO) in writing (e.g., e-mail notification). The employer understands that it is the responsibility of the SWA to make a record of all notifications and attempt to inform referred workers of the amended date of need expeditiously. 20 CFR 653.501(c)(3)(i).

If there is a change to the anticipated date of need, and the employer fails to notify the OHO at least 10 business days before the original date of need, the employer agrees that it will pay eligible workers referred through the clearance system the specified rate of pay disclosed in this clearance order for the first week starting with the originally anticipated date of need or will provide alternative work if such alternative work is stated on the clearance order. 20 CFR 653.501(c)(5).

B. Employer agrees that no extension of employment beyond the period of employment specified in the clearance order will relieve it from paying the wages already earned, or if specified in the clearance order as a term of employment, providing transportation from the place of employment, as described in paragraph 7.B above. 20 CFR 653.501(c)(3)(ii).

C. Employer assures that all working conditions comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration, and other employment-related laws. 20 CFR 653.501(c)(3)(iii).

D. Employer agrees to expeditiously notify the OHO or SWA by emailing and telephoning immediately upon learning that a crop is maturing earlier or later, or that weather conditions, over-recruitment, or other factors have changed the terms and conditions of employment. 20 CFR 653.501(c)(3)(iv).

E. If acting as a farm labor contractor (FLC) or farm labor contractor employee (FLCE) on this clearance order, the employer assures that it has a valid Federal FLC certificate or Federal FLCE identification card and when appropriate, any required State FLC certificate. 20 CFR 653.501(c)(3)(v).

F. Employer assures that outreach workers will have reasonable access to the workers in the conduct of outreach activities pursuant to 20 CFR 653.107. 20 CFR 653.501(c)(3)(vii).

*I declare under penalty of perjury that I have read and reviewed this clearance order, including every page of this Form ETA-790A and all supporting addendums, and that to the best of my knowledge, the information contained therein is true and accurate. This clearance order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job. 20 CFR 653.501(c)(3)(viii). I understand that to knowingly furnish materially false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a federal offense punishable by fines, imprisonment, or both. 18 U.S.C. 2, 1001.*

| 1. Last (family) name *  Duque -Tovar | 2. First (given) name *  Enrique | 3. Middle initial § |
|---|---|---|
| 4. Title *  Owner | | |
| 5. Signature (or digital signature) *  Digital Signature Verified and Retained By | *[signature]* | 6. Date signed *  1/14/2021 |

**Employment Service Statement**

In view of the statutorily established basic function of the Employment Service (ES) as a no-fee labor exchange, that is, as a forum for bringing together employers and job seekers, neither the Department of Labor's Employment and Training Administration (ETA) nor the SWAs are guarantors of the accuracy or truthfulness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the ES constitute a contractual job offer to which the ETA or a SWA is in any way a party. 20 CFR 653.501(c)(1)(i).

**Public Burden Statement** *(1205-0466)*

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. Public reporting burden for this collection of information is estimated to average .63 hours per response for all information collection requirements, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing, reviewing, and submitting the collection of information. The obligation to respond to this data collection is required to obtain/retain benefits (44 U.S.C. 3501, Immigration and Nationality Act, 8 U.S.C. 1101, et seq.). Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Employment and Training Administration, Office of Foreign Labor Certification, 200 Constitution Ave., NW, Suite PPII 12-200, Washington, DC, 20210. (Paperwork Reduction Project OMB 1205-0466). DO NOT send the completed application to this address.

Form ETA-790A      **FOR DEPARTMENT OF LABOR USE ONLY**      Page 8 of 8

H-2A Case Number: H-300-21006-998169    Case Status: Full Certification    Determination Date: 02/19/2021    Validity Period: 3/8/2021 to 10/1/2021

# EXHIBIT B

EXHIBIT B

## AGREEMENT TO FURNISH FARM LABOR SERVICES

THIS AGREEMENT is entered this **23** day of **December**, by and between **MBR FARMS**, hereinafter referred to as Grower, and **Enrique Duque**, hereinafter referred to as Contractor.

It is the mutual desire of the parties that Contractor provide and manage labor for the growing and/or harvesting of Grower's crops described in this Agreement, each party acting independently, in pursuance of his own separate business.

THEREFORE, Grower and Contractor agree as follows:

**CONTRACTOR LICENSE:** Contractor warrants and represents the s/he is a duly registered and licensed farm labor contractor (FLC) under the laws of the United States, and agrees to provide Grower with a copy of its federal certificate or registration within five (5) days after the date this contract is signed.

**COMPLIANCE WITH FEDERAL, STATE, AND MUNICIPAL LAWS:** Contractor agrees to comply with all federal, state and municipal laws relating to its duties hereunder, including, but not limited to the Migrant and Seasonal Agricultural Worker Protection Act (MSAWPA); the Fair Labor Standards Act (FLSA); the Immigration Reform and Control Act of 1986 (IRCA); federal, state and municipal laws and regulations concerning agricultural labor, the establishment of pay rates, the payment of employees, the payment of taxes, the maintenance of payroll and other records, the reporting of employee information to governmental agencies, the posting of such notices, and providing information to employees. Grower will have the right at any time during working hours to inspect Contractor's book and records.

**CONTRACTOR'S FUNCTIONS: Growing Crop:** Contractor agrees, as an independent contractor, to furnish and manage labor to perform the services specified in this Agreement for the consideration in money and/or percentage of proceeds agreed to be paid by Grower. Labor services shall include, but shall not be limited to, such tasks as planting, cultivating, irrigating, weeding, thinning, pruning, hoeing, dusting, spraying, fertilizing, and harvesting.

**LABOR EMPLOYMENT AND MANAGEMENT:** Contractor is acting as an independent contractor. Contractor is solely responsible for the operation, maintenance and repairs of its equipment. Contractor is the sole employer of all labor required to perform work under the Agreement, and those persons shall perform work under Contractor's sole discretion and control, Grower having no right to direct or control those persons in any respect whatsoever. Further, subject to limitations of the MSAWPA, Grower is not an employer or co-employer of said labor and is relying entirely upon Contractor to provide persons and equipment necessary to perform Contractor's duties under this Agreement.

**NOTICES**: All notices to be given under this Agreement shall be considered delivered when mailed to the parties by United Stated Postal Service, postage pre-paid, addresses as follows:

**CONTRACTOR:**

| | |
|---|---|
| **Business Name:** | ENRIQUE DUQUE |
| **FLC Name:** | |
| **Permanent Address:** | 6996 AXSON RD AXSON, GA. 31624 |
| **Temporary Address:** | |
| **Telephone Number:** | |
| **Cell Number:** | (912) 592-9592 |
| **Fax** | |
| **E-mail:** | enriqueduquetovar20@gmail.com |

**GROWER:**

| | |
|---|---|
| **Business Name:** | MBR FARMS |
| **Owner Name:** | BARTON MCKINNON |
| **Permanent Address:** | 91 THE OAKS CIECLE PEARSON, GA. 31642 |
| | *Circle* |
| **Temporary Address:** | |
| **Telephone Number:** | |
| **Cell Number:** | (912)501-0804 |
| **Fax:** | |
| **E-mail:** | bogarrity012289@gmail.com |

or to such other places as the parties may designate by written notices, or by personal delivery, other manner provided by law.

# FARM LABOR CONTRACTOR WORK ORDER

**Type of Work:**

ALL GENERAL FARM LABOR RELATED TO **<u>BLUEBERRIES</u>**

**Employee duties:**

Harvest, count, prune, load, unload, and all farm labor related to **<u>BLUEBERRIES</u>** All jobs will be done under extreme weather conditions, repetitive movements like bending, stooping and heavy lifting. Workers will also be pulling weeds, raking, cleaning around shed areas, laying irrigation pipes, digging ditches, and cleaning fields.

**Employee Requirements:**

- All works should have at least 60 days verifiable experience.
- Must lift at least 52 lbs.

**Address of Field or Block Number(s) & Acres:**

448 VIRGIL MCKINNON RD PEARSON, GA.  31642

**Start Date(s):**03/01/2021          **End Date(s):** 10/01/2021

**Estimated Number of Employees:** 84

**Contractor Employee Pay Rate:** [x] Hourly **<u>$11.71</u>** [x] Piece Rate **<u>$0.50 per pound</u>**

---

**CONTRACTOR**                                    **GROWER**

By: _Enrique Duque_                       By: _____

Title: _Owner_____              Title: _____

Date: _____              Date: _____


**NOTARY**

By: _____

My Commission Expires: _____

EXHIBIT C

# In The Matter Of:

*Hernandez v.*
*Patricio*

---

*Barton McKinnon*
*August 9, 2024*
*30(b)(6) MBR Farms*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 210*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

Min-U-Script® with Word Index

30(b)(6) MBR Farms                                    1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF GEORGIA
2                     WAYCROSS DIVISION

3   CHRISTHIAN ZUNIGA           )
    HERNANDEZ, LUIS             )
4   ALFONSO PALMILLAS LOPEZ     )
    and RAMON RODRIGUEZ         )
5   MENDEZ on behalf of         )
    themselves and all those    )
6   similarly situated          )
                                )
7   PLAINTIFFS,                 )
                                )
8                               )
    VS.                         )    CASE NO.
9                               )    5:23-cv-00023-LGW-BWC
                                )    JURY TRIAL DEMANDED
10                              )
    MARIA LETICIA PATRICIO,     )
11  ENRIQUE DUQUE TOVAR,        )
    JOSE CARMEN DUQUE           )
12  TOVAR, and MBR FARMS,       )
    INC., a Georgia             )
13  Corporation,                )
                                )
14  DEFENDANTS.                 )

15

16          Zoom deposition of 30(b)(6) MBR Farms through

17    and by BARTON MCKINNON, taken on behalf of defendants

18    pursuant to Notice and agreement of counsel, in

19    accordance with the Georgia Rules of Civil Procedure,

20    for purposes of discovery, cross-examination and all

21    other purposes allowable by law, all parties appearing

22    via web-conference before LaKeysha T. Satterfield, CCR,

23    the witness located in Atlanta, Georgia, on August 9,

24    2024 at 10:30 a.m.

25
```

30(b)(6) MBR Farms                                         2

```
 1                        APPEARANCES

 2

 3    FOR THE PLAINTIFFS:

 4        Daniel Werner, ESQUIRE
          Radford Scott, LLP
 5        315 W. Ponce De Leon Avenue
          Suite 1080
 6        Decatur, Georgia 30030
          Dwerner@radfordscott.com

 7
          Charlie Y. Wang, ESQUIRE
 8        Vedder Price (CA), LLP
          1925 Century Park East, Suite 1900
 9        Los Angeles, California 90067
          Cwang@vedderprice.com

10

11    FOR THE DEFENDANTS:

12        James R. Miller, ESQUIRE
          Elliott Blackburn PC
13        3016 North Patterson Street
          Valdosta, Georgia 31602
14        Jmiller@elliottblackburn.com

15        Kayla H. Barnes, ESQUIRE
          Coleman Talley LLP
16        3344 Peachtree Road
          Kayla.barnes@colemantalley.com

17

18

19

20

21

22

23

24

25
```

**30(b)(6) MBR Farms**                                    **3**

1

2

                    **EXAMINATION INDEX**

3
                                                      Page
4     Examination By Mr. Werner                        3
      Examination By Ms. Barnes                       111
5     Examination By Mr. Miller                       126
      Further Examination By Mr. Werner               127
6

7

                      **EXHIBIT INDEX**

8

9     P-1 Notice                                        8
      P-2 Entirety of Exhibit 4                        44
10    P-3 Checks                                        48
      P-4 Affidavit                                     56
11    P-5 Responses                                     72
      P-6 verification statement                      128
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   individuals from Mexico and/or Guatemala were
 2   solicited, recruited, interviewed, reviewed, selected,
 3   hired, and transported to the United States for
 4   employment as H-2A visa holders to work for or at MBR
 5   Farms for each year between 2020 and the present,
 6   including vanities -- identities of all individuals
 7   involved in the same.  You're not qualified to testify
 8   about that?
 9        A.  I don't know anything about that.  We are not
10   part of that.
11        Q.  H-2A workers worked on your farm; is that
12   correct, in 2021?
13        A.  Yes, that is correct.  But how the selection
14   process or any of that, we're not involved with.
15        Q.  Okay.  But you are qualified to talk about the
16   process that you know of by which MBR Farms acquired
17   H-2A workers to work on the farm; is that correct?
18        A.  That's correct, yeah.
19        Q.  Okay.  Let's keep scrolling through then.
20        A.  Line item 21, I don't understand that.
21        Q.  Let me ask you some questions about that.  That
22   would maybe clarify it.  And I'll first read number
23   21, which is, "Any affirmative steps taken to ensure
24   and monitor compliance with inappropriate litigation
25   hold until discovery in this and litigation is
```

1    Q.  And when is that?

2    A.  Usually starts in April, runs through June.

3    Q.  And why is that time particularly busy?

4    A.  That's when we do the harvesting.  That's when

5    all the work is done, majority of the work is done.

6    Q.  How many hours a day do you usually work during

7    harvest season?

8    A.  Me personally?

9    Q.  You personally?

10    A.  I manage more than I actually work on the farm.

11    Q.  I'm talking about -- you know, work broadly.

12    So how many hours -- how many hours you put in a day

13    whether it's managing --

14    A.  Yeah, a little more than eight hours a day.

15    Q.  A little more than eight hours a day?

16    A.  Yeah.

17    Q.  And during blueberry harvest season, when you

18    say you're mostly managing, what managing are you

19    doing as it relates to the blueberry harvest?

20    A.  Lining up a truck to be there, making sure that

21    everything is in the field so that H-2As can do their

22    job.  If we're using our machine to pick, you know,

23    making sure it's ready to go, everything's loaded and

24    pretrip, scheduling the trucks to be delivered once

25    they're filled.

```
 1        Q.   Okay.  When you say lining up a truck, what is
 2   that?  What does that mean?
 3        A.   So the blueberries are harvested and put into a
 4   crate.  That crate stacks into a pallet.  And that
 5   pallet is put into a refrigerated truck for transport.
 6        Q.   Okay.  Now, the blueberries are initially
 7   harvested into buckets, right?  The workers themselves
 8   put them in -- in buckets?
 9        A.   That is correct.
10        Q.   And then the workers pour the buckets into the
11   -- the crates?
12        A.   That's correct.
13        Q.   And then the crates are placed on the pallets?
14        A.   Correct.
15        Q.   And then the pallets are loaded into the
16   refrigerated trucks?
17        A.   Correct.
18        Q.   Did I leave any steps out?
19        A.   No, that's it.
20        Q.   And we can go into this later, but I believe
21   Enrique Duque said that MBR Farms owns the buckets; is
22   that right?
23        A.   Correct.
24        Q.   And MBR Farms owns the crates?
25        A.   No.
```

1      Q.   Who owns the crates?

2      A.   The packing sheds that we -- we sell to provide

3    us with those crates.

4      Q.   Is that also true about the pallets?

5      A.   Yes, they own the pallets.

6      Q.   So part of your job is to make sure that the

7    crates and the pallets are all lined up for when the

8    blueberries are harvested; is that correct?

9      A.   That's correct.  Making sure that we have

10   enough so that we don't run out during the day.

11     Q.   One request, please wait until I'm done with

12   the question.  I understand I have a tendency to

13   interrupt as well.  But it doesn't show up well on the

14   transcript if we're talking over each other.

15         Has MBR Farms ever had a situation where

16   blueberries were being picked and you ran out of-- out

17   of crates?

18     A.   Yes.

19     Q.   And what -- what happens when that occurs?

20     A.   You just can't pick.

21     Q.   So the workers have to go home?

22     A.   Correct.

23     Q.   Is that a decision that you make?

24     A.   Yes.  If it -- if we don't have the crates,

25   yes.

1    Q.  Do you remember if that happened ever in 2021?

2    A.  I don't recall that happening any until this

3    year, '23.

4    Q.  But you can't say it did not happen.  You just

5    don't remember; is that correct?

6    A.  Correct.

7    Q.  So when you said one of the things you do

8    during harvest season is lining up the truck,

9    everything we've just talked about is what you meant;

10   is that correct?

11   A.  Correct.

12   Q.  You also said part of your job is making sure

13   everything in the field is ready.  What do you mean by

14   that?

15   A.  What we just talked about.

16   Q.  How do you -- is it you who determines which

17   blueberries are ready to harvest?

18   A.  Yes.

19   Q.  How do you decide that?

20   A.  The varieties are ready at a different time, so

21   we determine which variety is ready to be picked for

22   the week.

23   Q.  Are all of -- well, let me ask this.  Does MBR

24   own blueberries that are harvested?

25   A.  Yes.

**Barton McKinnon - August 9, 2024**                33
**30(b)(6) MBR Farms**

1      A.  So, sometimes they will be full and can't take

2   a load.  So we'll see if somebody else can take it.

3      Q.  And when -- you sell the blueberries to the

4   packing shed, is that right?

5      A.  Correct.

6      Q.  At what point is the sale made?

7      A.  What do you mean by that?

8      Q.  So, when the blueberries are picked, they still

9   belong to you; is that correct?  Or belong to MBR

10  Farms, right?

11     A.  Correct.

12     Q.  At some point, the packing shed owns the

13  blueberries?

14     A.  Correct.

15     Q.  At what point does the packing shed take

16  ownership of the blueberries?

17     A.  So the process -- kind of the process of that

18  is when we deliver the blueberries to the packing

19  shed, we will weigh them at that point and they will

20  give us our weight tickets.  Once they give us the

21  weight tickets, then they have to pack for it.  So it

22  has to be graded, sorted, and packed.  And they ship

23  it off to fill their contract orders.  We do not

24  receive payment until after their product has been

25  sold and they have the money to pay us.

1    Q.  But the amount they pay you is based on those

2    initial weight tickets; is that right?

3    A.  Combination of the weight tickets, the quality

4    that they pack, and what they were able to sell them

5    for.

6    Q.  Do you have a written agreement with the

7    packing shed?

8    A.  Not sure.  I don't know if I have a written

9    one.  My uncle owned the packing shed, so I don't know

10   that we ever had a contract signed.

11    Q.  What's your uncle's name?

12    A.  Archie McKinnon.

13    Q.  So, just kind of as an example, if there were a

14   lot of blueberries in a load that were, you know,

15   rotten or there was a lot -- there were a lot of

16   leaves and -- or something like that, they would --

17   you would get less money?  Or how -- when we talk

18   about the quality, what does that mean?

19    A.  Yeah, that's -- what you're saying is correct.

20   If the quality of the fruit is not as good, it affects

21   your price, how you pack out, like if I take him 100

22   pounds and he can only pack 90 pounds of that 100, I

23   pack that at 90 percent and I'm base paid off that 90

24   percent.

25    Q.  Are the different blueberry varieties that MBR

1  and shakes the bush, and the berries will fall off and

2  fall on a conveyor belt.  They'll be carried to the

3  top of the picker where they come out and drop into

4  your crate that is filled, and they will be laborers

5  like there packing the crates to pallets.

6      Q.  And this -- this happened in 2021; is that

7  right?

8      A.  Yes.  Yes.

9      Q.  So the machine picker is owned by MBR Farms?

10     A.  Correct.

11     Q.  And when -- when the berries fall off the

12  conveyor belt into the crate, those are the crates

13  that are provided by the -- by the packing shed?

14     A.  Correct.

15     Q.  So the role in 2021 -- the role of H-2A workers

16  was to take the crates off of the machine and place

17  them onto pallets; is that right?

18     A.  No.  So they will actually ride on the machine

19  and stack the empty crate under the chute where the

20  berries come to, then they'll take it -- you know,

21  once it's full, they'll take it off, put another one

22  on, and they will stack them in pallet form on the

23  machine.  That machine can hold four pallets at the

24  back of it.  When we get to the end of the road, we

25  unload those pallets into the semi and get empty

1    crates, start over.

2        Q.   When you say we -- we unload the pallets onto

3    the semi, is that done with a forklift?

4        A.   Correct.

5        Q.   And who owns the forklift?

6        A.   MBR.

7        Q.   In 2021, what percentage of the blueberries

8    were machine harvested versus handpicked?

9        A.   Roughly 75 percent handpicked, 25 percent

10   machine picked.

11               (Discussion off the record.)

12               MR. WERNER:  Let's go ahead and take a five-

13   minute break then.  That's okay with defense counsel?

14               MS. BARNES:  That's fine.  I was just

15   thinking I had to run to the restroom.

16               (Break was taken.)

17       Q.   (By Mr. Werner) Mr. McKinnon, we just took a

18   10-minute break.  You understand you're still under

19   oath?

20       A.   Correct.

21       Q.   Did you speak with anybody during the break?

22       A.   Yes.

23       Q.   Who did you speak with?

24       A.   My lawyer.

25       Q.   Anybody else?

1      A.   Well, both lawyers that are here.

2      Q.   Did you discuss your testimony with them?

3      A.   They told me I was doing a good job and pizza

4    will be here shortly.

5      Q.   Anything else?

6      A.   No.  Where the bathroom was.

7      Q.   That's the most important thing.

8           I want a follow-up question on the machine

9    harvester.  How many H-2A workers would be working

10   sort of on the machine harvesting operation at one

11   time?

12     A.   It varies depending on the, you know,

13   production, but no less than three -- or no less than

14   two, no more than five.

15     Q.   And while machine harvesting is happening, is

16   there also handpicking going on maybe in a different

17   part of the field?

18     A.   Yes.

19     Q.   And that's also being done by the H-2A workers?

20     A.   Correct.

21     Q.   And that was true in 2021?

22     A.   Correct.

23     Q.   There were portable toilets in the field; is

24   that correct?

25     A.   Correct.

1    Q.  And those are provided by MBR Farms?

2    A.  Correct.

3    Q.  Was there drinking water in the field?

4    A.  Yes.

5    Q.  Who provided that?

6    A.  We did.

7    Q.  And that was in 2021 as well?

8    A.  Correct.

9    Q.  How would you describe the skill level

10   necessary to do a good job handpicking blueberries?

11           MS. BARNES:  I'm gonna object to the form,

12   but you can answer if you understand the question.

13   A.  So you need some experience to be able to pick

14   the berries without making the other ones fall off the

15   bush that are not ready to harvest.

16   Q.  In the job order Enrique Duque submitted to

17   bring in the H-2A workers to work at MBR, he said that

18   there was a two-month experience requirement.  Is that

19   about -- is that consistent with -- with what you

20   think the amount of experience should be?

21   A.  They need to have some experience.  If they've

22   never done it, they won't be able to do it.

23   Q.  I'm sorry.  Can you repeat that last part?

24   A.  They need to have some experience.  If they

25   have never done it, they wouldn't be -- they won't do

```
1      Q.  (By Mr. Werner)  All right.  I'm showing you

2   what's been marked as Plaintiffs' Exhibit 2.  I've

3   already told you the Bates numbers.  Do you recognize

4   this document?  And you can look at the version that's

5   in front of you.  It might be easier.

6      A.  Yes.

7      Q.  Can you tell me what it is?

8      A.  This is a form that the contract was filled out

9   to give to H-2A workers.

10     Q.  When was the first time you saw this document?

11     A.  Right now.

12     Q.  It was attached to the complaint.  Did you see

13  it when you reviewed the -- when you saw the

14  complaint?

15     A.  I didn't look at this.

16     Q.  Going down to page 3 on the docket, which is

17  Bates number ending in 1078, it lists two places of

18  employment.  One is 91 The Oaks Circle in Pearson.  Do

19  you know what that address is?

20     A.  Yes.

21     Q.  What is it?

22     A.  That is the address of MBR Farms as far as all

23  of our billing, mailing, things of that nature.

24     Q.  Is that a house or an office?

25     A.  Yeah, that's my sister's house.  She does all
```

1    the bookkeeping in her house.

2        Q.   How far is that from the farm?

3        A.   Three, four miles roughly.

4        Q.   Are there any blueberries on that property?

5        A.   No.

6        Q.   Did H-2A workers in 2021 do any work at all on

7    that property?

8        A.   No.

9        Q.   As far as you know, they didn't step foot on

10   that property?

11       A.   Correct.

12       Q.   And then below that it says, "Additional place

13   of employment, grower MBR Farms," and provides the

14   Virgil McKinnon Road address, which you testified

15   earlier is the location of the farm; is that correct?

16       A.   Correct.

17       Q.   I'm scrolling up to the previous page, which

18   is, you know, in the docket page 2 of 9 and it's the

19   Bates number ending on 1077.  If you can take a look

20   at the job duties, which is part 8A; do you see that?

21       A.   Yes.

22       Q.   Does that accurately describe the work that the

23   H-2A workers did at MBR in 2021?

24       A.   Mostly.  I mean, we didn't do everything on

25   this list but, yeah, mostly that's correct.

```
 1      Q.  What did the H-2A workers not do that's on this
 2  list in 2021?
 3      A.  Raking, cleaning around sheds.  They didn't do
 4  any count.
 5      Q.  I'm sorry.  You said they didn't do any what?
 6      A.  It says count.  Not sure what that means.
 7      Q.  Oh, count.  Okay.  Well, I wonder if that means
 8  just keeping track of the -- the buckets they filled.
 9  Do you think that's -- that may be what that means?
10      A.  It may be --
11          MS. BARNES:  Object to the form.  You can
12  answer.
13      A.  -- that may be what it is.  I'm not sure what
14  that means.
15      Q.  Fair enough.  So you mentioned count, really,
16  because we don't know what it means.  You said
17  cleaning around sheds and raking.  Is there anything
18  else that they did not do?
19      A.  Prune.
20      Q.  They did not prune?
21      A.  Correct.
22      Q.  Anything else?
23      A.  No.
24      Q.  Were blueberry bushes -- are the blueberry
25  bushes pruned at some point during the year?
```

1    A.  I'm sorry.  I didn't -- they didn't lay any

2    irrigation pipe or dig any ditches either.  I'm sorry.

3    I didn't see.  I didn't see it until your mouse

4    blinked.

5         COURT REPORTER:  I'm sorry.  It's hard to

6    understand you a little bit.  Can you repeat that last

7    part?  You said you didn't see?

8    A.  I didn't see the land irrigation pipes and

9    digging ditches until his mouse cursor moved over.

10   But they did not do those things as well.

11   Q.  (By Mr. Werner) I'm going to come back to this.

12   I did want to ask a followup based on another

13   document.  And I'm going to mark this as Plaintiffs'

14   Exhibit 3.

15         (Whereupon, Plaintiffs' Exhibit 3 was

16         marked for identification and copy of same

17         is attached hereto.)

18   Q.  (By Mr. Werner) I'm showing you what's been

19   marked as Plaintiffs' Exhibit 3.  Just looking at the

20   first page, which is Bates number PL Hernandez

21   Patricio 0001068, is it correct that these are checks

22   that MBR provided to Enrique Duque to pay for H-2A

23   workers' labor on MBR's Farm?

24   A.  Correct.

25         MS. BARNES:  You can see it.  Just make sure.

1    I'm just making sure you can see it.

2        A.  Oh, yes.  Correct.

3        Q.  I'm going to scroll down to -- well, that's not

4    good.  Okay.  There's a check -- do you see the check

5    -- and I can zoom in a little bit -- for $181.50?

6        A.  Correct.

7        Q.  And that check was written to Sherry Duque; is

8    that right?

9        A.  Correct.

10       Q.  Why were some checks written to Sherry Duque

11   and some written to Enrique Duque?

12       A.  We wrote -- we wrote all the checks to Sherry

13   in '22, 2022.

14       Q.  So in 2022, MBR employed H-2A workers?

15       A.  Yes.

16       Q.  And they were also hired through Enrique Duque?

17       A.  We dealt with Sherry.  So Ricky told us in '22

18   that he had some problem getting his paperwork filled

19   out and that they ran it through his wife this year

20   and that we needed to pay her.

21       Q.  Did you ask him what issues he was having?

22       A.  No.

23       Q.  Did you ask him why it needed to be run through

24   his wife?

25       A.  He just said that he had some problems with his

1  paperwork getting done so he ran it through his wife's

2  name that year.  That's all he explained to us.  He

3  told us not to worry, that he could have the labor.

4  It was no issue other than just writing the check in a

5  different name.

6      Q.  Was the 2022 job order that allowed for the

7  H-2A workers to come through Enrique Duque or through

8  Sherry Duque?

9      A.  Through Sherry.

10     Q.  But Enrique continued to be the actual

11  contractor who you were dealing with; is that correct?

12         MS. BARNES:  Object to the form.  You can

13  answer

14     A.  He was a point of contact, yes.

15     Q.  (By Mr. Werner)  And he was the one who was in

16  the fields when the workers were working?

17     A.  Correct.

18     Q.  Sherry was not in the fields?

19     A.  Right.

20     Q.  So that's correct, she was not in the fields?

21     A.  Correct.

22     Q.  Looking at this check, this $181.50 check, it

23  says labor/drip lines.  Do you see that?

24     A.  I do.

25     Q.  What does that mean, drip lines?

```
 1      A.  So in '22, they helped us install our new

 2   plants.  In '21, when I told you that they didn't lay

 3   irrigation pipes, they did in '22 but not in '21.  In

 4   '21 they only did harvesting for us.

 5      Q.  Did it concern you that in 2022 Enrique Duque

 6   transferred the whole H-2A process to Sherry Duque

 7   essentially in name only but he was continuing to do

 8   all the same work he had done in 2021?

 9          MS. BARNES:  Object to the form.

10      Q.  (By Mr. Werner) You can answer.

11      A.  At the time it didn't.

12      Q.  2020 hindsight --

13      A.  Yeah, that's a little bit more --

14          MS. BARNES:  Object to the form but you can

15   answer.

16      Q.  (By Mr. Werner) I'm sorry.  Can you repeat what

17   you just said?

18      A.  I said in hindsight, yeah, I would have, but I

19   didn't at the time.

20      Q.  Why would it have in hindsight?

21          MS. BARNES:  Object to the form.

22      A.  Because I'm in here with you today.

23      Q.  What?

24      A.  I said because I'm in here talking to you

25   today.
```

```
 1        Q.  Explain that a little bit more of why in
 2   hindsight do you think that was a mistake?
 3             MS. BARNES:  I'm going to continue to object
 4   to this line of questioning, but you can go ahead.
 5        A.  Well, at the time --
 6             COURT REPORTER:  Ms. Barnes, can you repeat
 7   your objection?
 8             MS. BARNES:  I said I'm going to continue to
 9   object to the form, but you can go ahead and answer.
10             THE WITNESS:  Go ahead and answer?
11             MS. BARNES:  Madam Court Reporter, is it okay
12   if the witness continues?
13             COURT REPORTER:  Yes, ma'am.
14        A.  So at the time, this was not an uncommon thing
15   for Hispanic contractors to not have some paperwork
16   filled out right, have to do something different.  So
17   at the time it did not concern me.  I was making a
18   joke about hindsight having to be in here with you
19   today.  That's what I was referring to.
20        Q.  (By Mr. Werner) Sitting here today, based on
21   what you've learned since then, if this happened to
22   you now would it have raised red flags?
23             MS. BARNES:  Object to the form.
24        A.  Absolutely.
25        Q.  Why?
```

1          MS. BARNES:  Same objection.

2      A.  Because I could potentially be involved in

3  something that I'm not supposed to be.

4      Q.  What do you mean by that?

5      A.  That they had done something wrong.  I don't

6  want any involvement in it.

7      Q.  In your mind, did Enrique Duque do anything

8  that was -- was wrong in 2021?

9          MS. BARNES:  Object to the form.  Can you be

10  more specific?

11      Q.  He can answer the question as he understands

12  it.  Go ahead and answer.

13      A.  I didn't know of Enrique doing anything wrong

14  in '21.

15      Q.  As you sit here now, do you understand that he

16  did anything wrong in 2021?

17      A.   I understand what he's been accused of.

18      Q.  What's he been accused of?

19      A.  Mistreating workers.

20      Q.  While I have this up, again, I'm still showing

21  you Plaintiff's Exhibit 3.  Going back to the first

22  page of the exhibit, which is Bates number 1068, in

23  the memo line of the two checks on this page it says

24  "machine labor."  Do you see that?

25      A.  Yes.

1      Q.   Is that to pay for workers who were working on
2   the machine harvester?
3      A.   Correct.
4      Q.   Machine pick would be the same on this page?
5      A.   Correct.
6      Q.   If it just says labor, it could be either one,
7   that's on -- that's the $4,360 check on page -- on
8   Bates number -- I'll just pull it back up in just a
9   second.  Bates number 1070?
10     A.   Correct.
11     Q.   So it could be -- they could be either
12  handpicking or machine harvesting?
13     A.   It could be, but generally where it said just
14  labor, that would be handpicking.  This one being,
15  because I can tell by the amount of it, it wouldn't be
16  that much on machine labor.
17     Q.   But you had said earlier that some workers may
18  be handpicking and some workers may be working on the
19  machine at the same time; is that right?
20     A.   Correct.
21     Q.   Would -- would those be paid with separate
22  checks or would it all be one check to Enrique Duque?
23     A.   It should be separate checks.  I'm not saying
24  that we didn't one time combine them, but one is paid
25  hourly and one is paid by poundage.  So they should

**Barton McKinnon - August 9, 2024**                    55
**30(b)(6) MBR Farms**

1    have been separate checks to keep it separate.

2        Q.   Oh, okay.  That's helpful.  And let me just --

3    looking at the check on the bottom of that same page

4    and the memo line that says picking labor, that would

5    be for hand harvesting; is that correct?

6        A.   Correct.

7        Q.   Okay.  I'm pulling up Exhibit 2 again, which is

8    the 2021 job order.  Where it says "workers needed,"

9    that's box 2A and B, it says 84.  Is that the number

10   of workers who ended up working at MBR Farms?

11       A.   There were different amounts every day that

12   showed up for work.

13       Q.   What was the largest number of workers that

14   were working at the farm on a single day in 2021?

15       A.   I don't recall.

16       Q.   Was it more than 80?

17       A.   I wouldn't think so. That was a long time ago.

18       Q.   Was it common to have more than 50 workers

19   working at the farm at the same time in 2021?

20       A.   Not common.

21       Q.   I'm sorry.  Can you repeat that?

22       A.   Not common in '21, no.

23       Q.   Was it common to have more than 40?

24       A.   That was probably average.

25       Q.   So 40 -- 40 was about average as far as the

1  number of workers working on your farm in 2021?

2      A.  It depended on the peak, you know, when you was

3  in peak -- the picking sequence.  What you had ready,

4  what wasn't ready.

5      Q.  So you said 40 was about average, and then

6  during peak it would be more?

7      A.  Correct.

8      Q.  Now, you had asked Enrique Duque for a hundred

9  workers, H-2A workers, is that correct, in 2020?

10     A.  I don't recall that.

11     Q.  I'm gonna mark the affidavit of Enrique Duque

12  Tovar as -- we're up to four now; is that right?

13  Plaintiff's Exhibit 4.

14         (Whereupon, Plaintiffs' Exhibit 4 was marked

15         for identification and copy of same is

16         attached hereto.)

17     Q.  (By Mr Werner)  For the record, this is Bates

18  number PL Hernandez Patricio 0001094 through 1098.

19         MR. WERNER:  Counsel, do you have a hard copy

20  of that available?  It might be easier.

21         MS. BARNES:  One second.  Okay.  I'm handing

22  Mr. McKinnon the entire affidavit.

23     Q.  (By Mr. Werner)  So your counsel just provided

24  you a paper copy of the document that -- marked as

25  Plaintiffs' Exhibit 4.  Do you recognize this

**Barton McKinnon - August 9, 2024**                    57
**30(b)(6) MBR Farms**

1   document?  I'm sorry.  Can you repeat that?

2       A.  No.

3       Q.  You do not recognize this document.

4       A.  I haven't looked at it.

5       Q.  Okay.  So you've never seen this document

6   before?

7       A.  Well, I don't know if I've seen it or not, but

8   I don't recall looking at it.

9       Q.  When is the last time you talked to Enrique

10  Duque?

11      A.  Sometime in '23.  About the time that we had

12  found out about this case and the lawsuit.  We told

13  him that we had been contacted -- we had contacted a

14  lawyer and that until it was over with make no further

15  contact.

16      Q.  Was that a phone call or did you meet him in

17  person?

18      A.  That was a phone call.

19      Q.  And that was the last time you talked to him?

20      A.  That was the last time that I called him, yes.

21  Or I talked with him, yes.  He called my brother-in-

22  law, Bobby, to apologize for having to go through this

23  after that fact, but that was it.

24      Q.  And Bobby told you about that conversation?

25      A.  Correct.

```
 1        Q.  What did Bobby tell you about that?
 2        A.  I don't recall.  So, I mean, sometime when all
 3   this was going on.
 4        Q.  What did Enrique apologize for?
 5        A.  For us being involved in this.
 6        Q.  When he spoke with Bobby, did he acknowledge
 7   that he had been criminally indicted?
 8        A.  No.
 9        Q.  The answer is no or you don't know?
10        A.  No, he just called to apologize that we were
11   involved in this.  That it was his fault we were
12   involved in this.
13        Q.  Looking at Exhibit 4, the affidavit, in
14   paragraph 3 he says, "Prior to the 2021 growing season
15   he didn't have any -- a business or working
16   relationship with MBR Farms;" is that correct?
17        A.  That is correct.
18        Q.  Who harvested the blueberries in 2020?
19        A.  I don't recall, but it was not Enrique.
20        Q.  Did you hire workers through a farm labor
21   contractor?
22        A.  Yes.
23        Q.  You don't know who that farm labor contractor
24   was?
25        A.  No.  I'd have to go back and look.
```

Barton McKinnon - August 9, 2024                    59
30(b)(6) MBR Farms

```
1        Q.  So you have documents indicating who that farm
2   labor contractor was; is that correct?
3        A.  I have check stubs where I paid.
4        Q.  Okay.  I'd like to request any documents
5   reflecting the employment of H-2A workers at MBR Farms
6   in 2020.
7            So Enrique says in this declaration that
8   towards the end of 2020, he approached Bobby Garrity
9   of MBR, who is an acquaintance.  Bobby is your
10  brother-in-law?
11       A.  Correct.
12       Q.  What's Bobby's role with MBR Farms?
13       A.  He's a contractor.
14       Q.  He's what?
15       A.  He's a contractor as well.  And we pay him as a
16  contractor as well.
17       Q.  So when you say he's a contractor, what is his
18  role as a contractor?
19       A.  Overseeing what needs done, helping get things
20  done.  Just various things on the farm.
21       Q.  So he isn't a labor contractor.  He's just paid
22  on a 1099 --
23       A.  Correct.
24       Q.  -- to do work at MBR Farms; is that correct?
25       A.  Correct.
```

**Barton McKinnon - August 9, 2024**          60
**30(b)(6) MBR Farms**

1    Q.  And you treat him as an independent contractor?

2    A.  Correct.

3    Q.  When was the first time you met Enrique Tovar?

4    I'm sorry.  Enrique Duque?

5    A.  As in work related or just at all?

6    Q.  At all?

7    A.  I mean, he's -- you know, he's a member of our

8    community growing up.  So, I mean, I've known him

9    before we actually went to working with him.

10   Q.  Was he a friend of yours in the community?

11   A.  Wouldn't really call him a friend.  I mean, we

12   just -- we knew him.  His wife went to church with my

13   wife's -- his wife went to church with my wife's

14   grandparents, so we just kind of knew each other in

15   the community.

16   Q.  Is it accurate that Enrique approached Bobby

17   Garrity towards the end of 2020 about potentially

18   providing help getting H-2A workers?

19   A.  Correct.

20   Q.  And Bobby -- did Bobby then communicate with

21   you about this?

22   A.  That's correct.

23   Q.  And then did you tell Bobby that MBR would

24   likely need up to 100 workers to pick its 2021 crop?

25   A.  Right.  I didn't remember it being exactly 100

**Regency-Brentano, Inc.**

1  but, yeah, I remember me and Bobby discussing.

2      Q.  And if Enrique said MBR would likely need up to

3  100 workers, you have no reason to think that that's

4  not correct?

5      A.  Correct.

6      Q.  When did you first engage or meet Enrique Duque

7  for business purposes?

8      A.  Somewhere -- somewhere after that discussion

9  when he approached Bobby at the end of 2020, but I

10  don't remember.  I don't recall exactly when, but it

11  was in 2020.

12      Q.  Was there any -- well, moving on to paragraph

13  four, Enrique says, "Based on my conversation with Mr.

14  Garrity, I engaged my brother, Jose Carmen Duque

15  Tovar, who is in Mexico, to identify and recruit

16  workers living in Mexico to come to South Georgia

17  under the H-2A non-immigrant visa program for the 2021

18  growing season."

19          First of all, have you ever met Jose Carmen

20  Duque Tovar?

21      A.  No.

22      Q.  You ever met him in person?

23      A.  No.

24      Q.  Has Enrique ever talked to you about Jose

25  Carmen Duque?

1    A.   Maybe I'm confused on what you're asking me.

2    Q.   I'm assuming somebody gave Enrique the green

3    light to go forward and start the process.  Who gave

4    him the green light?

5    A.   Oh, yeah.  We were saying that we needed the

6    workers.  We told Enrique we needed some help picking

7    blueberries.  Is that what you're asking?  I thought

8    you were asking if there was anything else.

9    Q.   Well, I guess his declaration is a little

10   confusing because he kind of skips ahead in time where

11   Mr. Garrity tells him we'll likely need up to 100

12   workers.  And then next thing we know, he's, through

13   his brother, out recruiting workers.  But there's

14   nothing in there saying, you know, what -- you know,

15   who told him to, yes, do this.  You understand what

16   I'm saying?

17   A.   Oh, okay.  Yeah, I see where you're at.  Yeah,

18   we told him that we were going to need H-2A workers

19   for our 2021 season.

20   Q.   And you said, please help us acquire those H-2A

21   workers?

22   A.   Correct.

23        MS. BARNES:  Object to the form.

24        MR. WERNER:  Madam court reporter, did you

25   get his answer to the last question?

Barton McKinnon - August 9, 2024                    66
30(b)(6) MBR Farms

```
 1        A.  No.

 2        Q.  Do you know if any of the H-2A workers who

 3   worked on your farm in 2021 had also worked on your

 4   farm in 2020?

 5        A.  I would not know.

 6        Q.  And was it -- did Bobby tell Enrique that MBR

 7   would prefer workers who had experience?

 8            MS. BARNES:  Object to the form as to what

 9   Bobby told someone.

10        A.  We would have requested, yeah, experience.

11        Q.  So you and Bobby made it clear to Enrique that

12   you wanted experienced workers, is that correct?

13        A.  Yes.

14        Q.  And when you say experienced workers, workers

15   with experience picking blueberries; is that right?

16        A.  Correct.

17        Q.  And did you tell him you preferred workers with

18   two months or more of picking experience?

19        A.  We just asked for experience.

20        Q.  How many H-2A workers worked at your farm in

21   2020?

22        A.  I'm not sure.

23        Q.  Was it more than 10?

24        A.  Yes.

25        Q.  Was it more than 20?
```

1     A.  Yeah, I would think it would be more than 20,

2     but I'm -- I'm honestly not -- I mean, I can't give

3     you an honest answer.

4     Q.  So, I mean, is it like -- I'm just trying to

5     come up with a range.  A safe range would be between

6     20 and 30 workers -- H-2A workers worked at your farm

7     in 2020?

8     A.  That's probably accurate.  We didn't have a lot

9     of berries being that first year.

10    Q.  Did Enrique tell you anything about the

11    recruitment process for H-2A workers?

12    A.  No.

13    Q.  Do you know if he told Bobby anything?

14    A.  No.

15    Q.  Was any paperwork signed or exchanged between

16    MBR and Enrique --

17    A.  Yeah.

18    Q.  -- for the hiring of H-2A workers in 2021?

19    A.  What was the last part of your question?  I

20    thought you'd stopped.  I'm sorry.

21    Q.  Well, I'll stop where you thought I'd stopped.

22    Was any paperwork exchanged between you and Enrique in

23    2021?

24    A.  Yes.

25    Q.  What paperwork?

**Barton McKinnon - August 9, 2024**                    68
**30(b)(6) MBR Farms**

1      A.   It was just a contract between us saying that
2  he was bringing H-2As to our farm to work.
3      Q.   And that's a contract that you signed on behalf
4  of MBR and Enrique signed as a farm labor contractor?
5      A.   Correct.
6      Q.   For the record, we have not received a copy of
7  that contract.  Mr. McKinnon, do you have a copy of
8  that contract at your office?
9      A.   Maybe.  Have to see if we can dig it up.  We
10  should.
11      Q.   That contract, obviously, would have been
12  responsive to our initial request for production of
13  documents.  And we again request on the record that it
14  be provided to us right away.
15         What were the terms of that contract?
16      A.   It just stated that he was gonna -- he would be
17  responsible for bringing the H-2A workers and
18  harvesting our berries.
19      Q.   Anything else?
20      A.   That was pretty much the gist of it.
21      Q.   What was the payment arrangement?
22      A.   It was on there as well, but I don't remember
23  exactly what it was.
24      Q.   You don't remember exactly what it was.  Can
25  you tell me roughly what it was?

1    A.  I'm going to say that it was close to what was
2  on here but, no, not honestly.
3    Q.  I'm sorry.  Can you repeat that?
4    A.  So I'm going to say that it was roughly what
5  was on here, but I can't say that it was exactly this.
6         MS. BARNES:  He's holding up the -- I don't
7  know what exhibit it is.  It's document 1-4 in the
8  compliant, the H-2A work order.
9         MR. WERNER:  Oh, okay.  That's the -- that's
10 Exhibit 2.
11        MS. BARNES:  Correct.  That's what he's
12 holding up.
13   Q.  (By Mr. Werner)  what was -- how did you pay
14 Enrique?  And when I'm referring to you, I'm talking
15 about MBR Farms.  You understand that, right?
16   A.  Correct.
17   Q.  How did you pay Enrique in 2021 for the H-2A
18 visa holders' work?
19   A.  So the hand picked labor was paid per pound.
20 Machine picked pay would be per hour.
21   Q.  And how much did you pay Enrique per hour for
22 the machine picked labor?
23   A.  I don't recall.
24   Q.  How did you know how much to pay him for the
25 machine picked labor?

1    A.  He would tell us how many hours he had.

2    Q.  And you would look at -- would he tell you in

3    person or would he give you something in writing?

4    A.  It would be -- you know, we'd both agree on the

5    price.  We would have -- we would have contractors on

6    the picker, operating the picker, working with them.

7    So as long as his numbers matched our numbers, we'd be

8    in agreeance.

9    Q.  So he would give you something in writing

10   saying these are the hours the machine pickers worked

11   today?

12   A.  I don't know if we got it in writing or if he'd

13   just say, I got this many hours this week and we'd

14   look back and make sure that it agreed with our

15   numbers.

16   Q.  So your contractors who were working on the

17   machine harvester were keeping track of their hours as

18   well, correct?

19   A.  Correct.

20   Q.  And you were paying them by the hour?

21   A.  Correct.

22   Q.  How many of their independent contractors would

23   be working on the machine harvester at a time?

24   A.  It would vary between like actually being on

25   the machine and operating the forklift.  You know,

```
 1   was sent at that time, but I will assure you that we
 2   will re-triple check our records and make sure we've
 3   gotten you everything that you've asked for.
 4           MR. WERNER:  Yeah, because obviously this is
 5   a very important document to the case and the fact
 6   that we're just receiving it now is -- you know, while
 7   we're taking midway through the deposition is -- is a
 8   problem.  You know, obviously we're preserving all
 9   rights with respect to its late production and, yes,
10   please do review your records to make sure there's no
11   -- there aren't other documents that you have not yet
12   produced.
13       Q.  (By Mr. Werner)  Mr. McKinnon, do you recognize
14   this document?
15       A.  Yes.
16       Q.  Can you tell me what it is?
17       A.  It was the agreement that we signed between
18   Ricky to pick the blueberries by the laborer.
19       Q.  Partway down the first page in a section that's
20   called "Compliance with federal, state and municipal
21   laws," the last sentence says, "Grower will have the
22   right at any time during working hours to inspect
23   contractor's book and records."
24           Did I read that correctly?
25       A.  Yes.
```

1    Q.   Did you or anybody else at MBR Farm ever
2    inspect Enrique Duque's records?
3    A.   No.
4    Q.   Why not?
5    A.   We didn't need to.
6    Q.   Why do you think you didn't need to?
7    A.   We didn't know why we would need to.
8    Q.   Scrolling to the second page -- first, just a
9    preliminary question.  It lists the contractor as
10   Enrique Duque and the grower as MBR Farms, and it
11   lists the owner's name as you.  But the email is
12   BOGarrity012289@gmail.com.  Is that Bobby Garrity?
13   A.   Correct.
14   Q.   So Bobby Garrity was -- was acting throughout
15   this process on behalf of MBR Farms; is that correct?
16        MS. BARNES:   Object to the form but you can
17   answer it.
18   A.   Yes, he was helping us with -- he was helping
19   us with Enrique getting us help.
20   Q.   Is that cell phone Bobby's cell phone number?
21   A.   Correct.
22   Q.   Moving on to the third and last page, this is
23   -- at the bottom it's signed by Enrique Duque in this
24   version, but not dated and is not signed by anybody
25   under grower.  Did somebody at MBR sign this document

```
1   --

2       A.  Yeah, we signed it.  Yeah, we signed this for

3   him.  Correct.

4       Q.  So you agreed to everything in this document;

5   is that correct?

6       A.  Yes.

7       Q.  And it was you personally who signed it or was

8   it Bobby?

9       A.  I signed it.

10      Q.  And also estimated number of employees, 84.

11  You agreed to that with Enrique because it's part of

12  the contract, correct?

13      A.  Right.

14      Q.  I apologize, because I just got this, so I'm

15  trying to find -- I'm still going through it.

16          On the first page under "Contractor's

17  Functions" it says that the contractor -- well, let me

18  just read that.  "Contractor agrees as an independent

19  contractor to furnish and manage labor to perform this

20  purpose as specified in this agreement for the

21  consideration in money and/or percentage of proceeds

22  agreed to be paid by grower."

23          Did I read that correctly?

24      A.  Yes.

25      Q.  And you paid Enrique, moving back to the last
```

1    page, $11.71 per hour for the H-2A workers when they

2    were doing machine harvesting?

3        A.   Correct.

4        Q.   And you paid Ms. -- and you paid Enrique Duque

5    50 cents per pound of blueberries when the workers

6    were handpicking; is that correct?

7        A.   Correct.

8        Q.   How many pounds does a -- does the bucket hold?

9        A.   I'd say about four or five pounds.

10       Q.   And when a worker filled a bucket, Enrique

11   would give the worker a tag after the docket -- the

12   bucket was dumped into the bin?

13            MS. BARNES:  Object to the form.

14       A.   Yes.

15       Q.   (By Mr. Werner) And then it was those -- that

16   the worker would hold on to that tag; is that correct?

17            MS. BARNES:  Object to the form.

18       A.   Correct.

19       Q.   (By Mr. Werner) And then at some point the

20   worker would give it to Enrique, who would keep track

21   of the number of tags the worker had; is that correct?

22            MS. BARNES:  Object to the form.

23       A.   Yes.

24       Q.   (By Mr. Werner) And then the worker would be

25   paid based on the number of tags; is that correct?

1    everything had been graded and sorted, what the volume

2    of blueberries that the packing shed would pay you for

3    was.  So just to clarify, Enrique was paid based on

4    that first weigh in, not the second one; is that

5    correct?

6        A.  Correct.  He was paid on gross weight.  We were

7    paid on processed weight.

8        Q.  Okay.  Did you ever communicate with an

9    attorney about the H-2A process before MBR Farms

10   contracted for H-2A workers?

11       A.  No.

12       Q.  Did Enrique ever represent to you or, as far as

13   you know, to Bobby that an attorney had reviewed the

14   submissions he was making to the US Government?

15       A.  No.

16       Q.  Do you know how Enrique -- well, let me back

17   up.  I'm assuming Enrique wasn't doing this work for

18   free; is that your understanding?

19           MS. BARNES:  Object to the form.

20       Q.  (By Mr. Werner) He was making money off of this

21   deal himself individually; is that correct?

22           MS. BARNES:  Object to the form.

23       Q.  (By Mr. Werner) You can answer.

24       A.  Yes.

25       Q.  So, yes, he was making money off of this; is

**Barton McKinnon - August 9, 2024**          81
**30(b)(6) MBR Farms**

1   that correct?

2       A.   Yes.

3       Q.   Do you know how much money he was making off of

4   it?

5       A.   I do not.

6       Q.   Was he taking a percentage of what you paid

7   him?

8       A.   I don't know.

9       Q.   But whatever money he would have made from

10  supplying H-2A workers to work on your farm, he would

11  have either taken from the money you paid him or he

12  would have taken from the workers; is that correct?

13          MS. BARNES:   Objecting to this line of

14  questioning about what someone else's actions were,

15  but you can answer if you know.

16      A.   I don't know how he made his money.   All I know

17  is what we agreed on, what we paid.

18      Q.   (By Mr. Werner) I'm going to pull -- I'm going

19  to return back to the 2021 job order, which is Exhibit

20  2.   And looking at box 8B on the first page, which is

21  Bates number 1077, the wage offer to the workers was

22  11.71 an hour; is that correct?

23      A.   Correct.

24      Q.   And the piece rate offer was 50 cents per

25  pound; is that correct?

**Barton McKinnon - August 9, 2024**        82
**30(b)(6) MBR Farms**

1        A.  Correct.

2            MS. BARNES:  Object to the form, but you can

3    answer.

4        Q.  (By Mr. Werner) Please repeat your answer,

5    please.

6        A.  Correct.

7        Q.  Do you know what the -- what I'm referring to

8    when I say the adverse effect wage rate?

9        A.  I do not.

10        Q.  Have you ever heard that term before?

11        A.  I have not.

12        Q.  So if this job offer told the workers that they

13    would get 11.71 an hour and you were paying Enrique

14    11.71 an hour for the workers' labor, if Enrique was

15    taking a percentage of that or some money from that so

16    he could make money, the workers didn't make 11.71 an

17    hour; is that correct?

18            MS. BARNES:  Object to the form of the

19    question.  Hypothetical.  But if you know the answer,

20    you can answer.

21            COURT REPORTER:  I'm sorry.  Ms. Barnes, can

22    you repeat your objection one more time?  It's a

23    little muffled for some reason.  I got some of it.

24            MS. BARNES:  I objected to the form of the

25    question as it asked a hypothetical and Mr. Werner

**Barton McKinnon - August 9, 2024**                                    83
**30(b)(6) MBR Farms**

1    hasn't laid the proper foundation.  And then I told my

2    client that he can answer if he knows the answer.

3            MR. WERNER:  And counsel, I think if you can

4    just object to form, that would preserve any -- any

5    objection.  When you go farther, it turns into a

6    speaking objection, which, you know, comes across as

7    coaching, whether that's your intent or not.  So you

8    can just say objection to form.  I'd appreciate it.

9        Q.  (By Mr. Werner) So Mr. McKinnon, do you want me

10   to restate my question?

11       A.  Yes, please.

12       Q.  You paid Enrique Duque 11.71 per hour for the

13   work that the H-2A workers did while machine

14   harvesting, correct?

15       A.  Correct.

16       Q.  And the 2021 H-2A agricultural clearance order

17   says that the worker's wage offer is the same amount,

18   11.71 per hour; is that correct?

19       A.  Correct.  Hey, can we take a bathroom break

20   real quick?

21       Q.  Yeah, let me just --

22            MS. BARNES:  Why don't we let Mr. Werner get

23   through this -- through this line.  Can you wait like

24   two minutes?  Yeah.  Let him finish this one and then

25   we should be fine.

1    Q.  (By Mr. Werner) Your agreement -- you paid

2    Enrique Duque 50 cents per  pound for the blueberries

3    that were handpicked, correct?

4    A.  Correct.

5    Q.  And this interstate clearance order or

6    agricultural clearance order says that the workers --

7    offers a piece rate of 50 cents per pound for the

8    workers; is that correct?

9    A.  Correct.

10   Q.  So if this is, in fact, what the workers were

11   paid, Mr. Duque didn't make any money from what MBR

12   paid him; is that -- that's just a logical statement,

13   but is that correct?

14           MS. BARNES:  Object to the form.

15   A.  Correct.

16   Q.  And if he did take a part of this money for

17   himself, then the amount and the wage offer and the

18   piece rate offer would not be accurate; is that

19   correct?

20           MS. BARNES:  Object to the form.

21   A.  That's correct.

22   Q.  Okay.  We can take a break now.  Let's try to

23   keep it to five minutes so no one is late.

24           (Break was taken.)

25   Q.  (By Mr. Werner) We're back on the record.

```
 1   requirements for the Fair Labor Standards Act?
 2       A.  No.
 3       Q.  Do you know what the Fair Labor Standards Act
 4   is?
 5       A.  No.
 6       Q.  Before this litigation, did you ever consult
 7   with an attorney about the record keeping requirements
 8   of the H-2A program or the Fair Labor Standards Act?
 9       A.  No.
10       Q.  Before this lawsuit, did you ever consult with
11   any government officials, either state, local, or
12   federal about the record keeping requirements of the
13   H-2A program and/or the Fair Labor Standards Act?
14       A.  No.
15       Q.  If the blueberries were wet, could they be
16   picked?
17       A.  No.
18       Q.  Why not?
19       A.  If they're wet and you pull them off, they turn
20   soft and mush.
21       Q.  They turn soft, is that what you said?
22       A.  Correct.
23       Q.  So that would include -- obviously, if it was
24   raining, then they couldn't be harvested; is that
25   correct?
```

Barton McKinnon - August 9, 2024                    88
30(b)(6) MBR Farms

1      A.  Correct.

2      Q.  In the morning when there was dew on them, they

3  also couldn't be harvested; is that correct?

4      A.  Correct.

5      Q.  So you instructed Enrique to not harvest or not

6  have the H-2A workers harvest blueberries that were

7  wet; is that correct?

8      A.  Correct.

9      Q.  And that would mean, therefore, not starting

10  work in the morning until the blueberries were dry; is

11  that correct?

12      A.  Correct.

13      Q.  And that would include stopping work if it

14  rained and not returning to work until the blueberries

15  were dry; is that correct?

16      A.  Correct.

17      Q.  Is it fair to say you had a continuous business

18  relationship with Enrique Duque in 2021 and --

19          MS. BARNES:  Object to the form.

20      A.  Could you repeat the question?

21      Q.  (By Mr. Werner) Did you have a continuous

22  business relationship with Mr. Duque -- with Enrique

23  Duque in 2021 and 2022?

24          MS. BARNES:  Object to the form.

25      A.  You ask if we done business together?  Is that

Barton McKinnon - August 9, 2024                    93
30(b)(6) MBR Farms

1       A.   Correct.

2       Q.   How did Enrique transport the workers to your

3   farm in 2021?

4              MS. BARNES:   Object to the form.

5       A.   Vans, buses.

6       Q.   Did you observe those vans and buses pulling up

7   to the farm and unloading the workers?

8       A.   Yeah, we'd see when they get there.   Yeah.

9       Q.   And you'd see them because you were in the

10  field?

11      A.   Correct.

12      Q.   Were you in the field every morning when the

13  workers arrived?

14      A.   No.

15      Q.   What would impact your decision about whether

16  or not to be in the field?

17      A.   Me, it's just whenever I was available to be

18  there, me personally.

19      Q.   And what would determine whether or not you're

20  available?

21      A.   Just what I have going on today.   If I wasn't

22  there, somebody would be there to see what time they

23  started, but it wasn't always me.

24      Q.   And who else would it be?

25      A.   Bobby or some of the other contractors that we

```
 1   would be picking or his crews would be picking?

 2        A.  We would do that before they actually showed up

 3   to start.

 4        Q.  How would you tell them that?

 5        A.  We'd just go to the field and see what's ready,

 6   you know, and then schedule what was gonna be picked

 7   that next day.

 8        Q.  Okay.  And how would you communicate that to

 9   Enrique?

10        A.  By phone.  Sometimes he would come to the field

11   to make sure that there was enough blueberries for him

12   to actually come pick, you know.  Sometimes we'd be

13   ready and they wouldn't want to come because there

14   wasn't enough for them to have a full day in or

15   something like that.  So he would come and look as

16   well when we told him what we wanted him to do.

17        Q.  And so there were some days when there weren't

18   enough blueberries to pick so you would tell Enrique,

19   you don't need to bring your crew here today?

20             MS. BARNES:  Object to the form.

21        A.  Correct.

22        Q.  (By Mr. Werner) Did you ever observe any of the

23   H-2A workers not doing their job correctly?

24        A.  I remember one time, I was seeing one that was

25   dropping a bunch of berries on the ground and I don't
```

1  know which -- I mean, I didn't see the person.  I just

2  seen the road they was picking, there was a lot more

3  on the ground.  So I went to Ricky and said, hey,

4  whoever's picking this road, you know, you need to

5  check on them.  They're wasting berries.

6      Q.  Can you think of any other examples?

7      A.  Only other thing is like they'd leave trash in

8  the field.

9      Q.  And if you saw that, you would talk to Enrique

10  about it?

11      A.  Yeah, just tell him they left a bunch of trash

12  in our field.  He'd clean it up or he'd have them do

13  it or something, yeah.

14      Q.  Did you ever have a situation where there was

15  an H-2A worker or H-2A workers who were, say, picking

16  too many green berries or damaging the plant or having

17  too many leaves in the bucket, anything like that?

18      A.  I don't recall nothing like that.

19      Q.  Do you remember if any of the H-2A workers in

20  2021 were injured while working at MBR Farms?

21      A.  I don't recall that.  I don't know.

22      Q.  How about 2022?

23      A.  No.

24      Q.  Did you pay Enrique every week for the work his

25  crew did?

```
 1   with that?
 2       A.  Yeah.  We didn't control the bucket or size or
 3   what had to be in the bucket.  All it was the total
 4   amount.
 5       Q.  But you supplied the buckets?
 6       A.  Correct.
 7       Q.  Did the buckets have an MBR logo on them?
 8       A.  No.
 9       Q.  What did you observe about the condition of the
10   vans and the buses that Enrique used to transport the
11   workers?
12       A.  We didn't really examine them.
13       Q.  You didn't what?
14       A.  We didn't examine them.
15       Q.  But you saw them.  I'm not suggesting that you
16   inspected them, but you --
17       A.  Right.
18       Q.  Do you have any observations about their
19   condition?
20       A.  No, I mean, the outside of the vehicle was
21   fine.  It was transportable.
22       Q.  Did any of them look old to you?
23       A.  Yeah, they looked old.
24       Q.  Could you tell if they had seatbelts?
25       A.  I don't know.
```

1    Q.  Did you ever communicate directly with any of

2    the H-2A workers?

3    A.  No.

4    Q.  That's partially because they probably wouldn't

5    have understood you and you wouldn't have understood

6    them, right?

7    A.  Both.

8    Q.  So when there were, you know, instructions you

9    needed to give for the H-2A workers, you would just

10   provide those to Enrique; is that correct?

11   A.  Yeah.  We just told Ricky.

12   Q.  You testified earlier that you were in the

13   field and you or one of the contractors would be in

14   the field in the morning when the workers would

15   arrive.  For the days that you were in the field, and

16   I'm talking about 2021, would you stay there all day?

17   A.  No.

18   Q.  Would you just kind of come and go?

19   A.  Yeah.

20   Q.  How would you determine whether to come and go?

21   A.  I mean, you just ride through, everything's

22   going fine.  Everything looks okay.  Come back later.

23   Check it again.

24   Q.  And when you came back and if everything wasn't

25   going fine, you would just talk to Enrique and be

1   like, hey, this -- can your crews do this differently?

2       A.  Yeah, just we'd be like, hey, you need to

3   address this issue or something like that.

4       Q.  Did you ever have a situation where the H-2A

5   workers pick the wrong blueberries?

6       A.  No.

7       Q.  I'm probably close to finishing up here.  Let's

8   take a -- let's go ahead and take a 15-minute break,

9   if that's all right, and then I -- I don't think I'll

10  have more than another 15 or 20 minutes of questions

11  after that.  Is that good?

12              (Discussion off the record.)

13              (Break was taken.)

14      Q.  (By Mr. Werner) So we are back on the record.

15  We've just taken about a 15-minute break.  You

16  understand that you're still under oath?

17      A.  Yes.

18      Q.  Did you have any conversations during the

19  break?

20      A.  Yes.

21      Q.  What did you talk about?

22      A.  How much longer we had.

23      Q.  Okay.  Anything else?

24      A.  That was it.

25      Q.  Do you know if Enrique had any farming

1    questions, but I'm going to go ahead and share --

2    share this screen.  In the job order, which is

3    Plaintiffs' Exhibit 2, at the top in boxes 3 and 4, it

4    says there's a begin date of March 8th, 2021 and an

5    end date of October 1st, 2021.  Do you see that?

6        A.  Yes.

7        Q.  And as we've discussed earlier, this is for

8    work at MBR Farms, correct?

9        A.  Correct.

10       Q.  You had mentioned the harvest season was

11   April -- April, May, June; is that correct?

12       A.  Correct.

13       Q.  So if the workers arrived on March 8th, what

14   were they doing at MBR before the harvest began?

15       A.  I don't recall.  Just getting here and getting

16   settled, I would say when they started picking.

17       Q.  Was there any work that H-2A workers did on the

18   farm before -- you know, other than harvesting?

19       A.  Yeah, they did like some weed pulling and other

20   things.

21       Q.  Because we've gone through this list.  Did they

22   do weed pulling before the harvesting began?

23       A.  They could have.

24       Q.  What records would show whether they did that?

25       A.  Our first check to Ricky would be showing when

1    they actually started work.

2       Q.   The weed pulling would be some that would come

3    about because you would be in the field and you would

4    see weeds and you would tell Enrique, can you have the

5    H-2A workers pull these weeds?

6       A.   Correct.

7       Q.   If the harvest ended in June, what was

8    happening between June -- between the end of the

9    harvest and October 1st, 2021?  What were the H-2A

10   workers doing?

11           MS. BARNES:  Object to the form.

12      A.   Weed pulling mostly.  I don't remember if we

13   were doing any land prep.  I know we planted in '22,

14   so I don't know if we were doing any land prep or

15   anything getting ready.  I know they helped in '22

16   when we was planting.  I don't remember if we did

17   anything towards the end of the year to get ready for

18   that, for the '22 season.

19      Q.   And again, the records would be checks that

20   would have been paid to --

21      A.   Correct.

22      Q.   And H-2A workers were paid by the hour for that

23   work?

24      A.   Yes -- hand picking fields by the hour.

25      Q.   You already talked about cleaning fields.

```
 1   fields?

 2       A.  No.

 3       Q.  Did MBR farms tell the H-2A workers what time

 4   to leave the fields?

 5       A.  No.

 6       Q.  Did MBR Farms tell -- and when I say Ricky, do

 7   you understand that to be Enrique Duque Tovar?

 8       A.  Yes.

 9       Q.  Did MBR Farms tell Ricky a specific time to

10   bring the H-2A workers to the farm?

11       A.  No.

12       Q.  Did MBR Farms tell Ricky a specific time that

13   work had to stop?

14           MR. WERNER:  Objection.

15       A.  No.

16       Q.  I want to talk a little bit about harvesting of

17   the blueberries.  You said -- you testified earlier

18   that you instruct Ricky as to which blueberries to

19   harvest.  Do you remember that?

20       A.  Yes.

21       Q.  When you're instructing which blueberries to

22   harvest, can you walk me through that a little bit

23   more?  Can you flesh that out for me?

24       A.  Generally, you know, it would be in person.

25   Sometimes over the phone but, you know, the more Ricky
```

1  got used to the layout of our fields and learned the

2  varieties, you know, we could tell him on the phone.

3  But generally in the beginning, you know, we'd meet

4  out there and show them this section of the field is

5  this variety and it's ready to pick.

6      Q.   So you would instruct him based off of sections

7  of the field?

8      A.   Correct.

9      Q.   Now, when you say sections of a field, if I

10 said a row, would that be the same thing?

11     A.   The section is multiple rows, but yes.

12     Q.   So you would -- so would it be a correct

13 statement that you would point out multiple rows and

14 instruct for those rows to be harvested?

15          MR. WERNER:   Objection.

16     Q.   (By Mr. Werner) Did you ever give instructions

17 as to specific blueberry plants?

18          MR. WERNER:   Object to the form.

19     A.   (Indiscernible.)

20     Q.   What I mean by that is, did you ever go out and

21 did you ever specifically tell Ricky, I need you to

22 harvest this specific plant of blueberries?

23          MR. WERNER:   Object to the form.

24     Q.   (By Mr. Werner) Or was it just a row?

25          MR. WERNER:   Same objection.

1    A.  It's like the variety, but all the varieties in
2    the same row.  So it's gonna be a yes answer.
3    Q.  You didn't go behind H-2A workers to -- or you
4    didn't go in front of H-2A workers and specifically
5    point out which individual plants to pick?
6    A.  Oh, no.
7         MR. WERNER:  Objection to form of the last
8    question.
9    Q.  (Mr. Barnes) Do you remember testifying earlier
10   about the skill level to harvest blueberries?
11   A.  Yes.
12   Q.  Do you have to have any type of formal
13   education to harvest blueberries?  And by that, I
14   mean, do you have to have a high school diploma to
15   harvest blueberries?
16   A.  No.
17   Q.  I've never harvested blueberries before.  I'll
18   tell you that.  How long would it take you to teach me
19   how to harvest a blueberry?
20   A.  Not long.  Experience makes a difference
21   because when you're touching that bush and you're
22   trying to get inside that bush, if you're not careful,
23   you'll hit other berries and make them fall off.
24   That's really -- that's really the extent of the
25   experience it takes.

30(b)(6) MBR Farms                                         135

```
 1              C E R T I F I C A T E
 2    STATE OF GEORGIA)
 3    DEKALB COUNTY   )
 4
 5    I hereby certify that the foregoing transcript was
 6    taken down, as stated in the caption, and the
 7    questions and answers thereto were reduced to the
 8    written page under my direction; that the foregoing
 9    pages 1 through 136 represent a true and correct
10    transcript of the evidence given.  I further certify
11    that I am not of kin or counsel to the parties in the
12    case; am not in the regular employ of counsel for any
13    of said parties; nor am I anywise interested in the
14    result of said case.  The witness will reserve the
15    right to read and sign the transcript.
16              This 9th day of August, 2024.
17
18
19    _____
20    LaKeysha T. Satterfield,
      GCCR# 6200610232205312 - Expires April 1, 2025
21
22
23
24
25
```

Regency-Brentano, Inc.

```
 1                        DISCLOSURE

 2     STATE OF GEORGIA:
       COUNTY OF DEKALB:
 3
                  Deposition of BRIAN MCKINNON
 4
           Pursuant to Article 10.B of the Rules and
 5     Regulations of the Board of Court Reporting of the
       Judicial Council of Georgia, I make the following
 6     disclosure:

 7         I am a Georgia Certified Court Reporter.  I am
       here as a representative of Regency Brentano.
 8

 9         I am not disqualified for a relationship of
       interest under the provisions of O.C.G.A. §9-11-28 ©.
10

11         Regency Brentano was contacted by the offices of
       Radford Scott to provide court reporting services for
12     this deposition.

13
           Regency Brentano will not be taking this
14     deposition under any contract that is prohibited by
       O.C.G.A. §15-14-37 (a) and (b).
15

16         Regency Brentano has no exclusive contract to
       provide reporting services with any party to the case,
17     any counsel in the case, or any reporter or reporting
       agency from whom a referral might have been made to
18     cover this deposition.

19
           Regency Brentano will charge its usual and
20     customary rates to all parties in the case, and a
       financial discount will not be given to any party to
21     this litigation.

22

23         LaKeysha T. Satterfield,
           GCCR# 6200610232205312 - Expires April 1, 2025
24

25
```

**Regency-Brentano, Inc.**