**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**(Waycross Division)**

| | |
|---|---|
| CRISTHIAN ZUNIGA HERNANDEZ,<br><br>LUIS ALFONSO PALMILLAS LOPEZ, and<br><br>RAMON RODRIGUEZ MENDEZ<br><br><br>*on behalf of themselves and all those similarly situated*,<br><br>         *Representative Plaintiffs*,<br>v.<br><br>MARIA LETICIA PATRICIO,<br><br>ENRIQUE DUQUE TOVAR,<br><br>JOSE CARMEN DUQUE TOVAR, and<br><br>MBR FARMS, INC., a Georgia corporation,<br><br><br><br>        *Defendants*. | Case No. 5:23-cv-00023<br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Cristhian Zuniga Hernandez, Luis Alfonso Palmillas Lopez, and Ramon Rodriguez Mendez (collectively, the "Plaintiffs") file this amended class action complaint on behalf of a class of over 100 H-2A visa holders (collectively, the "other class members") against Defendants Maria Leticia Patricio, Enrique Duque Tovar, Jose Carmen Duque Tovar, and MBR Farms, Inc. (collectively, the "Traffickers"). By this action, the Plaintiffs and other class members

1

seek to recover compensation for the Traffickers' labor trafficking and racketeering, as well as to punish the Traffickers for their wrongful, immoral, and pernicious violations of numerous federal and state laws.  For their amended class action complaint, , the Plaintiffs state as follows:

<u>INTRODUCTION</u>

1.      This is an action by migrant farmworkers forced and misled into farm labor and pine straw raking by Traffickers in southeastern Georgia.  On behalf of themselves and other class members, the Plaintiffs bring this action to vindicate their rights under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and Georgia statutory and common law.

2.      The Traffickers used the H-2A visa program to transport Plaintiffs and other class members to Georgia and force them to work in dangerous conditions with little to no pay, housed them in substandard housing, and subjected them to ongoing abuse.   The Traffickers misrepresented the material terms and conditions of employment, including the pay and living conditions, and then charged various unlawful fees (or conspired to do so) to Plaintiffs and other migrant farmworkers, which were never reimbursed.  The unlawful profits from their scheme were then laundered, including through the Seminole Hard Rock Hotel and Casino.  As a result of Traffickers' actions, Plaintiffs and other class members suffered significant economic and psychological harm.

3.      Plaintiffs, on behalf of themselves and other class members, seek unpaid wages, liquidated damages, trebled damages, general and special damages, punitive damages, emotional distress damages, damages arising from Traffickers' breach of contract, disgorgement of the Traffickers' ill-gotten gains, pre- and post-judgment interest, costs, and reasonable attorneys' fees.

2

PARTIES

The Representative Plaintiffs

4.     Plaintiffs Cristhian Zuniga Hernandez, Luis Alfonso Palmillas Lopez, and Ramon Rodriguez Mendez are Mexican citizens.

5.     Plaintiffs were admitted to the United States on a temporary basis under 8 U.S.C. § 1101(a)(15)(H)(ii)(a)—commonly known as the H-2A program—to work for the Traffickers during the 2020–2021 Georgia farm harvests.[1]

6.     Plaintiffs are from rural, impoverished areas of Mexico where there are few opportunities for gainful employment, and no opportunities for earning wages comparable to those promised under the H-2A program.

7.     At all times relevant to this action, the Plaintiffs were employed in the production of goods, including the gathering and bailing pine straw and the harvest and maintenance of various agricultural products, for interstate commerce.

8.     At all times relevant to this action, the Plaintiffs were employees of the Traffickers.

9.     Each Plaintiff is a "person" within the meaning of that term as defined by the federal RICO statute, in that each Plaintiff is an individual capable of holding a legal or beneficial interest in property.

10.    Each Plaintiff is an aggrieved person as set forth in the Georgia RICO.

11.    Each Plaintiff is a person who was injured by reason of violations of O.C.G.A. § 16-14-4, as set forth in the Georgia RICO.

---

[1] *See also* 8 U.S.C. § 1188 (requirements for admission of H-2A visa holders); 20 C.F.R. § 655.100-304 (same).

12.     Plaintiffs—and similarly situated workers Vladimir Hernandez Gonzales, Juan Carlos Jaramillo Barrientos, Oscar Daniel Jaimes Mireles, and Gerardo Martinez Castillo— previously have consented in writing to become party Plaintiffs in this action for claims under the FLSA.

The Traffickers

13.     Defendant Maria Leticia Patricio ("Defendant Patricio") is a citizen of the United States and a resident of Georgia.  She is the leader of a transnational criminal organization whose members and associates engaged in a variety of federal crimes in Georgia, Florida, Texas, Mexico, Honduras, and Guatemala.

14.     Defendant Patricio is an H-2A Labor Contractor in that she recruited, solicited, hired, employed, furnished, housed, and/or transported H-2A workers; and is not a fixed-site employer, an agricultural association, or an employee of a fixed-site employer or agricultural association.  *See* 20 C.F.R. § 655.103(b).

15.     Defendant Enrique Duque Tovar ("Defendant E. Duque") is a citizen of the United States and a resident of the State of Georgia.  He is the brother of Defendant Jose Carmen Duque Tovar.  He supervised and managed foreign workers who entered the United States under the H-2A visa program.  He also confiscated the foreign workers' identification documents to prevent them from leaving and threatened the workers with violence.

16.     Defendant E. Duque is an H-2A Labor Contractor in that he recruited, solicited, hired, employed, furnished, housed, and/or transported H-2A workers; and is not a fixed-site employer, an agricultural association, or an employee of a fixed-site employer or agricultural association.  *See* 20 C.F.R. § 655.103(b).

17.     Defendant Jose Carmen Duque Tovar ("Defendant J. Duque") is a lawful permanent resident of the United States and a resident of the State of Georgia.  He is the brother of Defendant E. Duque.  He recruited foreign workers from Mexico to enter the United States on H-2A visas, and he supervised and managed foreign workers who entered the United States under the H-2A visa program.  He also held the foreign workers' identification documents to prevent them from leaving.

18.     Defendant J. Duque is an H-2A Labor Contractor in that he recruited, solicited, hired, employed, furnished, housed, and/or transported H-2A workers; and is not a fixed-site employer, an agricultural association, or an employee of a fixed-site employer or agricultural association.  *See* 20 C.F.R. § 655.103(b).

19.     Defendant MBR Farms, Inc. ("Defendant MBR Farms") is a for-profit Georgia corporation with its registered address at 91 The Oaks Cir, Pearson, GA 31642.  Defendant MBR Farms operates a blueberry farm located at 448 Virgil Mckinnon Rd, Pearson, GA 31642.

20.     Barton McKinnon is the President and Chief Executive Officer of MBR Farms. Mr. McKinnon's sister, Rebecca Garrity is the Secretary and Chief Financial Officer. Mr. McKinnon and Ms. Garrity's husband, Robert Garrity, oversee the operations of MBR Farms, including the blueberry farm.

21.     Defendant MBR Farms employed the Plaintiffs and other class members who came to the United States with H-2A temporary foreign worker visas during the 2021 blueberry harvest season.

22.     Defendant MBR Farms and Defendant E. Duque jointly employed the Plaintiffs and other class members during the 2021 blueberry harvest season.

23.     Defendant MBR Farms:

(a)     Determined the number of H-2A workers to be hired;

(b)     Set a two-month experience requirement for H-2A workers who were hired.

(c)     Instructed E. Duque not to let the H-2A workers start harvesting blueberries while there was still dew and to stop work when it rained;

(d)     Determined which specific varieties of blueberry—and therefore which plants—the H-2A workers should harvest on a given day;

(e)     Determined each day whether the H-2A workers should work on a mechanical harvester, hand-pick blueberries, clear weeds from the field, or pick up trash;

(f)     Instructed E. Duque to correct H-2A workers' work if, for example, they were spilling too many blueberries and would require the workers to pick up trash they left in the field;

(g)     Had the power to send workers home if there were insufficient bins and crates, which MBR contracted with a packer to provide, available for the berries;

(h)     Entered into a contract with E. Duque setting the hourly pay rate and piece rate the H-2A workers would be paid;

(i)     Determined which work would be paid by the hour and which would be paid by a piece rate;

(j)     Leased the land where the H-2A workers performed work for MBR Farms;

(k)     Owned the blueberry bushes the H-2A workers harvested, the blueberries themselves, buckets the workers filled when they hand-picked blueberries, portable toilets, drinking water, the mechanical harvester the H-2A workers used to harvest some of the blueberries, and the tractor forklift used to lift the crates the H-2A workers filled into trucks; and

(l)     Used the H-2A workers as part of a normal and integral phase of MBR's blueberry production.

24.     Defendant MBR Farms is a fixed-site employer because it owns or operates a farm or other similar fixed-site location where agricultural activities are performed, and because it recruits, solicits, hires, employs, houses, or transports H-2A workers as incident to or in conjunction with its agricultural operation.  *See* 20 C.F.R. § 655.103(b).

25.     The Traffickers are an enterprise or enterprises engaged in commerce or in the production of goods for commerce.

26.     At all relevant times, the Traffickers had a gross volume of sales made or business done of not less than $500,000 per year.

27.     At all relevant times, the Traffickers were a "venture" within the scope of 18 U.S.C. § 1595(a) in that they had a continuing business relationship that was "a common undertaking or enterprise involving risk and potential profit."[2]

28.     At all relevant times, MBR Farms and E. Duque were a "venture" within the scope of 18 U.S.C. § 1595(a) in that they had a continuing business relationship that was "a common undertaking or enterprise involving risk and potential profit."[3]

29.     Each Trafficker is a "person" within the meaning of that term as defined by the federal RICO statute, in that each Defendant-Trafficker is an individual capable of holding a legal or beneficial interest in property.

30.     The Traffickers transported Plaintiff and other class members, or caused Plaintiffs and other class members to be transported, from Mexico to Georgia to work.

---

[2] *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021).
[3] *Id*.

VP/#60678439.4

JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331 because it arises under the Trafficking Victims Protection Act (18 U.S.C. § 1595), the Fair
Labor Standards Act (29 U.S.C. § 201 *et seq.*), and the Racketeer Influenced and Corrupt
Organizations Act (18 U.S.C. § 1961 *et seq.*).

32.     This Court has supplemental jurisdiction over all asserted state law claims pursuant
to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common
nucleus of operative facts from which the federal claims arise and, therefore, they form part of the
same case or controversy under Article III of the United States Constitution.

33.     This Court has general personal jurisdiction over each of the Traffickers because
each was domiciled and/or operating in the State of Georgia during their trafficking of the Plaintiffs
and other class members.   In addition, this Court has specific personal jurisdiction over each
individual defendant Trafficker pursuant to O.C.G.A. § 9-10-91, and this Court's exercise of
personal jurisdiction over each individual defendant is consistent with the Due Process Clause of
the United States Constitution.

34.     The United States District Court for the Southern District of Georgia (Waycross
Division) is a proper venue pursuant to 28 U.S.C. § 1391 and Southern District of Georgia Local
Rule 2.1 because it is the judicial district in which all the individual defendant Traffickers resided
and/or operated during their trafficking, and the judicial district in which a substantial part of the
events or omissions giving rise to the claims against all of the Traffickers occurred.

RICO Enterprises

35.     At all relevant times, the Traffickers were an enterprise ("RICO Enterprise I") within the meaning of that term as defined by the federal and Georgia RICO in that they were associated in fact though not a legal enterprise.  *See* 18 U.S.C. § 1961(4); O.C.G.A. § 16-14-3(6).

36.     On October 5, 2021, the Traffickers (except Defendant MBR Farms), along with Daniel Mendoza, Nery Rene Carrillo-Najarro, Antonio Chavez Ramos a/k/a Tony Chavez, JC Longoria Castro, Victoriano Chavez Hernandez, Charles Michael King, Stanley Neal McGauley, Luis Alberto Martinez a/k/a Chino Martinez, Delia Ibarra Rojas, Juana Ibarra Carrillo, Donna Michelle Rojas a/k/a Donna Lucio, Margarita Rojas Cardenas a/k/a Maggie Cardenas, Juan Francisco Alvarez Campos, Rosalva Garcia Martinez a/k/a Chava Garcia, Esther Ibarra Garcia, Rodolfo Martinez Maciel, Brett Donavan Bussey, Linda Jean Facundo, Gumara Canela, Daniel Merari Canela Diaz, and Carla Yvonne Salinas, were indicted on multiple federal charges arising out of the same scheme that gave rise to this lawsuit.  *See United States v.  Maria Leticia Patricio*, No.  5:21-cr-00009-LGW-BWC (S.D. Ga. Oct. 15, 2021), ECF No.  3 (the "Indictment").  A true and correct copy of the Indictment is attached hereto as **Exhibit 2.**

37.     The individuals identified in the Indictment collectively will be referred to herein as the "Patricio TCO".[4]

38.     At all relevant times, the members of the Patricio TCO were an enterprise ("RICO Enterprise II") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.  *See* 18 U.S.C. § 1961(4); O.C.G.A. § 16-14-3(6).

39.     At all relevant times, the Patricio TCO and the Seminole Hard Rock Hotel and Casino were an enterprise ("RICO Enterprise III") within the meaning of that term as defined by

---

[4] The Indictment also refers to these individuals as the "Patricio TCO."  Indictment at ¶ 1.

the RICO in that they were associated in fact though not a legal enterprise.  *See* 18 U.S.C. §
1961(4); O.C.G.A. § 16-14-3(6).

40.    At all relevant times, the Patricio TCO and officials employed at the Georgia
Department of Labor were an enterprise ("RICO Enterprise IV") within the meaning of that term
as defined by the RICO in that they were associated in fact though not a legal enterprise.
*See* 18 U.S.C. § 1961(4); O.C.G.A. § 16-14-3(6).

41.    The RICO Enterprises I, II, III, and IV, collectively will be referred to herein as the
"RICO Enterprises."

42.    The RICO Enterprises were ongoing organizations with a framework, either formal
or informal, for carrying out their common purposes.

<u>STATEMENT OF FACTS</u>

<u>Statutory and Regulatory Structure of the H-2A Program</u>

43.    Foreign nationals cannot work in the United States without prior authorization from
the United States government.  Foreign nationals can obtain work authorization in the United
States if a qualifying sponsor, an employer based in the United States, petitions the United States
government for a nonimmigrant visa on their behalf.  A nonimmigrant visa that authorizes foreign
nationals to work for an agricultural employer is called an "H-2A visa."

44.    An agricultural employer in the United States may bring temporary foreign
nationals ("H-2A workers") to the United States if the United States Department of Labor
("USDOL") certifies that (1) there are not enough U.S. workers to perform the job, and (2) the
employment of H-2A workers will not adversely affect the wages and working conditions of U.S.
workers who are similarly employed.  These provisions, along with the implementing federal
regulations, are commonly referred to as the "H-2A program."

VP/#60678439.4

45.     Under the H-2A program, prospective employers must file Form ETA 9142A, H-2A Application for Temporary Labor Certification ("Labor Cert.  Application") with the USDOL's Employment and Training Administration.

46.     The application must include a Form ETA 790, Agricultural Clearance Order ("Job Order").

47.     The Job Order is used in the recruitment of both U.S. and H-2A workers, is the job offer, and becomes the work contract of the employed workers.

48.     The employer submits the Job Order to the State Workforce Agency ("SWA") in the state where the work will be performed.

49.     In Georgia, the SWA is the Georgia Department of Labor ("GADOL").

50.     If an employer's Job Order appears to meet the minimum federal regulatory requirements and otherwise appears valid, the SWA approves the Job Order, and U.S. worker availability is tested by use of the interstate Employment Service system[5] and by the employer's own hiring efforts.  If it is determined that sufficient U.S. workers are not available to fill the jobs, the USDOL certifies the need for temporary foreign workers, and the Department of Homeland Security issues H-2A visas for the number of job opportunities requested by the employer and not filled by U.S. workers.

51.     The Job Order must comply with the applicable H-2A regulations that establish the minimum benefits, wages, and working conditions that must be offered to avoid adversely affecting similarly employed U.S. workers.

---

[5] Employment Service (ES) refers to the national system of public ES offices described under the Wagner-Peyser Act.  Employment services are delivered through a nationwide system of one-stop centers and are managed by State Workforce Agencies (SWAs) and funded by the USDOL. *See* 20 C.F.R. § 651.10 (definition of "Wagner-Peyser Act Employment Service").

52.     The H-2A regulations require, in part, the following:

(a)     If the worker is paid by the hour, the employer must pay the worker at least the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the federal or state minimum wage rate in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period.

(b)     If the worker is paid on a piece-rate basis, and the worker's earnings do not result in average earnings of, at least, the AEWR, then the worker's pay must be supplemented so that the worker's earnings are, at least, as much as the worker would have earned had the worker been paid the AEWR.

(c)     The employer either must provide each worker with three meals per day or must furnish free and convenient kitchen facilities to the workers so that the workers can prepare their own meals.  Where the employer provides the meals, the job order must state the charge, if any, to the worker for such meals.

(d)     The employer must provide housing to the workers, free of charge, and the housing must meet federal and local legal standards.

(e)     The employer must keep accurate and adequate records with respect to the workers' earnings, including but not limited to: field tally records, supporting summary payroll records, and records showing the nature and amount of the work performed; the number of hours of work offered each day by the employer; the hours actually worked each day by the worker; the time the work began and ended each workday; the rate of pay (both piece rate and hourly, if applicable); the worker's earnings per pay period; the worker's home address;

and the amount of and reasons for any and all deductions taken from the worker's wages.

(f)     The employer must furnish to each worker, on or before each payday, a written statement that includes, among other items: the worker's total earnings for the pay period; the worker's hourly rate and/or piece rate of pay; the hours of employment offered to the worker; the hours actually worked by the worker; an itemization of all deductions made from the worker's wages; and, if piece rates are used, the units produced daily.

(g)     The employer must provide to each H-2A worker, no later than the time at which the worker applies for the visa, a copy of the work contract between the employer and the worker in a language understood by the worker as necessary or reasonable.

53.     Once the USDOL approves the Labor Cert. Application, the employer transmits it and Form I-129, Petition for Nonimmigrant Worker (the "Petition"), to U.S. Citizenship and Immigration Services ("USCIS") indicating, among other things, the total number of H-2A visas the employer is requesting.

54.     After USCIS approves the Petition, the prospective worker applies for the H-2A visa and admission to the United States through a U.S. Embassy or Consulate.  If the worker is determined to be admissible, the H-2A visa is issued, permitting the worker to enter the United States and perform paid work in agriculture for an agricultural employer during a specific period of time.

VP/#60678439.4

55.     Under the H-2A visa program, a qualifying sponsor or employer is required to pay the foreign worker the AEWR or a higher corresponding wage rate under the terms of the contract with pay stubs that accurately list the workers' pay, hours worked, deductions, and earnings.

56.     A qualifying sponsor or employer is also required to pay up front or reimburse workers in the first work week for costs associated with obtaining the H-2A visa, border crossing fees, reasonable transportation, lodging, food expenses, and the reasonable costs associated with returning to their home countries.

<u>The Overall Human Trafficking Scheme</u>

57.     Starting at least in 2020, in an effort to exploit the Plaintiffs and other class members and cheat the federal immigration and visa laws for financial gain, Defendants Patricio, E. Duque, J. Duque (collectively, the "Contractors"), and other members of the Patricio TCO caused—or conspired to cause—to be mailed and/or electronically transmitted multiple false job orders to GADOL and H-2A petitions to the United States government seeking hundreds or thousands of foreign workers to enter the United States to work for agricultural employers and fraudulently caused the United States to issue thousands of H-2A visas to foreign nationals.

58.     The Contractors exploited the Plaintiffs and other class members by demanding they pay excessive and illegal fees for the opportunity to come to the United States on an H-2A visa and work in the United States.

59.     The Contractors exploited the Plaintiffs and other class members by lying to the Plaintiffs and other class members by falsely guaranteeing that once in the United States, the Plaintiffs and other class members would do the work described in the contract and would be paid under the terms of a contract, with transportation, housing, and food provided.

VP/#60678439.4

60.     The Contractors further exploited the Plaintiffs and other class members by requiring them to pay for their costs associated with obtaining the H-2A visa, border crossing fees, transportation fees, lodging fees, and food expenses.

61.     The Contractors exploited the Plaintiffs and other class members by holding their immigration and identification documents hostage to prevent them from leaving or from contacting law enforcement.

62.     The Contractors exploited the Plaintiffs and other class members by requiring them to perform physically demanding work in agricultural fields in the United States for little or no pay.

63.     When payday did come, the Plaintiffs and other class members were paid in cash and without pay stubs that accurately listed their pay, hours worked, deductions, or earnings.

64.     The Contractors exploited the Plaintiffs and other class members by forcing them to live in crowded, unsanitary, and degrading living conditions, and by threatening them with deportation and violence.

65.     The Contractors further exploited the Plaintiffs and other class members by forcing them to pay additional fees to get their passports and H-2A visas back from the Traffickers.

66.     The Contractors further exploited the Plaintiffs and other class members by coercing them to pay substantial sums as a condition of leaving their employment.

67.     The Contractors and other members of the Patricio TCO have reaped more than $200 million from the illegal scheme, laundering the funds through cash purchases of land, homes, vehicles, and businesses; through cash purchases of cashier's checks; and by funneling millions of dollars, including through cash deposits made at the Seminole Hard Rock Hotel and Casino in Tampa, Florida.

VP/#60678439.4

68.     In 2021 and 2022, Defendant MBR Farms conspired with the Contractors in this labor exploitation scheme, as set forth below.

Racketeering

69.     The acts and omissions described herein were committed by the indicated Defendant or Defendants through the RICO Enterprises.

The Employment Contracts

**The 2020 Job Order**

70.     On or around March 3, 2020, Defendant E. Duque submitted job order number H-300-20041-312099 ("the 2020 Job Order") to the GADOL.

71.     On or around March 3, 2020, Defendant E. Duque signed the "Employer's Certification" in the 2020 Job Order.

72.     In the 2020 Job Order, Defendant E. Duque signed the following Employer's Certification:

"I declare under penalty of perjury that I have read and reviewed this clearance order, including every page of this Form ETA-790A and all supporting addendums, and that to the best of my knowledge, the information contained therein is true and accurate.  This clearance order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job.  20 C.F.R. § 653.501(c)(3)(viii).  I understand that to knowingly furnish materially false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a federal offense punishable by fines, imprisonment, or both.  18 U.S.C. 2, 1001."

73.     The approved 2020 Job Order (attached as **Exhibit 3**) included, but was not limited to, the following terms:

(a)     A prohibition against the employer and its agents seeking or receiving payment from any worker for application fees and recruitment costs.

(b)     Period of employment of 04/10/2020 through 08/20/2020.

(c)     Anticipated hours of work of at least 35 hours per week.

(d)     Job duties described as farm labor related to blueberries.

(e)     An hourly wage of not less than the AEWR, or $11.71 per hour for work performed within year 2020 through February 22, 2021.

(f)     A weekly pay period.

(g)     Free housing that met local, state and federal requirements, including adequate kitchen facilities with utensils to allow workers to cook their own meals.

(h)     Weekly trips to a food store and a laundry facility.

(i)     That three meals a day would be provided for workers.

74.     Guaranteed employment for a total number of work hours equal to at least three-fourths of the workdays of the total work period was advertised in each respective job order, or the monetary equivalent if the hours were not offered.

75.     The terms and conditions of the 2020 Job Order, together with the requirements of 20 C.F.R. § 655, constituted a job offer.

76.     The job offer, when accepted, created a work contract between Traffickers and the Plaintiffs and other class members who accepted the offer.

77.     The work contracts at issue here incorporate a promise to "comply with applicable Federal and State minimum wage . . . and other employment-related laws" including the FLSA and the TVPA.

78.     By promising to pay the federally mandated wage rate, Traffickers also promised

17

to pay that wage free and clear without deductions for items for the employers' benefit or without reducing the workers' wages by shifting costs to those workers.

79.     The Employer's Certification in the 2020 Job Order certifies that the job order "describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job."

80.     When Defendant E. Duque signed the Employer's Certifications in the 2020 Job Order, he knew some of the representations were false.

81.     When Defendant E. Duque signed the Employer Certifications, he knew the following statements to be true:

(a)     That Traffickers would charge their workers, including the Plaintiffs and other class members, various fees associated with H-2A recruitment and employment, including transportation and rent.

(b)     That Traffickers would use the H-2A workers, including the Plaintiffs and other class members, for job duties that were not authorized under the Job Orders, including packing pine straw, or packing watermelons.

(c)     That Traffickers would not pay to their H-2A workers, including the Plaintiffs and other class members, the wage rates offered in the respective job orders, as required by law.

(d)     That Traffickers would not provide the H-2A workers, including the Plaintiffs and other class members, housing that met minimum standards required by law. In reliance on Defendant E. Duque's false declarations, under penalty of perjury, in the 2020 Job Order, the USDOL approved the Job Order and allowed for the certification of recruitment of 100 foreign guest workers, including the

Plaintiffs and other class members.

82.     In reliance on Defendant E. Duque's certifications in the 2020 Job Order, the GADOL approved the 2020 Job Order.

83.     On or about March 6, 2020, Defendant E. Duque submitted the approved Job Order along with a Labor Cert. Application to the USDOL.

84.     In reliance on Defendant E. Duque's certifications in the 2020 Job Order and the Labor Cert.  Application, the USDOL approved the 2020 Labor Cert. Application.

**The 2021 Job Order**

85.     On or around December 23, 2020, Barton McKinnon, acting on behalf of Defendant MBR Farms, signed a written contract with Defendant E. Duque.

86.     The contract listed Barton McKinnon as the owner of MBR Farms but provided Robert Garrity's cell phone number and email address as MBR Farms' contact information.

87.     The contract provided E. Duque would provide laborers to MBR Farms under the following terms and conditions:

VP/#60678439.4

**Type of Work**:

ALL GENERAL FARM LABOR RELATED TO **BLUEBERRIES**

**Employee duties**:

Harvest, count, prune, load, unload, and all farm labor related to **BLUEBERRIES** All jobs will be done under extreme weather conditions, repetitive movements like bending, stooping and heavy lifting. Workers will also be pulling weeds, raking, cleaning around shed areas, laying irrigation pipes, digging ditches, and cleaning fields.

**Employee Requirements:**

- All works should have at least 60 days verifiable experience.
- Must lift at least 52 lbs.

**Address of Field or Block Number(s) & Acres:**

448 VIRGIL MCKINNON RD PEARSON, GA. 31642

**Start Date(s)**:03/01/2021          **End Date(s)**: 10/01/2021

**Estimated Number of Employees**: 84

**Contractor Employee Pay Rate**: [x] Hourly **$11.71** [x] Piece Rate **$0.50 per pound**

88.    At the time Mr. McKinnon signed the contract on behalf of MBR Farms, he knew MBR Farms did not need 84 laborers on its blueberry farm from March 1, 2021 until October 1, 2021.

89.    At the time Mr. McKinnon signed the contract on behalf of MBR Farms, he knew MBR Farms 84 farm laborers would not work at its blueberry farm from March 1, 2021 until October 1, 2021.

90.    At the time Mr. McKinnon signed the contract, he knew or should have known the laborers would not be paid $11.71 per hour and a piece rate of $0.50 per pound of blueberries picked.

VP/#60678439.4

91.     Under the contract, E. Duque's opportunity for profit and risk of loss were directly tied to the success of MBR Farms' blueberry growing operation.

92.     Under the contract, MBR Farms' opportunity for profit and risk of loss depended on E. Duque providing laborers to work on the farm.

93.     By contracting with Defendant E. Duque to provide laborers for a period of seven months for which both parties carried opportunities for profit and risk of loss, MBR Farms entered into a venture with E. Duque within the meaning of 18 U.S.C. § 1595(a).

94.     At the time it entered into the contract, MBR Farms knew it would benefit financially from the arrangement by way of increased profits and it would receive the value of the H-2A workers' low-cost labor.

95.     MBR Farms did benefit financially from the arrangement by way of increased profits and did receive the value of the H-2A workers' low-cost labor.

96.     Throughout its venture with Defendant E. Duque, MBR Farms knew or should have known E. Duque was subjecting the H-2A workers at MBR Farms to forced labor, trafficking for forced labor, and document servitude.

97.     The contract indicated MBR Farms had "the right at any time during working hours to inspect [E. Duque's] book [*sic*] and records."

98.     MBR Farms never inspected E. Duque's books and records.

99.     If it were exercising reasonable care—particularly because of the discrepency between the terms of the contract and the actual number of H-2A workers and duration of the work at MBR Farms' blueberry growing operations and because MBR Farms paid E. Duque at rate that would not permit the H-2A workers to earn the required AEWR—MBR Farms would have inspected E. Duque's books and records.

21

100.    On or around January 14, 2021, Defendant E. Duque submitted job order number H-300-21006-998169 (the "2021 Job Order") to the GADOL.

101.    Defendant E. Duque included the terms of his contract with Defendant MBR Farms in the 2021 Job Order.

102.    On or around January 14, 2021, Defendant E. Duque electronically signed the "Employer's Certification" in the 2021 Job Order.

103.    In the 2021 Job Order, Defendant E. Duque, signed the following Employer's Certification:

"I declare under penalty of perjury that I have read and reviewed this clearance order, including every page of this Form ETA-790A and all supporting addendums, and that to the best of my knowledge, the information contained therein is true and accurate.  This clearance order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job.  20 C.F.R. § 653.501(c)(3)(viii).  I understand that to knowingly furnish materially false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a federal offense punishable by fines, imprisonment, or both.  18 U.S.C. 2, 1001."

104.    The approved 2021 Job Order (attached as **Exhibit 4**) included, but was not limited to, the following terms:

(a)    A prohibition against the employer and its agents from seeking or receiving payment from any worker for application fees and recruitment costs.

(b)    Period of employment of 03/08/2021 through 10/01/2021.

(c)    Anticipated hours of work of at least 35 hours per week.

(d)    Job duties described as farm labor related to blueberries.

22

(e)     An hourly wage less than the AEWR of $11.81 for work performed from February 23, 2021 to October 1, 2021.[6]

(f)     A piece rate of $0.50 per pound.

(g)     A weekly pay period.

(h)     Free housing that met local, state and federal requirements, including adequate kitchen facilities with utensils to allow workers to cook their own meals.

(i)     Free weekly trips to a food store and a laundry facility.

(j)     That three meals a day would be provided for workers seven days a week.

105.    Guaranteed employment for a total number of work hours equal to at least three-fourths of the workdays of the total work period advertised in each respective job order, or the monetary equivalent if the hours were not offered.

106.    The terms and conditions of the 2021 Job Order, together with the requirements of 20 C.F.R. § 655, constituted a job offer.

107.    The job offer, when accepted, created a work contract between Traffickers and the Plaintiffs and other class members who accepted the offer.

108.    The work contracts at issue here incorporate a promise to "comply with applicable Federal and State minimum wage . . . and other employment-related laws" including the FLSA and the TVPA.

109.    By promising to pay the federally mandated wage rate, Traffickers also promised to pay that wage free and clear without deductions for items for the employers' benefit or without reducing the workers' wages by shifting costs to those workers.

---

[6] Defendant E. Duque's 2021 Job Order was approved even though it listed a wage smaller than the AEWR for the 2021 year.

110. The Employer's Certification in the 2021 Job Order certifies that the respective job order "describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job."

111. When Defendant E. Duque signed the Employer's Certifications in the 2020 Job Order and 2021 Job Order, he knew some of the representations were false.

112. In reliance on Defendant E. Duque's certifications in the 2021 Job Order, the GADOL approved the 2021 Job Order.

113. When Defendant E. Duque signed the Employer Certifications, he knew the following statements to be true:

(a)     That Traffickers would charge their workers, including the Plaintiffs and other class members, various fees associated with H-2A recruitment and employment, including transportation and rent.

(b)     That Traffickers would use the H-2A workers, including the Plaintiffs and other class members, for job duties that were not authorized under the Job Orders, including packing pine straw, or packing watermelons.

(c)     That Traffickers would not pay to their H-2A workers, including the Plaintiffs and other class members, the wage rates offered in the respective Job Orders, as required by law.

(d)     That Traffickers would not provide the H-2A workers, including the Plaintiffs and other class members, housing that met minimum standards required by law. In reliance of Defendant E. Duque's false declarations, under penalty of perjury, in the 2021 Job Order, the USDOL approved the job order and allowed for the certification of recruitment of 84 foreign guest workers, including the Plaintiffs

24

and other class members.

114.     In reliance on Defendant E. Duque's certifications in the 2021 Job Order, the GADOL approved the 2021 Job Order.

115.     On or about February 4, 2021, Defendant E. Duque submitted the approved Job Order along with a Labor Cert.  Application to the USDOL.

116.     In reliance on Defendant E. Duque's certifications in the 2021 Job Order and the Labor Cert.  Application, the USDOL approved the 2021 Labor Cert.  Application.

**The 2022 Season**

117.     Defendants E. Duque, J. Duque, and Patricio were indicted on October 5, 2021, and the indictment was unsealed on November 17, 2021.

118.     After Defendant E. Duque was indicted, he switched his farm labor contracting business into the name of his wife, Sherry Duque.

119.     In 2022, Sherry Duque operated as a front for E. Duque's operations.

120.     In 2022, E. Duque continued to manage all aspects of his farm labor contracting business, except that Sherry Duque signed H-2A visa-related documents, and financial transactions were in Sherry Duque's name.Defendant MBR Farms continued to engage the farm labor contractor services of Defendant E. Duque during the 2022 season. With the exception the two straw-contractor roles Sherry Duque played, as described in the preceding paragraph, MBR Farms dealt exclusively with E. Duque in all aspects of employing the H-2A workers on E. Duque's crew.

121.     MBR Farms CEO Barton McKinnon knew Sherry Duque was operating as a front for Defendant E. Duque.

122.     MBR Farms CEO Barton McKinnon knew or should have known the straw-contractor scheme was illegal.

123.    MBR Farms took no action to prevent this illegal conduct, but rather actively participated in it by using the services of Defendant E. Duque, an indicted farm labor contractor who was using Sherry Duque to cover up his continuing illegal farm labor contracting activities.

<u>Recruitment</u>

124.    In 2020 and 2021, Defendant J. Duque, as an agent of the other Traffickers, recruited the Plaintiffs and other class members to work for the Traffickers as H-2A Visa workers in the United States.

125.    Specifically, the Plaintiffs and other class members met with Defendant J. Duque at his home in San Luis Potosi.

126.    During these recruiting meetings, Defendant J. Duque, as an agent of the other Traffickers, promised the Plaintiffs and other class members an opportunity to work in the United States harvesting blueberries, at a higher hourly wage rate than the Plaintiffs and other class members actually earned.

127.    In 2021, Defendant J. Duque's representations were based in part on the terms and conditions of employment set forth in the contract between MBR Farms and Defendant E. Duque.

128.    Defendant J. Duque, as an agent of the other Traffickers, represented that the Plaintiffs and other class members could earn between $900 to $1,400 USD per week picking blueberries.

129.    Defendant J. Duque, as an agent of the other Traffickers, represented that the Plaintiffs and other class members that the term of employment would be eight months.

130.    Defendant J. Duque knew the representations he made to the Plaintiffs and other class members were false.

26

131.    The terms and conditions of the 2020 Job Order and the 2021 Job Order, together with the requirements of 20 C.F.R. § 655, constituted offers of employment.

132.    Relying on Traffickers' promises of gainful employment, each of the Plaintiffs and other class members accepted the offer of employment.

133.    The offer of employment, when accepted, created an employment contract between the Traffickers and each of the Plaintiffs and other class members who accepted the offer.

134.    Relying on the Traffickers' promises of gainful employment under the terms of the job offers, the Plaintiffs and other class members accepted the offer of employment.

135.    The offer of employment, when accepted, created an employment contract between the Traffickers, and each of the Plaintiffs and other class members who accepted the offer.

136.    The Plaintiffs' and other class members' native language is Spanish, and they cannot read English.

137.    The Traffickers failed to give any of the Plaintiffs and other class members a copy of the employment contract translated in "a language understood by the worker[s]," as required by 20 C.F.R. § 655.103(q).

<u>Pre-Employment Expenses</u>

138.    The Plaintiffs and other class members incurred various immigration, processing, lodging, and travel expenses in order to come work for the Traffickers.

139.    Defendant J. Duque, as an agent of the other Traffickers, demanded from each of the Plaintiffs and other class members upfront payments of 3,000-5,000 pesos, or approximately $150–$265 USD, per person to sign up for the opportunity to work in the United States.

VP/#60678439.4

140.     Relying on Traffickers' promises of gainful employment, each of the Plaintiffs and other class members accepted the offer of employment and paid Defendant J. Duque the demanded fees.

141.     After the Plaintiffs and other class members paid Defendant J. Duque the demanded cash, Defendant J. Duque informed them he would be in contact when it was time to leave for the United States.

142.     Weeks, or in some cases months later, Defendant J. Duque contacted the Plaintiffs and other class members and told them they would need to travel to Monterrey for their H-2A visas.

143.     After each of the Plaintiffs and other class members paid the upfront cash to sign up with Defendant J. Duque, he contacted each of the Plaintiffs and other class members and told them they would need to pay him an additional 5,000-6,000 pesos, or approximately $350–$400 USD, to obtain their H-2A visas.

144.     Thereafter, the Plaintiffs and other class members each traveled to Monterrey to the U.S. consulate to wait for their H-2A visas to be processed.  They stayed in a hotel while in Monterrey waiting to receive their H-2A visas.

145.     The Plaintiffs and other class members each incurred expenses for travel and lodging during their trip to, and time spent in, Monterrey to obtain the H-2A visas.

146.     After each of the Plaintiffs and other class members had obtained their H-2A visas, they then traveled to the United States.  Each incurred additional travel-related expenses on their journey from Monterrey to their final work destination in Georgia.

147.     The Plaintiffs and other class members were taken from Monterrey to Nuevo Laredo, a city on the border of Mexico and the United States.  They crossed through an

28

immigration checkpoint in Nuevo Laredo before being transported to Georgia.  The Contractors demanded the Plaintiffs and other class members pay the Contractors' transportation fees from Monterrey to Nuevo Laredo.

148.     The Plaintiffs and other class members had to pay transportation, lodging, and other fees and costs during their trip from the border to Georgia.

149.     After paying the required fees to the Contractors, the Plaintiffs and other class members were required to pay additional expenses in order to travel to Georgia to work.

150.     Each of the Plaintiffs and other class members arrived in Georgia on a different date.[7]

151.     The expenses described above were costs necessary to enter the United States as an H-2A worker and were incurred for the benefit of Traffickers, as defined by 29 C.F.R. §§ 531.32(c) and 778.217.

152.     The Plaintiffs and other class members incurred the expenses before receipt of their first paychecks.

153.     The Plaintiffs and other class members took loans to pay the fees required by the Traffickers and to pay travel expenses.

154.     The Traffickers never reimbursed Plaintiffs and other class members for any of the expenses the Plaintiffs and other class members incurred to obtain their visas, the recruitment fees paid to Defendant J. Duque, or any other expenses related to their travel and lodging from Mexico to Georgia.

---

[7] Plaintiff Ramon Rodriguez Mendez arrived in Georgia in April 2021.  Plaintiff Luis Alfonso Palmillas Lopez arrived in Georgia on or about April 11, 2021.  Plaintiff Cristhian Zuniga Hernandez arrived in Georgia on or about April 22, 2021.

29

155.    The employment contracts at issue here incorporate a promise to "comply with applicable Federal and State minimum wage . . . and other employment-related laws," including the FLSA and TVPA.

156.    By promising to pay the federally mandated AEWR, the Traffickers also promised to pay that wage free and clear without deductions for items for the employers' benefit and without reducing the workers' wages by shifting costs to the workers.

157.    The Traffickers' failure to reimburse the Plaintiffs and other class members for these pre-employment expenses brought the Plaintiffs' and other class members' wages below the federal minimum wage and the AEWR.

158.    The expenses the Plaintiffs and tother class members paid as described above were contrary to Defendant E. Duque's sworn declaration to USDOL in the 2020 Job Order and 2021 Job Order—and the certifications to the GADOL in the respective 2020 and 2021 Job Orders— that (a) Defendant E. Duque and his agents had not sought and received, and  would not seek and receive, payments from the Plaintiffs and other class members for activities related to labor certification, and (b) Defendant E. Duque would forbid foreign labor recruiters from receiving these payments.

<u>Wages, Working and Housing Conditions</u>

159.    Upon arrival in Georgia, the Plaintiffs and other class members were housed in a motel.  The motel appeared abandoned, with broken windows, dirty rooms, unkempt beds, and no hot water.  They each shared a room with multiple other workers.

160.    The Plaintiffs and other class members each stayed in the motel for the first part of their stay in Georgia, some for only three days, but others for up to one month.

161.     After moving out of the motel, the Plaintiffs and other class members were housed in four trailers in a small trailer park.  One of the four trailers was empty.

162.     The trailers were also dirty and run down with no air conditioning or heat, and holes in the floor.  The roofs leaked when it rained.  There were rats and cockroaches.

163.     Each trailer housed between 15–18 workers, with only a single bathroom.

164.     Some of the trailers had no beds, so the workers were forced to sleep on the floor. In other trailers, the workers slept in bunkbeds.

165.     The stove did not work in one of the trailers, so the Plaintiffs and other class members were forced to replace it with the stove from the empty trailer.  They also had to fix the bathroom and refrigerator in one of the trailers.

166.     Upon arriving at the trailers, the Contractors confiscated the Plaintiffs' and other class members' immigration documents, including their passports and visas.  The Contractors represented to the Plaintiffs and other class members that the Traffickers needed the documents for social security.

167.     The Plaintiffs and other class members started working within a few days of their arrival.

168.     After police were called to the premises where the Plaintiffs and other class members were staying, Defendant E. Duque and his agents moved the Plaintiffs and other class members to other housing in the middle of the mountains.  The Plaintiffs and other class members rested on bunk beds without mattresses with refrigerators that did not work.

169.     Despite being told they would be harvesting blueberries, the Plaintiffs and other class members were also ordered to perform manual labor making pine straw bales and packing watermelons.

31

170.    The Plaintiffs and other class members' work making pine straw bales was not agriculture or secondary agriculture within the meaning of the FLSA.

171.    Despite being told that they would earn up to $1,400 a week, the Plaintiffs and other class members were paid far less than the wages Defendant MBR Farms, Defendant E. Duque, and his agents promised or were not even paid at all.  For example:

(a)    Plaintiff Luis Alfonso Palmillas Lopez began working on Friday, April 16, 2021.  The first day, he worked making pine packs from 6 A.M.  to 6 or 7 P.M.  He was not paid for his work.  The next day he was paid $30 USD for the day.  After that, on the days he worked making pine straw bales, he was paid $1 per pack; he usually made about 70-80 bales in a day.  In total, Plaintiff Lopez made approximately $190–$220 USD per week, but he was charged $20 weekly for rides to work, the grocery store and laundry.  He was also charged rent and an additional $1,000 USD for his transportation to the United States.  These expenses were deducted from his paychecks. When Plaintiff Lopez worked in MBR Farms' blueberry fields, his earnings were similar.

(b)    Plaintiff Ramon Rodrigues Mendez did not work for about a week to ten days after arriving in Georgia.  During this time, he had no money and no food.  He and the other workers were forced to combine their resources and share food to get by because the Contractors  did not bring them anything to eat.  Plaintiff Ramon Rodriguez Mendez first began cleaning garbage and debris for the first four days of work and was paid only $40.00 for this work.  The first week of work he earned a total of $120.00.  He had fees of $40.00 deducted for transportation and rent from his pay. When Plaintiff Mendez worked in MBR Farms' blueberry fields, he continued to earn less than $250 per week, though he worked long hours.

(c)      Plaintiff Cristhian Zuniga Hernandez was paid $350.00 for a week of work, including for work at MBR Farms, but the Contractors deducted $100 for transportation and hotel lodging.

172.    Defendant E. Duque announced to the Plaintiffs and other class members that he was going to start charging $1,000 to each person as a fee for bringing the Plaintiffs and other class members to the U.S. and that the fees would be deducted from the paychecks.

173.    The Contractors  deducted from the Plaintiffs' and other class members' paychecks fees for rent and transportation to the fields to work, to do laundry, and to go grocery shopping.

174.    The Traffickers did not supplement the Plaintiffs' and other class members' weekly earnings to ensure they received the wages required by the FLSA and their employment contracts.

175.    The Plaintiffs and other class members never received any reimbursement for any fees they paid to Contractors for rent or transportation or for any deductions from their pay.

176.    The Traffickers failed to make, keep, preserve, and retain accurate employment records, as required by the FLSA and by the H-2A regulations.

177.    The Traffickers did not provide Plaintiffs and other class members with complete and regular earning statements containing the information required by the H-2A regulations.

178.    The Traffickers did not pay overtime premiums equal to one-and-a-half the Plaintiffs'  and other class members' regular rate of pay during workweeks when the Plaintiffs and other class members performed work that was not agriculture or secondary agriculture, as defined by the FLSA.

179.    The Traffickers' failure to pay the wages required by the FLSA and the employment contract were contrary to Defendant E. Duque's sworn declaration to USDOL in the 2020 and

2021 Labor Cert.  Applications and representations to the GADOL and to Plaintiffs and other class members in the 2020 and 2021 Job Orders that Defendant E. Duque would pay the required wages.

180.    To the extent Defendants Patricio and MBR Farms did not directly commit the acts and omissions described above, they conspired with the other Defendants by knowingly providing support to the violations of the sworn declaration to USDOL in the 2020 and 2021 Labor Cert. Applications and representations to the GADOL and to the Plaintiffs and other class members in the 2020 Job Order and 2021 Job Order.

181.    As a result of the working and housing conditions the Plaintiffs and other class members endured during their time in Georgia, they suffered economic injuries and emotional distress, including stress, fear of serious injury, worry and/or anxiety.

<u>The Labor Trafficking</u>

182.    The Traffickers recruited the Plaintiffs and other class members in Mexico.

183.    The Plaintiffs and other class members are poor and from impoverished communities with limited opportunities for employment and education.

184.    The Traffickers sought out workers from impoverished backgrounds and limited understanding of the U.S. legal system.

185.    During recruitment, the Traffickers knowingly made or conspired to make false promises to the Plaintiffs and other class members about the wages and conditions of the offered employment.

186.    The Traffickers required or conspired to require the Plaintiffs and other class members to pay substantial recruitment fees.

187.    The Plaintiffs and other class members took out loans to pay the required fees and expenses.

34

188.   After making the pre-employment payments to the Contractors, the Plaintiffs and other class members still had to pay additional travel expenses in order to travel to Georgia to work.

189.   Once in the United States, the Traffickers confiscated or conspired to confiscate Plaintiffs' passports to prevent them from escaping.

190.   When the Plaintiffs and other class members arrived in Georgia, the Traffickers housed the Plaintiffs and other class members, or caused them to be housed, in substandard housing.

191.   The Traffickers forced or conspired to force the Plaintiffs and other class members to perform arduous labor without adequate access to food, water, or rest.

192.   The Traffickers forced or conspired to force Plaintiffs and other class members to work without compensation or for substandard wages.

193.   The Traffickers threatened, or caused the Plaintiffs and other class members to be threatened, that any worker who left the employment would be unable to return to the U.S. with another H-2A Visa in the future.

194.   Defendant E. Duque berated the Plaintiffs and other class members with insults and vulgarities at numerous times to maintain Plaintiffs and other class members in a state of apprehension.

195.   Defendant E. Duque repeatedly threatened, or caused Plaintiffs to be threatened, that any worker who left the employment would be reported to immigration.

196.   MBR Farms CEO Barton McKinnon and manager Bobby Garrity observed E. Duque berating and threatening the Plaintiffs and other class members when they were working at MBR Farms' blueberry field.

VP/#60678439.4

197.    Mr. McKinnon and Mr. Garrity did nothing to stop the verbal abuse and threats.

198.    The Plaintiffs and other class members reasonably believed Defendant E. Duque's threats.

199.    The Plaintiffs and other class members reasonably believed Mr. McKinnon's and Mr. Garrity's silence in the face of E. Duque's verbal abuse and threats meant they supported E. Duque's verbal abuse and threats.

200.    Defendant E. Duque would "rent" out the Plaintiffs and other class members to do other work not on the 2020 and 2021 Job Orders.  In one instance, the Plaintiffs and other class members went to work on a watermelon farm.  Defendant E. Duque earned $15.00 an hour per worker he "lent" but the Plaintiffs and other class members earned only $8.00 an hour.

201.    After one of the workers called 911 to complain about Defendant E. Duque, the police came to where the Plaintiffs and other class members were staying.

202.    After the policed arrived and briefly spoke to Defendant E. Duque, he subsequently transported the Plaintiffs and other class members to another location 40 minutes further away from the Plaintiffs and other class members work location.  Defendant E. Duque threatened and assaulted the Plaintiffs and other class members after police came attempting to find out who called the police.  He said "fucking idiots, you guys do not have rights here" and proceeded to threaten that he would deport them and make sure that they would never return to the U.S.

203.    On another occasion, Defendant E. Duque took the Plaintiffs and other class members to his house and gave them food and water.  He recorded a video of the Plaintiffs and other class members eating and drinking after mentioning that someone had complained to the social services about the Plaintiffs and other class members' working condition.  Thereafter, he

told the Plaintiffs and other class members that he was going to "deal" with the person who spoke with social services.

204.    Sometime after the police came, Defendant E. Duque drunkenly assaulted Plaintiff Ramon Rodriguez Mendez.  He grabbed Plaintiff Mendez by the neck and pushed him on top of a van and insulted him and yelled that Plaintiff Mendez "didn't know anything."  His hands remained on Plaintiff Mendez's neck.  Even after being assaulted, Plaintiff Mendez believed he could not leave.

205.    The Traffickers threatened or conspired to threaten the Plaintiffs and other class members with significant debt to prevent the Plaintiffs and other class members from leaving the Traffickers' employment, in that the Traffickers would require the Plaintiffs and other class members to pay a certain amount of money to Traffickers to be released from the contract.

206.    Because the Traffickers did not pay the Plaintiffs and other class members all their earned wages, and because Plaintiffs and other class members had to pay for travel and recruitment expenses, Plaintiffs and other class members had little or no money while in Georgia.

207.    Despite wanting to leave, the Plaintiffs and other class members continued to work for the Traffickers because they feared legal or violent retaliation from Traffickers.

208.    Despite wanting to leave, the Plaintiffs and other class members continued to work for the Traffickers because they feared being unable to repay the loans the Traffickers induced them to take out.

209.    Despite wanting to leave, the Plaintiffs and other class members continued to work for the Traffickers because they feared being deported, and/or they feared being unable to return to the United States with a H-2A Visa.

210.    During the Plaintiffs' and other class members' time in Traffickers' labor trafficking scheme, the Plaintiffs and other class members experienced economic injuries and emotional distress, including stress, sleeplessness, anxiety, humiliation, and fear of being deported, of being harmed, of their family members back home being harmed, and of the consequences of being unable to pay back their loans.

211.    When the Plaintiffs and other class members escaped the Traffickers' captivity, they still owed money on the loans they had to take on to pay their pre-employment expenses.

212.    The Plaintiffs and other class members reasonably believed they owed the Traffickers a legally enforceable monetary debt for leaving before the end of the contract.

213.    After escaping from Traffickers' captivity, the Plaintiffs and other class members continued to suffer emotional distress caused by their time working under labor trafficking conditions.

<u>CLASS ACTION ALLEGATIONS</u>

214.    The Representative Plaintiffs seek to represent a class consisting of all H-2A temporary foreign workers who were employed pursuant to temporary labor certifications issued to Defendant E. Duque.

215.    The class members are so numerous and so geographically dispersed as to make joinder impracticable.  The precise number of individuals in the class is known only to the Traffickers.  However, the class is believed to include over 200 individuals.  The class is comprised of indigent foreign migrant workers.  The class members are not fluent in the English language and are unfamiliar with the American judicial system.  The relatively small size of the individual claims and the indigence of the class members make the maintenance of separate actions by each class member economically infeasible.

VP/#60678439.4

216.     There are questions of law and fact common to the class.  These common legal and factual questions include:

(a)     Whether the Traffickers were obligated to provide the class members with adequate living conditions and food without charge;

(b)     Whether the Traffickers were obligated to reimburse the class members for expenses the class members incurred, including transportation, housing, and food;

(c)     Whether the Traffickers recruited, harbored, transported, obtained and/or provided the Plaintiffs and other putative class members for the purpose of subjecting them to forced labor;

(d)     Whether the Traffickers used and/or threatened Plaintiffs and other putative class members with physical restraint, serious harm, and/or abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;

(e)     Whether the Traffickers knowingly benefitted from participating in a venture that the Traffickers knew or should have known was engaged in providing and/or obtaining Plaintiffs' and other putative class members' labor or services through actual or threats of physical restraint, serious harm, and/or abuse of the legal process;

(f)     Whether the Traffickers knowingly benefitted from participating in a venture they knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiffs and other putative class members for the purpose of subjecting them to forced labor, trafficking for forced labor, and/or document servitude;

39

(g)     Whether the Traffickers, through the RICO Enterprises, committed a pattern of racketeering activity causing the Plaintiffs and other putative class members to suffer pecuniary losses;

(h)     Whether the Traffickers violated their contracts with the Plaintiffs and other putative class members as embodied in the clearance order by failing to pay the Plaintiffs' and other putative class members' wages;

(i)     Whether the Traffickers are an enterprise within the meaning of the federal and Georgia RICO; and

(j)     Whether the Traffickers, through the enterprise, engaged in a pattern of racketeering activity.

217.    The claims of the Plaintiffs are typical of those of the other class members and these claims predominate over any questions affecting only individual class members.

218.    The Plaintiffs have the same interests as do other members of the class and will vigorously prosecute these interests on behalf of the class.

219.    Counsel for the Plaintiffs are experienced in handling class actions by H-2A workers to enforce their rights under their employment contracts and have handled numerous class actions in the federal courts, including class actions on behalf of H-2A workers bringing claims similar to those presented in this action.  Plaintiffs' counsel is prepared to advance litigation costs necessary to vigorously litigate this action and to provide notice to the class members under Rule 23(b)(3).

220.    A class action under Rule 23(b)(3) is superior to other available methods of adjudicating this controversy because, *inter alia*:

40

(a)     The common issues of law and fact, as well as the relatively small size of the individual class members' claims, substantially diminish the interest of members of the class in individually controlling the prosecution of separate actions;

(b)     Many members of the class are unaware of their rights to prosecute these claims and/or lack the means or resources to secure legal assistance;

(c)     There has been no litigation already commenced against the Traffickers by the members of the class to determine the questions presented;

(d)     It is desirable that the claims be heard in this forum because the Traffickers reside in this district and the acts giving rise to the causes of action set out herein arose in this district; and

(e)     A class action can be managed without undue difficulty because the Traffickers have regularly committed the violations complained of herein and were required to maintain detailed records concerning each member of the class.

<u>FLSA COLLECTIVE ACTION ALLEGATIONS</u>

221.     The Plaintiffs bring their FLSA claims on behalf of themselves and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required wages at the Traffickers' operations within the applicable statute of limitations.  See 29 U.S.C. § 255.

222.     Common proof applicable to the Plaintiffs and the other similarly situated workers will show that the Traffickers failed to properly pay the required minimum and overtime wages.

223.     The Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA opt-in class, but this information is readily ascertainable from the Traffickers' records.  The Traffickers therefore should be required to provide the Plaintiffs with a

41

list—including last known addresses, telephone numbers, and email addresses—of all individuals who the Traffickers employed within the applicable statute of limitations.

<u>COUNT I</u>
(Violation of the Federal Forced Labor Statute Against the Traffickers)
(18 U.S.C. § 1589)

224.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

225.    The Traffickers knowingly provided or obtained the labor or services of the Plaintiffs and other class members by means of actual and threatened force and physical restraint.

226.    The Traffickers knowingly provided and/or obtained the labor or services of the Plaintiffs and other class members by means of serious harm and/or threats of serious harm.

227.    The Traffickers knowingly provided and/or obtained the labor or services of the Plaintiffs and other class members by means of a scheme, plan, or pattern intended to cause the Plaintiffs and other class members to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint.

228.    As a result of the Traffickers' conduct, the Plaintiffs and other class members have suffered economic damages, for which they should be compensated in an amount to be proven at trial.

229.    As a result of the Traffickers' conduct, Plaintiffs and other class members have suffered significant emotional and physical pain and suffering, for which they should be compensated in an amount to be determined by the jury or Court.

230.    The Traffickers' conduct warrants the Court's imposition of punitive damages against the Traffickers.

VP/#60678439.4

231.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Traffickers' wrongful conduct.

<u>COUNT II</u>
(Trafficking With Respect to Forced Labor Against the Traffickers)
(18 U.S.C. § 1590)

232.     The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

233.     The Traffickers knowingly recruited, harbored, transported, provided, and/or obtained by any means, the Plaintiffs and other class members for their labor or services in violation of Chapter 77 of Title 18 of the U.S. Code.

234.     As a result of the Traffickers' conduct, the Plaintiffs and other class members have suffered economic damages, for which they should be compensated in an amount to be determined by a jury or the Court.

235.     As a result of the Traffickers' conduct, the Plaintiffs and other class members have suffered significant emotional and physical pain and suffering, for which they should be compensated in an amount to be determined by a jury or the Court.

236.     The Traffickers' conduct warrants the Court's imposition of punitive damages against the Traffickers.

237.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Traffickers' wrongful conduct.

VP/#60678439.4

<u>COUNT III</u>
(Conspiracy to Commit Forced Labor and Trafficking With Respect to Forced Labor)
(18 U.S.C. § 1594)
(Alternative Claim Against Defendants Patricio and MBR Farms)

238.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

239.    Plaintiffs bring this claim against Defendants Patricio and MBR Farms in the alternative to the claims against Defendants Patricio and MBR Farms set forth in Counts I and II, *supra*.

240.    Defendants E. Duque and J. Duque committed the violations of 18 U.S.C. §§ 1589 and 1590 as set forth in Counts I and II, *supra*.

241.    Defendants Patricio and MBR Farms intentionally agreed that Defendants E. Duque and J. Duque would commit the violations of 18 U.S.C. §§ 1589 and 1590 set forth in Counts I and II, *supra*.

242.    Defendants Patricio and MBR Farms intentionally committed overt acts in furtherance of Defendants E. Duque and J. Duque's commissions of violations of 18 U.S.C. §§ 1589 and 1590 set forth in Counts I and II, *supra*.  These overt acts included, but were not limited to:

(a)    Assisting with the recruitment of the Plaintiffs and other class members;

(b)    Agreeing to be named as an agent (Patricio) or grower (MBR Farms) in fraudulent submissions to the government intended to obtain Plaintiffs' and other class members' labor;

VP/#60678439.4

    (c)     Signing a contract with Defendant E. Duque containing terms MBR Farms knew were false, including the number of workers needed, the duration of employment, and the wages that would be paid (MBR Farms);

    (d)     Housing the Plaintiffs and other class members in substandard conditions causing psychological deterioration (Patricio);

    (e)     Organizing a transnational criminal organization for the purpose of subjecting Plaintiffs and other class members to forced labor and trafficking with respect to forced labor (Patricio); and

    (f)     Paying the Plaintiffs and other class members sub-minimum wages (MBR Farms).

243.    As a result of Defendants Patricio's and MBR Farms' conduct, the Plaintiffs and other class members have suffered economic damages, for which they should be compensated in an amount to be determined by a jury or the Court.

244.    As a result of Defendants Patricio's and MBR Farms' conduct, the Plaintiffs and other class members have suffered significant emotional and physical pain and suffering, for which they should be compensated in an amount to be determined by a jury or the Court.

245.    Defendants Patricio's and MBR Farms' conduct warrants the Court's imposition of punitive damages against the Traffickers.

246.    Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Traffickers' wrongful conduct.

COUNT IV

(Unlawful Conduct with Respect to Documents in
Furtherance of Forced Labor and Trafficking Statute Against the Traffickers)
(18 U.S.C. § 1592)

247.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

45

248.     The Contractorss knowingly concealed, removed, confiscated, and possessed the Plaintiffs' and other class members' passports and other immigration documents, and other actual or purported government identification documents, in the course of violating 18 U.S.C. §§ 1589 and 1590.

249.     The Contractorss knowingly concealed, removed, confiscated, and possessed the Plaintiffs' and other class members' passports and other immigration documents, and other actual or purported government identification documents, to prevent or restrict or attempt to prevent or restrict, without lawful authority, Plaintiffs' and other class members' liberty to move or travel, in order to maintain their labor or services.

250.     The Contractors' conduct warrants the Court's imposition of punitive damages against the Traffickers.

251.     Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Contractors'' wrongful conduct.

<u>COUNT V</u>
(Benefitting Financially from Violations of Chapter 77 Against all Defendants)
(18 U.S.C. § 1595(a))

252.     The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

253.     Pursuant to 18 U.S.C. § 1595(a), the Traffickers knowingly benefitted, or attempted or conspired to benefit, financially and/or by receiving things of value, from participation in a venture they knew or should have known has engaged in violations of 18 U.S.C. §§ 1589, 1590, and 1592.

254.     The Defendants' conduct warrants the Court's imposition punitive damages against the Defendants.

VP/#60678439.4

255.    Pursuant to 18 U.S.C. § 1595, the Plaintiffs and other class members are entitled to recover damages and reasonable attorneys' fees for the Defendants' wrongful conduct.

<u>COUNT VI</u>
(Violations of the Federal Fair Labor Standards Act Against All Defendants)
(29 U.S.C. § 201 *et seq.*)

256.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

257.    The FLSA, 29 U.S.C. § 201 *et seq.*, provides that an employer pay employees the minimum wage and overtime premiums.

258.    At all relevant times each Defendant was a single employer or joint employer of the Plaintiffs and other H-2A workers within the meaning of the 29 U.S.C. § 203(d).

259.    The Traffickers never paid the Plaintiffs and other H-2A workers the minimum wage for the services that they provided to them.

260.    The Traffickers have violated 29 U.S.C. § 206 by failing to pay the Plaintiffs and other H-2A workers the applicable minimum wage for every compensable hour of labor they performed.

261.    The Traffickers have violated 29 U.S.C. § 207 by failing to pay the Plaintiffs and other H-2A workers the applicable overtime wages for every compensable hour of labor they performed.

262.    The violations alleged in this Count resulted, in part, from Defendants' willful failure to pay the Plaintiffs and other H-2A workers the proper wages for their work.

263.    The violations alleged in this Count resulted, in part, from the Traffickers' willful failure to reimburse expenses, which the Plaintiffs and other H-2A workers incurred primarily for the benefit of the Traffickers.

VP/#60678439.4

264.     The Traffickers have violated 29 U.S.C. § 211(c) by failing to make, keep, and preserve specific employment-related records, including records of their employees and of the wages, hours, and other conditions and practices of employment maintained by the Traffickers.

265.     The Traffickers have not accurately recorded the actual number of hours that each employee worked.

266.     The Traffickers have failed to keep adequate employment records and have not properly or adequately recorded the Plaintiffs' and other H-2A workers' hours worked during their employment.

267.     Pursuant to 29 U.S.C. § 216(b), the Plaintiffs and other H-2A workers are entitled to recover all unpaid wages, an additional equal amount as liquidated damages, and reasonable attorneys' fees and costs in amounts to be determined by a jury or the Court.

COUNT VII
(Violation of Federal Racketeer Influenced and Corrupt Organizations Act
Against All Defendants)
(18 U.S.C. § 1962)

268.     The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

269.     This Count sets forth claims by the Plaintiffs and other class members against all Traffickers for damages resulting from Traffickers' violations of RICO, 18 U.S.C. §§ 1961-68.

270.     Each Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

271.     Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

272.     RICO Enterprises I–IV (collectively, the "RICO Enterprises"), as defined in paragraphs 35-42, *supra*, are association-in-fact enterprises with the common purpose to recruit,

48

contract, transport, and employ foreign workers to work as farm laborers at the Traffickers'
business operations in Georgia.

273.    The RICO Enterprises are engaged in interstate commerce.

274.    The RICO Enterprises function as continuing units.

275.    The Traffickers, through the RICO Enterprises, rely on the racketeering acts
described in this Complaint to conduct their regular business activities.

276.    The Traffickers' racketeering acts have or had similar purposes: to profit from the
fraud Traffickers committed in the contracting, hiring, and employment of Plaintiffs and other
class members.

277.    Each of the Traffickers' acts yielded similar results and caused similar injuries to
Plaintiffs and other class members, including underpayment of wages.

278.    As set forth in the preceding paragraphs, the racketeering acts have or had similar
participants: the Traffickers and their agents.   As set forth in the preceding paragraphs, the
Traffickers, through the RICO Enterprises, directed their racketeering activities at similar
individuals and entities: the Plaintiffs and other class members, and federal and state government
agencies.

279.    The Traffickers' acts have or had similar methods of commission, such as common
recruitment tactics, consistent practices with respect to collecting payments from Plaintiffs and
other class members, and use of similar employment practices and policies with respect to the
Plaintiffs and other class members.

280.    The Traffickers conducted or participated in—or conspired to conduct or
participate in—the affairs of the RICO Enterprises, through a pattern of numerous acts of

racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

281.    Specifically, the Traffickers conducted or participated in—or conspired to conduct and/or participate in—the affairs of the RICO Enterprises by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

Predicate Acts

*Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343*

282.    As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, made and/or conspired to make material misrepresentations to the GADOL and USDOL regarding the nature of the Plaintiffs' and other class members' work, the hours they would work, and the wages they would receive.

283.    As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprise, used and/or conspired to use the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to further these fraudulent schemes.

284.    These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

*Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351*

285.    As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, knowingly and with intent to defraud did and/or conspired to recruit, solicit, and hire the Plaintiffs and other class members outside the United States, for the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or

50

promises regarding the nature of Plaintiffs' and other class members' work, the hours they would work, and the wages they would receive.

286.    These willful, knowing, and intentional acts constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

*Violation of 18 U.S.C. § 1589*

287.    As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, made and/or conspired to provide or obtain the labor or services of the Plaintiffs and other class members by means of actual and threatened force and physical restraint, by means of serious harm and/or threats of serious harm, or by means of a scheme, plan, or pattern intended to cause the Plaintiffs and other class members to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint.

288.    These willful, knowing, and intentional acts constitute violations of 18 U.S.C. § 1589.

289.    The Traffickers engaged in the racketeering activity described in this claim repeatedly in 2020 and 2021.

*Violation of 18 U.S.C. § 1590*

290.    As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, made and/or conspired to recruit, harbor, transport, provide, and/or obtain by any means, the Plaintiffs and other class members for their labor or services in violation of Chapter 77 of Title 18 of the U.S. Code.

291.    These willful, knowing, and intentional acts constitute violations of 18 U.S.C. § 1590.

VP/#60678439.4

292.    The Traffickers engaged in the racketeering activity described in this claim repeatedly in 2020 and 2021.

*Violation of 18 U.S.C. § 1592*

293.    As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, made and/or conspired to conceal, remove, confiscate, and possess the Plaintiffs' and other class members' passports and other immigration documents, and other actual or purported government identification documents, in the course of violating 18 U.S.C. §§ 1589 and 1590.

294.    As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, made and/or conspired to conceal, remove, confiscate, and possess the Plaintiffs' and other class members' passports and other immigration documents, and other actual or purported government identification documents, with the intent of violating 18 U.S.C. §§ 1589 and 1590.

295.    These willful, knowing, and intentional acts constitute violations of 18 U.S.C. § 1592.

<u>Pattern of Related Racketeering Acts</u>

296.    The Traffickers engaged in the racketeering activity described in this claim repeatedly in 2020, 2021, 2022, and likely preceding years.

<u>RICO Conspiracy</u>

297.    In the alternative, in violation of 18 U.S.C. § 1962(d), Defendants Patricio and MBR Farms conspired with Defendants E. Duque and J. Duque by pursuing the same criminal objectives and with intent to further the endeavors which, when completed, violated 18 U.S.C. § 1962(c).

VP/#60678439.4

<u>Injury and Remedies</u>

298.    As a direct and proximate result of the Traffickers' willful, knowing, and intentional acts discussed in this section, Plaintiffs and other class members have suffered injuries to their property, including but not limited to the difference between the wages they earned and what they would have earned if Traffickers had not fraudulently misclassified them as agricultural workers and other pecuniary losses and/or losses to real or personal property.

299.    Plaintiffs and other class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

(a)    Compensation for their injuries to their property;

(b)    Trebling of the damages set forth in subparagraph (a), *supra*; and

(c)    Attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

<u>COUNT VIII</u>
(Violation of Georgia Racketeer Influenced and Corrupt Organizations Act
Against All Defendants)
(Ga. Code. Ann. § 16-14-1, *et seq.*)

300.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

301.    Each Plaintiff is an aggrieved person with standing to sue within the meaning of the Georgia RICO, O.C.G.A. § 16-14-6(b).

302.    Each Plaintiff is a person who was injured by reason of violations of O.C.G.A. § 16-14-4, and therefore the Plaintiffs have standing to sue pursuant to Georgia RICO, O.C.G.A. § 16-14-6(c).

VP/#60678439.4

303. The RICO Enterprises, as defined in paragraphs 35-42, *supra*, are association-in-fact enterprises with the common purpose to recruit, contract, transport, and employ foreign workers to work as farm laborers at the Traffickers' business operations in Georgia.

304. The Traffickers, through a pattern of racketeering activity or proceeds derived from the pattern or racketeering activity, acquired or maintained interest or control (a) of the RICO Enterprises, and/or (b) of real property or personal property, including money.

305. The Traffickers, through the RICO Enterprises, have been engaged in the pattern and practice of, and are financial beneficiaries of, (a) human trafficking and forced labor as described in this Complaint in violation of 18 U.S.C. §§ 1589, 1590, and 1592; mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343; fraud in foreign labor contracting in violation of 18 U.S.C. § 1351;  making false statements and writings in violation of O.C.G.A. § 16-10.20; and perjury and related offenses in violation of O.C.G.A. § 16-10-71.

306. The predicate acts of criminal racketeering activity as described in this Complaint constitute a "pattern of racketeering activity" as defined O.C.G.A. §§ 16-14-4(b) and (c).  The Traffickers repeatedly committed the RICO predicate act of human trafficking, forced labor, financially benefitting from the labor trafficking, mail and wire fraud, fraud in foreign labor contracting, and making false statements and writings.

*Predicate Acts*

Conduct Defined as "Racketeering" in the Federal RICO Act

307. As set forth in Count VII, *supra*, the Traffickers, through the RICO Enterprises, committed mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; fraud in foreign labor contracting, in violation of 18 U.S.C. § 1351; and violations of the TVPRA 18 U.S.C. §§ 1589, 1590, and 1592.

VP/#60678439.4

234.     Paragraphs 282-295, *supra*, are incorporated herein by reference.

### False Statements and Writings: O.C.G.A. § 16-10-20

308.     As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, knowingly and willfully falsified material facts and made false, fictitious, or fraudulent statements or representations to GADOL, the Plaintiffs, and other class members, including misrepresentations about Plaintiffs' and other class members' wages, housing, work, working conditions, and fees.

309.     These knowing and willful acts constituted false statements in violation of O.C.G.A. § 16-10-20.

### Perjury and Related Offenses (False Swearing): O.C.G.A. § 16-10-71

310.     As set forth in the preceding paragraphs, the Traffickers, though the RICO Enterprises, did or conspired to execute the Form ETA-9142A, Appendix A of the 2020 and 2021 Applications for Certification, and Form ETA-790A for the 2020 and 2021 Job Orders, which contained a lawful oath or affirmation, in which Defendant E. Duque knowingly and willfully made false statements regarding pre-employment fees and costs, the wages Plaintiffs and other class members would receive, and the work Plaintiffs and other class members would perform.

311.     These knowing and willful acts constituted false swearing, in violation of O.C.G.A. § 16-10-20.

### Pattern of Related Racketeering Acts

312.     The Traffickers engaged in multiple predicate acts, as described in this Complaint, repeatedly in 2020, 2021, and likely preceding years.

313.     The Traffickers, through the RICO Enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

314. The Traffickers' racketeering acts have or had similar purposes: to profit from the fraudulent recruitment of Plaintiffs and other class members for employment on farms, packing pine straw, packing watermelons, picking blueberries.

315. Each of the Traffickers' acts yielded similar results and caused similar injuries to Plaintiffs and other class members having to incur pre-employment fees and costs, taking out loans to pay for those fees and costs, and receiving wages that were substantially lower than the wages fraudulently promised.

316. As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Traffickers and their agents.

317. As set forth in the preceding paragraphs, the Traffickers, through the RICO Enterprises, directed their racketeering activities at similar individuals and entities: the Plaintiffs and other class members, and federal and state government agencies.

318. The Traffickers' acts have or had similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from the Plaintiffs and other class members, and use of similar employment practices and policies with respect to the Plaintiffs and other class members.

<u>Injury and Remedies</u>

319. As a direct and proximate result of the Traffickers' willful, knowing, and intentional acts discussed in this section, Plaintiffs and other class members have suffered injuries to their property, including but not limited to the difference between the fraudulently promised wage rates and the wages received by Plaintiffs and other class members, the pre-employment fees and costs Plaintiffs and other class members paid, the interest on the loans Plaintiffs and other

class members had to take out to pay for those fees and costs, and other pecuniary losses and/or losses to real or personal property.

320.    The Traffickers' conduct described herein showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

321.    The Plaintiffs and other class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

(a)    Compensation for Plaintiffs' and other class members' injuries to their property;

(b)    Punitive damages;

(c)    Trebling of the damages set forth in subparagraph (a) and (b), *supra*; and

(d)    Attorneys' and experts' fees and costs associated with this action, as authorized by O.C.G.A 16-14-6(c).

322.    Further, Plaintiffs seek an order:

(a)    Requiring the Traffickers to divest themselves of any interest in the RICO Enterprises and real or personal property they acquired through the pattern of racketeering activity, as set forth in O.C.G.A. § 16-14-6(a)(1) and which is permitted as a civil remedy by O.C.G.A. § 16-14-6(b).

(b)    Prohibiting the Traffickers from engaging in the same type of endeavor as they did through the RICO Enterprises, including operating a farm labor contracting business and/or employing farmworkers, as set forth in O.C.G.A. § 16-14-6(a)(2) and which is permitted as a civil remedy by O.C.G.A. § 16-14-6(b).

<u>COUNT IX</u>
(Unjust Enrichment)
(Against the Traffickers)

323.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

324.    The Plaintiffs and other class members conferred a benefit on the Traffickers by performing labor and services for the Traffickers as described in this Complaint.

325.    The Traffickers were aware of the benefit conferred upon them by the Plaintiffs and other class members.

326.    The Traffickers retained that benefit without compensating the Plaintiffs and other class members for the benefit they conferred on the Traffickers.

327.    The Traffickers' retention of the benefits the Plaintiffs and other class members conferred on them without compensating the Plaintiffs and other class members is inequitable and unjust.

328.    The value of the benefit conferred on the Traffickers is to be proven at trial.

329.    The Plaintiffs and other class members are entitled to recover an amount to be proven at trial from the Traffickers as a remedy for their unjust enrichment.

330.    The Traffickers' conduct described herein showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.  Accordingly, the Plaintiffs and other class members are entitled to punitive damages.

58

COUNT X
(Intentional Infliction of Emotional Distress)
(Against the Traffickers)

331.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

332.    The Traffickers acted intentionally and/or recklessly in subjecting the Plaintiffs and other class members to a culture that trafficked them and forced them to work without compensation.

333.    The Traffickers' conduct in human trafficking and forced labor is extreme and outrageous.

334.    The Traffickers' conduct caused the Plaintiffs and other class members severe emotional distress.

335.    As a result of the Traffickers' conduct, the Plaintiffs and other class members have suffered significant emotional and pain and suffering, for which they should be compensated in an amount to be proven at trial.

336.    The Traffickers' conduct described herein showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.  Accordingly, the Plaintiffs and other class members are entitled to punitive damages.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order to:

(a)    Grant judgment against Defendants Maria Leticia Patricio, Enrique Duque Tovar, Jose Carmen Duque Tovar in favor of the Plaintiffs and other class members, for violations of the TVPA as proved, for their actual damages and punitive damages;

(b)      Grant judgment against Defendants Maria Leticia Patricio, Enrique Duque Tovar, Jose Carmen Duque Tovar , and MBR Farms, Inc. jointly and severally, in favor of the Plaintiffs on their FLSA claims, and award each of them the amount of their unpaid minimum wages and an equal amount as liquidated damages, pursuant to 29 U.S.C. § 216(b);

(c)      Grant judgment against all Traffickers, jointly and severally, on Plaintiffs' and other class members' claims under the Federal Racketeer Influenced and Corrupt Organizations Act and awarding Plaintiffs and other class members treble damages;

(d)      Grant judgment against all Traffickers, jointly and severally, on Plaintiffs' and other class members' claims under the Georgia Racketeer Influenced and Corrupt Organizations Act, and awarding Plaintiffs and other class members treble damages and punitive damages;

(e)      Enjoin violations of the Georgia Racketeer Influenced and Corrupt Organizations Act by issuing appropriate orders and judgments, as set forth in O.C.G.A. § 16-14-6(a);

(f)      Grant judgment against the Traffickers, jointly and severally, in favor of all Plaintiffs and other class members on their unjust enrichment claims, and award each Plaintiff their actual damages and punitive damages;

(g)      Grant judgment against the Traffickers, jointly and severally, on Plaintiffs' and other class members' claims for intentional infliction of emotional distress, and awarding Plaintiffs and other class members their actual damages and punitive damages;

(h)     Certify this case as a class action in accordance with Rule 23(b)(3) of the Federal
Rules of Civil Procedure with respect to all claims, except claims under the Fair
Labor Standards Act;

(i)      Certify this case as a collective action in accordance with 29 U.S.C. § 216(b) with
respect to claims under the Fair Labor Standards Act;

(j)      Award Plaintiffs and other class members pre- and post-judgment interest as
allowed by law;

(k)     Award Plaintiffs and other class members attorneys' fees and the costs of this
action; and

(l)      Award Plaintiffs and other class members such further relief, at law or in equity, as
this Court deems just and proper.

<u>JURY TRIAL DEMAND</u>

The Plaintiffs hereby demand a jury trial on all issues so triable.


Dated: August 19, 2024                          Respectfully Submitted,

CRISTHIAN ZUNIGA HERNANDEZ,
LUIS ALFONSO PALMILLAS LOPEZ, and
RAMON RODRIGUEZ MENDEZ,

BY: /s/ Daniel Werner
Daniel Werner (Ga.  Bar No.  422070)
RADFORD SCOTT, LLP
125 Clairemont Ave.,
Suite 380
Decatur, Georgia 30030
Tel: (678) 271-0304
E-mail: dwerner@radfordscott.com

VP/#60678439.4

Charlie Y.  Wang (California Bar No.  320236)
(*Pro Hac Vice*)
VEDDER PRICE (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
Tel: (424) 204-7700
E-mail: cwang@vedderprice.com

**NOTICE COUNSEL:**

Dana Mehlman (Illinois Bar No.  6302515)
(*Pro Hac Vice*)VEDDER PRICE P.C.
222 North LaSalle Street,
Chicago, Illinois 60601
Tel: (312) 609-7509
Tel: (312) 609-7626
E-mail: dmehlman@vedderprice.com
E-mail: aczerniak@vedderprice.com

VP/#60678439.4